IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FREEDOM FROM RELIGION | ) | |
| FOUNDATION, INC., | ) | Case No. 11-cv-0626 |
| ANNIE LAURIE GAYLOR, and | ) | |
| DAN BARKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' STATEMENT OF PROPOSED FINDINGS OF FACT**

The United States submits the following proposed findings of fact in support of its

motion for summary judgment:

**I.     PLAINTIFFS**

1.     Plaintiff Freedom From Religion Foundation ("FFRF") is a non-profit, atheist

membership organization that advocates for the separation of church and state and educates on

matters of non-theism. (Doc. 13, Am. Compl., ¶ 7; Annie Laurie Gaylor Dep. 26:12-21, Apr. 23,

2013 (Doc. 37); FFRF 30(b)(6) Dep.143:9-17, 180:10-19, Apr. 24, 2013 (Doc. 39).)

2.     FFRF is a plaintiff in a representational capacity only. It is not suing for any independent

claim of its own. (FFRF 30(b)(6) Dep. 114:10, 115:2-6, 155:9-12, 155:22-156:2, 156:11-20,

204:9-14.)

3.     Plaintiff Dan Barker is a Lifetime Member of, and Co-President of FFRF. (Doc. 13 ¶ 12.)

4.     Plaintiff Annie Laurie Gaylor is a Lifetime Member of, and Co-President of FFRF. (*Id.* ¶

11.)

5.      Both Mr. Barker and Ms. Gaylor are atheists. (*Id.* ¶¶ 11-12; Dan Barker Dep. 24:6-14,

Apr. 23, 2013 (Doc. 38); Gaylor Dep. 26:12-27:12.)

**A.      Dan Barker**

6.      In his capacity as Co-President of FFRF, Mr. Barker:

a.      Counsels members of FFRF, whom he views:

> somewhat as members or congregants in a sense that many of them
> had questions or problems with how do I deal with religious
> relatives, how do I announce the news that I am no longer a
> believer, morality with God -- basically doing much of what I used
> to do as a minister, but now for a totally different message, for a
> nonminister of the gospel type of message.

(Barker Dep. 48:4-16.). The topics of Mr. Barker's counsel include:

> how to deal with religious relatives; how to start an FFRF chapter;
> how to handle/respond to a violation of church/state separation;
> how to respond to argumentative believers; what to do when asked
> to say grace at Thanksgiving; how to deal with religious holidays;
> what to say to children who have to say the Pledge of Allegiance;
> how to teach children about morality without religion; etc.

(Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6);

b.      Counsels:

> former and active clergy who have given up their faith, as part of
> FFRF's "Clergy Project." These ministers, priests, rabbis and other
> religious persons, need someone to talk to, and they seek advice on
> finding an exit strategy from the ministry. More than 420 clergy
> are now in the Clergy Project, many of whom have directly
> contacted Mr. Barker for help.

(Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6; *see also* Ex. 43, "Faith-free

Clergy Struggle to Escape Pulpit");

1.      Mr. Barker engages in this type of counseling "about every day" (Barker

Dep. 55:22-56:9.)

2.      He sees the counseling he undertakes through the Clergy Project as part of an FFRF project. (*Id.* 59:7-18.)

c.      "[T]ravels and participates extensively in debates with religious advocates, where [he] argues for the message of reason and skepticism over superstition and faith." (Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6);

d.      "[R]egularly speaks on college campuses promoting atheism as opposed to belief in God and religion" and often "also meets with atheist and agnostic students to counsel them about their campus efforts to promote reason over Godliness" (Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6);

e.      "[W]rites freethought songs that question religion and promote secular humanism" and "regularly performs concerts around the country, and the world, while advocating the virtues of irreverence" (Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6; *see also* Ex. 41, "Solstice Tribute;" Ex. 46, ad for a two-CD set entitled "Friendly Neighborhood Atheist;" Ex. 47, ad for a CD entitled "Beware of Dogma;" Ex. 48, ad for a CD entitled "Adrift on a Star: Irreverent Songs by Dan Barker");

f.      Writes books about atheism, like *Losing Faith in Faith: From Preacher to Atheist* (*see* Ex. 42), and *Just Pretend: A Freethought Book for Children* (*see* Ex. 45); and

g.      Oversees the day-to-day activities of FFRF's staff in furtherance of FFRF's purpose (Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6).

7.    Mr. Barker testified that he "can't use the word preacher, but if I use it, I'll put it in quotes," then likened his public relations and public speaking on behalf of FFRF to being a "'preacher' for atheism and agnosticism." (Barker Dep. 47:11-48:3; *see also id.* 63:18-65:1 ("while what I do at FFRF is not ministry – it's what you might call an anti-ministry I suppose".)

8.     Immediately prior to his deposition, Mr. Barker had been on a "speaking tour of California promoting State-Church separation and atheism, rationalism." (*Id.* 49:22-50:5.)

9.     Mr. Barker knows about ministry in the religious sense because he was formally ordained to the religious ministry by the Standard Christian Center in 1975 and he received a certificate from the Center that he was so ordained. (*Id.* 26:15-27:13; Ex. 49, Mr. Barker's certificate of ordination.)

10.     Mr. Barker worked as an ordained minister from 1975 through 1983. (Barker Dep. 26:15-27:13, 44:4-15.)

11.     Among his tasks as an ordained minister, Mr. Barker preached on religious topics in a variety of places, from traditional congregations to street corners to prisons; performed religious rituals; provided religious education in forums like Bible study and Sunday school; engaged in music ministry, including religious and evangelical performances at other churches, publishing his own works of Christian music, and creating Christian musical recordings with others in musical ministry; did hospital visitations; and counseled individual church members, including youth, regarding their spiritual concerns. (*Id.* 27:18-13, 28:21-29:21, 30:6-31:1, 32:3-11, 33:18-35:20, 37:9-39:4.)

12.     Now that he is an atheist, Mr. Barker is "in demand" for "de-baptisms" that he performs for people that comes with a "de-baptism certificate" provided by FFRF. (Gaylor Dep. 87:11-88:2; Ex. 44.)

13.     In Mr. Barker's own words:

> I'm not a minister of the gospel anymore, but in my own personal life the things that I am doing today are similar to what I was doing before as a minister. I don't call it preaching. It's lecturing or debating. I don't call it spiritual counseling. It is psychological counseling. I don't call it traveling evangelism anymore, but I call it traveling promotion for freethought. Writing music, I don't write

religious music anymore.  I write irreverent music, which is
similar, like the flip side of a coin.

(Barker Dep. 124:19-11.)

**B.    Annie Laurie Gaylor**

14.    In her capacity as Co-President of FFRF, and among other tasks, Ms. Gaylor:

a.   Speaks and writes extensively, including on FFRF's website, on the topics of FFRF's
purpose to promote separation of church and state and to educate the public on
matters relating to non-theism (Ex. 3 Interrog. No. 4; Ex. 5 Interrog. No. 6; *see also*
Ex. 50, "In Defense of 'Godlessness'");

b.   Engages in speaking opportunities around the country related to the separation of
church and state and matters of nontheism (Ex. 5 Interrog. No. 6);

c.   Oversees the day-to-day activities of FFRF's staff in furtherance of FFRF's purpose
(*Id.*; Ex. 3 Interrog. No. 4);

d.   Has published materials providing a "sample secular service" for funerals without
religion (Ex. 51, "Secular Memorials and Funerals Without God;" *see also* Ex. 52,
"Let's Dispense with Christian Funerals"); and

e.   Advises FFRF members on things like "how to deal with religious relatives; . . . how
to respond to argumentative believers; what to do when asked to say grace at
Thanksgiving; how to deal with religious holidays; what to say to children who have
to say the Pledge of Allegiance; [and] how to teach children about morality without
religion" (Ex. 5 Interrog. No. 6).

15.    One year when Ms. Gaylor's mother, Anne Nicol Gaylor, was president of FFRF, she
was voted "Madison's favorite religious leader." (Gaylor Dep. 86:21-87:10.)

### C.     FFRF

16.     At FFRF's recent convention in Portland, it (led by Mr. Barker and Ms. Gaylor) held a "Nonprayer Breakfast, . . . and a Moment of Bedlam, we call it, instead of a prayer or a moment of silence." (FFRF 30(b)(6) Dep. 131:11-19.)

17.     FFRF does not own any real property other than its offices in Madison, Wisconsin and a building in Alabama. (*Id.* 185:13-186:5.)

18.     Neither parcel of real property is used to provide housing to anyone. (*Id.* 185:13-186:5.)

## II.     THE HOUSING ALLOWANCES DESIGNATED FOR MR. BARKER AND MS. GAYLOR

19.     Mr. Barker and Ms. Gaylor are married to each other. (Barker Dep. 48:21-49:9.)

20.     They own the home in which they reside. (*Id.* 17:10-18:8; Gaylor Dep. 37:17-38:1.)

21.     On August 17, 2011, the Executive Council of FFRF first designated a housing allowance for Mr. Barker and Ms. Gaylor. (Ex. 3 Interrog. No. 3(b) & (c); Ex. 5 Interrog. No. 3 (c) & (f).)

22.     The housing allowance was designated for the remainder of 2011 and was in the amount of $5,500 for Ms. Gaylor and Mr. Barker each. (Ex. 3 Interrog. No. 3(b); Ex. 5, Interrog. No. 3 (f) & (g).)

23.     Designating a housing allowance for Mr. Barker and Ms. Gaylor was intended to create standing for them to bring the current lawsuit challenging the constitutionality of § 107. (Barker Dep. 63:19-65:17; *see* Gaylor Dep. 35:3-36:1.)

24.     Mr. Barker testified that he did not even want to exempt his income under § 107; he just wants to prevent others from exempting their income using its terms. (Barker Dep. 63:19-65:17.)

25.     In Mr. Barker and Ms. Gaylor's responses to the United States' Interrogatories, however, they averred that they "would exclude their housing allowances from reported income . . . if § 107 . . . so allowed." (Ex. 3 Interrog. No. 5.)

6

26.     For tax year 2011, Mr. Barker and Ms. Gaylor included the amount designated for their respective housing allowances in their gross income for federal income tax filing purposes. (Barker Dep. 68:10-15; Gaylor Dep. 48:17-19; Ex. 3 Interrog. No. 5.)

27.     For tax year 2011, neither Mr. Barker nor Ms. Gaylor filed a claim for refund with the IRS in the amount of the income tax that they paid on the amount designated as their housing allowances. (Barker Dep. 68:16-22; Gaylor Dep. 49:3-7; Ex. 3 Interrog. No. 5.)

28.     Also on August 17, 2011, the Executive Council of FFRF designated a housing allowance for Mr. Barker and Ms. Gaylor for 2012. (Ex. 3 Interrog. No. 3(b).) The designation for each was $13,200. (*Id.*)

29.     For tax year 2012, Mr. Barker and Ms. Gaylor included the amount designated for their respective housing allowances in their gross income for federal income tax filing purposes. (*Id.* Interrog. No. 5; Barker Dep. 68:10-15; Gaylor Dep. 48:17-19.)

30.     For tax year 2012, neither Mr. Barker nor Ms. Gaylor filed a claim for refund with the IRS in the amount of the income tax that they paid on the amount designated as their housing allowances. (Barker Dep. 68:16-22; Gaylor Dep. 49:3-7; Ex. 3 Interrog. No. 5.)

31.     On October 12, 2012, the Executive Council of FFRF designated a housing allowance for Mr. Barker and Ms. Gaylor for 2013. (Ex. 3 Interrog. No. 3(b).) The designation for each Individual Plaintiff was $15,000. (*Id.*)

32.     For 2011, 2012, and 2013, Mr. Barker and Ms. Gaylor received from FFRF their housing allowances as part of their salaries. (Ex. 5 Interrog. No. 4(c); Barker Dep. 68:3-9; Gaylor Dep. 72:5-19.)

33.     According to Mr. Barker, the designations of the housing allowances were "on paper only." (Barker Dep. 68:3-9.) Mr. Barker and Ms. Gaylor would have received the amounts

anyway as part of their base salaries. (*Id.* 101:2-102:2 (referring to Ex. 3 Interrog. No. 3(i));

Gaylor Dep. 72:5- 73:12 (same); FFRF 30(b)(6) Dep., 168:12-17.)

34.     Neither Mr. Barker nor Ms. Gaylor contend that FFRF owns a dwelling that they seek to

use as their lodging, the fair rental value of which they would seek to exempt from their gross

income for federal income tax purposes.

35.     Neither Mr. Barker nor Ms. Gaylor has had communication with the IRS regarding their

housing allowances. (Ex. 3 Interrog. No. 6; *see also id.* Interrog. No. 5.)

36.     Mr. Barker and Ms. Gaylor's tax returns for the years 2011 through 2013 have not been

audited by the IRS. (FFRF 30(b)(6) Dep. 74:4-6.)

37.     FFRF has had no communication with the IRS regarding Mr. Barker's or Ms. Gaylor's

housing allowances. (*Id.* 172:8-15; Ex. 5 Interrog. No. 7.)

**III.     THE HISTORICAL CONTEXT FOR § 107**

       **A.     Parsonages Before the Income Tax in the United States**

38.     "The patterns of housing members of the clergy in America have deep histories in the

churches of Western Europe. The most important and common feature of religious

organizations' approach to housing members of the clergy is the basic assumption that the clergy

would live in housing on the premises of the church grounds or nearby on ecclesiastically-owned

property." (Decl. of James Hudnut-Buemler[1] ¶ 19.)

39.     "The historical record shows that underlying this assumption were four religiously

motivated reasons for congregations to provide housing for their spiritual leaders." (*Id.* ¶ 20.)

---

[1] All footnotes cited in the Declaration have been omitted from the quotes that follow.

40.     "Doing so enabled them to more freely exercise their religious beliefs than if they did not

provide housing. Those reasons are:

a.   First, the ecclesiastical employer required priests and ministers to live nearby to the

location of their work at all hours of the day and night, particularly at the

unpredictable moments when parishioners may be in extremis and in need of

immediate pastoral care.

b.   Second, by controlling the living arrangements of clergy, the church can reinforce the

faith's expectations for simple living, or holiness among the clergy; that is, members

of the clergy should thereby live no better and no worse than their church authorities

have arranged for them to live.

c.   Third, by having the church own the living premises instead of the minister owning

his housing, the clergy were freed from temporal burdens (like home repair, yard

work, and the like) to engage in spiritual work.

d.   Fourth, by owning housing for their clergy, congregations, dioceses and other church

entities were freed from the difficulties associated with resettling clergy when the

time came for personnel redeployment."

(*Id.* ¶ 21.)

41.     The overwhelming majority of American colonists were from Christian denominations.

(*Id.* ¶ 24.)

42.     Those colonists brought with them the standard ecclesiastic housing practice at that time,

for the four reasons mentioned above: "a clergyman assigned to a parish had a yearly income

fixed and additionally lived in a parish-owned rectory for the course of his ministry in that

particular place." (*Id.* ¶ 23; *see also id.* ¶ 24-26.)

43.     A parsonage was "used for more than simply housing the minister." (*Id.* ¶ 27.)

44.     Often, church business was conducted in the parsonage. (*Id.* ¶¶ 27-29, 80.)

45.     "The parsonage system was in very wide use in the nineteenth and early twentieth

centuries." (*Id.* ¶ 30.)

46.     "For the Roman Catholic Church and Methodist Episcopal churches (north and south) the

practice of providing rectories and parsonages, respectively, was virtually universal and

hardwired into their deployment models for clergy. Both religions established parsonages at or

very near their houses of worship." (*Id.* ¶¶ 31, 38.)

47.     "In both religions, the bishop of a diocese or conference could, and did, send ministers to

different parishes according to the religious needs of the Church as a whole.  Providing housing

on-site to the ministers enabled them to move freely according to their denomination's religious

needs without having to extricate themselves from a private tenancy or a home that they owned

only to have to find new accommodations where they were called." (*Id.* ¶ 32; *see id.* ¶¶ 33-35,

38.)

48.     "The logic and religious importance of housing ministers at or near their congregations

was even clear to churches like the African Methodist Episcopal Church (AME), which for

various reasons struggled to house its pastors and maintain vital ministries." (*Id.* ¶ 36.)

49.     "An article in the African-American Christian Recorder in 1867 celebrated the

achievement of an AME church in Zanesville, Ohio, that led the way in showing that AME

congregations could provide for their ministries on the same basis as their white counterpart

denomination. Without parsonages it was harder to expect itinerating ministers in the AME, the

author believed, to attend to the needs of the congregations with their whole beings." (*Id.* ¶ 37.)

50.     "[T]wo of the largest American churches overseen by bishops entered the 20th century

determined to use clergy housing principally as a tool for pastorally effective, spiritually focused,

and ecclesially accountable ministry. And, using the Zanesville AME church example, other less established and less populous churches struggled to do the same." (*Id.* ¶ 39.)

51.     The 1906 Census and the 1916 Census "support[] the idea that, in the absence of any rulings about the tax status of parsonages with respect to income to clergy, they were in wide usage by the largest, most well-organized faith groups of the day." (*Id.* ¶ 44; *see id.* ¶¶ 40-43, 48-58.)

52.     The "successful congregations led by professionally ordained and set apart full-time clergy continued to be housed at the congregation's pleasure and expense." (*Id.* ¶ 59.)

53.     "However, the authors of the report on parsonages noted that 69 out of the 202 reporting denominations listed no parsonages." (*Id.* ¶ 46.)

54.     "The denominations for which there were no parsonages reported were generally very small, either having no regular ministry, or being faiths whose ministers were part-time and expected to engage in other principal full-time work." (*Id.* ¶ 47; *see also id.* ¶ 48.)

55.     A 1919 analysis of the information provided for the entire United States from the Income Tax Returns for 1916 "noted that less than 1% of all people who self-reported as ministers reported an income above $3,000.  The journal also noted that 'taking the [ministers'] profession as a whole two out of three men are paid less than $1,000 a year.'" (*Id.* ¶¶ 60-61.)

56.     "These low prevailing wages would have created another set of problems for ministers in the early twentieth century had they been required to find housing of their own - the lack of a modern real estate industry and mortgage financing suitable to most minister's needs and capabilities." (*Id.* ¶ 62.)

57.     "Throughout the early 1900s, 'mortgages featured variable interest rates, high down payments, and short maturities….[B]efore the Great Depression, homeowners typically renegotiated their loans every year.'" (*Id.* ¶ 63.)

58.     "These facts indicate, that $5,000-$6,000 and more homes were out of reach to clergy earning an average of $1,500 per year . . . . This would be especially true if clergy had to re-sell the home after short tenures of less than five years in particular churches because of an ecclesiastical imperative to move to where they were needed. ." (*Id.* ¶ 64.)

59.     "[T]he parsonage system provided a critical means for churches to ensure that the spiritual needs of their congregations were met by providing for their clerics' needs for a place to live so that they could be immediately available to the congregation and to live in a much larger home to accommodate the church business conducted there." (*Id.* ¶ 65.)

### B.     Parsonages and the United States Income Tax

60.     "Though the Income Tax as we know it had to be delayed in its implementation from 1909 until the passage of the 16th amendment in 1913, the introduction of the tax posed all kinds of new questions to long-standing social practices: did sailors have to pay income tax for their room and board while they did their jobs envoyage? Did ranch hands have to pay income tax on their bunks and beans? Did soldiers have to pay income tax for the value of their base housing, and did officers' wives have to pay income tax on the value of rent while they waited stateside to see if their men returned from the Philippines and war with Filipino insurgents?" (*Id.* ¶ 15.)

61.     "To these novel concerns were added the question and what of the clergy? They lived next door to their churches in houses and rectories. Did they need to pay a tax on the value of the housing or was it a part of the job—an offer said members of the cloth 'could not refuse?'" (*Id.* ¶ 17.)

62.     In the "Revenue Act of 1921," Congress exempted from federal income taxation "the rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel as part of his compensation" in § 213(b)(11) of the Revenue Act of 1921. (*Id.* ¶ 66.)

63.     There is no explicit explanation in the legislative history for the legislative intent behind § 213(b)(11) of the Revenue Act of 1921. (*Id.* ¶¶ 74-75, 81.)

64.     It is likely, however, that Congress, in enacting § 213(b)(11) of the Revenue Act of 1921, was aware of the foregoing historical context for the way in which religious employers used parsonages for their employees and would have thought it "odd to tax a minister on the rental value of a parsonage in which he was obliged by his employer, the church, to live and work.. (*Id.* ¶ 71; *see id.* ¶¶ 66-71, 75-81.)

65.     In part, this is because the "Bureau of Internal Revenue had earlier established what is commonly called the 'for the convenience of the employer doctrine' starting with an office ruling, O.D. 265, 1 C B 71 (1919)." (*Id.* ¶ 72.) "It held that the shipboard food and board given to seamen in addition to their wages did not count as income for tax purposes. (*Id.*)

66.     "But a 1921 decision by the same office, O.D. 862, 4 C B 85 (1921) held that 'When in addition to the salary paid a clergyman he is permitted to use the parsonage living quarters free of charge the fair rental value of the parsonage considered a part of his compensation for services rendered and as such should be reported as income.'" (*Id.* ¶¶ 73, 80.)

## C.     The Introduction of Parsonage Housing Allowances and Their Exemption from Federal Income Tax

67.     "The parsonage income tax exclusion worked well for clergy of established, mainstream, and populous churches who could afford to purchase (or already owned) a manse or parsonage for their clergy." (*Id.* ¶ 82.)

13

68.     "But there were other churches, just as there had been throughout the history of the United States, with paid clergy who did not benefit from this exemption." (*Id.* ¶ 83.)

69.     "Yet the four religiously motivated reasons to provide housing to ministers were just as true for these minority religions." (*Id.* ¶ 84.)

70.     "Thus, the first three decades of the parsonage exemption applied only to clergy of more established churches with fulltime clergy serving communities with enough accumulated capital to build or acquire a parsonage." (*Id.* ¶ 85-86.)

71.     "The parsonage exemption, therefore, was available to some kinds of congregations rather than others, a situation that would only intensify in succeeding decades as religious diversity, and residential mobility increased." (*Id.* ¶ 87.)

72.     "In some instances churches lacking readily available parsonages provided their ministers with cash in lieu of a parsonage." (*Id.* ¶ 88.)

73.     As a result of court decisions in 1950 and 1954, "[s]uch ministers eventually were successful in claiming they were entitled to a tax-free housing allowance on the analogy of the one that that had been already established as available to military officers who lived off base under the convenience of the employer doctrine." (*Id.* ¶ 89-90.)

74.     "The four religiously motivated reasons to provide minister's housing remained relevant, but the way in which they were put into effect changed with the rapid post-war social change, especially in residential housing patterns, suburbanization, and domestic prosperity after WWII" (*Id.* ¶ 92), and a revival of religious interest (*Id.* ¶ 93).

75.     Considering all of these facts, "the 1954 Internal Revenue Code Sec 107(2) provision allowing clergy to accept income tax exempt cash housing allowances accommodated more institutions and clergy combinations." (*Id.* ¶ 94; *see also id.* ¶ 91-92.)

76.     "Importantly, instituting the parsonage allowance option eliminated discrimination between traditional, colonial era denominations' style of providing for their ministries and the part-time ministers and rabbis who were characteristic of smaller, newer, and less affluent religious groups such as Pentecostals, evangelical churches, and independent African-American congregations." (*Id.* ¶ 95.)

77.     "After the close of WWII in 1945, the existing pent-up demand for housing, which having gone unmet while wartime production had gone into military manufacturing, combined with a baby boom to drive a sustained 20-year process of residential suburban housing starts." (*Id.* ¶ 96.)

78.     "Accompanying all these new suburbanites were tens of thousands of new churches from mainline Protestant groups, the Roman Catholic Church, and from the Conservative and Reformed branches of Judaism, all of which were often approached by developers to locate new congregations and even given land on the condition that they build houses of worship." (*Id.* ¶ 97.)

79.     "One example of this is Protestant suburban church 'planting.' Often, a denomination sent the minister into a community first to live and gather a church congregation which might meet in a school for a time before building a house of worship. In this instance, there was no 'parsonage' to live in because a congregation would have been too new to purchase a home for its minister." (*Id.* ¶ 98.)

80.     "Except for the Catholic parishes, very few of the new suburban churches included a parsonage or rectory on the premises (even once a house of worship was built)." (*Id.* ¶ 99.)

81.     "Instead, it made sense, in light of the four religiously motivated reasons to provide housing for a minister, for suburban congregations to house their clergy in the community along

with the rest of the community's residents because their clergy could still be maximally available to parishioners." (*Id.* ¶ 100.)

82.    "Sometimes the congregation would own the home. Less frequently, they would enable the minister through a cash allowance to rent or purchase the home; particularly as clergy became older and nearer retirement." (*Id.* ¶ 101.)

83.    "Another feature of the housing boom was easier access to mortgages with far friendlier terms for consumers." (*Id.* ¶ 103.)

84.    "Thus, although ministers' salaries had declined relative to general wages since the 1890s and their relative standard of living decreased accordingly, it was easier for them to get a mortgage for a home of their own and easier to sell quickly if called to a new congregation." (*Id.* ¶ 104.)

85.    "In addition to suburbanization, the historical record shows that a major social change pushing an increasing number of clergy towards the acceptance of a cash allowance to purchase their own homes in place of living in a manse or parsonage was the changing view of retirement in American society." (*Id.* ¶ 105.)

86.    "Clergy, like other Americans of the middle 20th century, were now beginning to think more and more about retirement as a phase of life for which provisions needed to be made, rather than dying on the job." (*Id.* ¶ 109; *see id.* ¶¶ 106-08.)

87.    "And religious institutions, which once had homes for superannuated and dying ministers, began to fund pensions that coordinated with Social Security and assumed that ministers would eventually retire, living out some golden years happily like anyone else." (*Id.* ¶ 110.)

88.     "This then raised the question of where were these ministers to live, and clergy began to be more interested in building equity towards having a home they would own in retirement; and, as eventual retirement became a temporal need of clergy, religious bodies began to adapt so as to keep their clergy focused on the spiritual aspects of their work." (*Id.* ¶ 111.)

### D.     The Role of Housing in the Contemporary Practice of Ministry

89.     "The four religious motivations for providing housing for a minister have remained relevant, whether a congregation opts to provide a parsonage for its spiritual leader or a housing allowance." (*Id.* ¶ 112.)

90.     "The changing demographics and social trends of the United States since World War II have impacted that choice, but the religious motivations have not changed." (*Id.* ¶ 113.)

91.     "In surveying the contemporary scene, it is my opinion that the paramount consideration in utilizing church-owned housing, or providing an allowance, is still the congregations' need to house clergy in such a way so that the minister can live with his or her people. It is of the essence of the office of minister, priest, or rabbi, that one be near one's congregation." (*Id.* ¶ 114.)

92.     "In a rural area this may favor a church owning a parsonage because the availability and marketability of homes near a congregation's place of worship is poor." (*Id.* ¶ 115.)

93.     "And in a place like Manhattan, San Francisco, Chicago, or affluent areas in southern California, a church-owned parsonage or apartment may be the only way for a church to get its clergy men and women close to their place of ministry and members of their congregation." (*Id.* ¶ 116; *see also id.* ¶ 102.)

94.     "Indeed, because ministerial employment pays so little (national mean = $46,880)  and real estate is worth so much in a place like the Upper East Side of Manhattan, it is quite possible for the fair market rental value of someone's apartment to be worth much more than one's salary." (*Id.* ¶ 117.)

95.     "For example, 40 of the 57 Presbyterian congregations on Long Island still had manses as of April 2012 according to Mark Tammen, Long Island's general presbyter. Tammen reported that sky high housing costs 'price pastors out of the market except for the largest congregations. If the person from God you want to call is in Minneapolis, if you don't have a manse, you can't call them,' he said." (*Id.* ¶ 119.)

96.     "The information officer for the Episcopal Diocese of Long Island, Rev. Canon Shawn Duncan, made a similar point, analytically, saying, 'Nationally the trend is to have rectories in those areas that are expensive to live.'" (*Id.* ¶ 120.)

97.     "In other instances, however, a cash allowance can give a religious congregation the flexibility it needs to better perform its religious functions at its own discretion." (*Id.* ¶ 121.)

98.     "For example, the conservative Temple Beth-El of Cedarhurst, Long Island sold the five bedroom home of its senior Rabbi Sholom Stern at his request and provided him a housing allowance instead for a smaller place when his children had grown up and left the home, using the proceeds to redirect funds to synagogue programming." (*Id.* ¶ 122; *see also id.* ¶ 127.)

99.     "Another congregation may wish to free its pastor of the temporal concerns of retirement, as in the case of Rev. Mark Bigelow, of the Congregational Church of Huntington, Long Island, age 52, who asked his church after 21 years of living in its parsonage to sell the three-bedroom home and pay him a cash allowance." (*Id.* ¶ 124.)

100.     "A newer congregation of immigrants who are still working on where to establish their place of worship, may still use the housing allowance to support their minister's needs without having to commit to a particular property for a parsonage." (*Id.* ¶ 125.)

101.     "In this instance the availability of the parsonage allowance provision can be used by newer religions while reducing the discrimination between them and the older, more established

religions that benefitted from the parsonage-only income tax exemption for ministers." (*Id.* ¶ 126.)

102.    "A cash allowance may allow the church and its minister to be flexible about accommodating family size, school district, special needs, disability access and so forth, again allowing a minister to ensure his or her family's needs are met and freeing the minister to provide spiritual guidance and counseling to the congregation." (*Id.* ¶ 127.)

103.    "In other words, then, both the income tax-free parsonage and the income tax-free housing allowance have useful functions in allowing congregations, in their discretion, to supply their needs for ministerial services." (*Id.* ¶ 128.)

**IV.     IRS DOCUMENTS REGARDING THE ADMINISTRATION OF § 107**

104.    In April 2009, the IRS published the latest version of the Audit Technique Guide for IRS employees examining federal income tax submissions by ministers ("ATG"). (Ex. 31.)

105.    With respect to who qualifies as a minister, the ATG sets forth the requirements in 26 C.F.R. § 1.107-1(a) and § 1.1402(c)-5(b)(2). (*Id.* at 4-5.)

106.    The ATG also notes that:

> The duties performed by the individual are also important to the initial determination whether he or she is a duly ordained, commissioned, or licensed minister. Because religious disciplines vary in their formal procedures for these designations, whether an individual is "duly ordained, commissioned, or licensed" depends on these facts and circumstances.

(*Id.* at 5.)

107.    In light of § 1.1402(c)-5(b)(2), the ATG reiterates that "whether service performed by a minister constitutes conduct of religious worship or ministration of sacerdotal functions depends on the tenets and practices of the particular religious body constituting the church or denomination." (*Id.*)

19

108.    The ATG sets forth a brief summary of a series of IRS and Tax Court rulings regarding how to determine whether a person is "duly ordained, commissioned, or licensed" under the formal procedures for different religions. (*Id.* at 4-6.)

109.    The ATG notes that the phrase "duly ordained, commissioned, or licensed" has been interpreted by the Tax Court "to be disjunctive, finding the purpose is not to limit benefits to the ordained, but is to prevent self[-]appointed ministers from benefiting. *Salkov v. Commissioner*, 46 T.C. 190, 197 (1966)." (*Id.* at 4.)

110.    The ATG notes that, in *Salkov*, "the petitioner qualified because he was commissioned by, and was a duly qualified member of the Cantors Assembly of America, which functions as the official cantorial body for the Conservative branch of the Jewish religion in America, and because he was selected by a representative Conservative congregation to perform the functions of cantor. Id. at 197." (*Id.*)

111.    In the event that the amount of the fair rental value of a parsonage is at issue, the ATG notes that "the fair rental value of the housing must be determined. Determining the fair rental value is a question of all facts and circumstances based on the local market, but the church and minister have often already agreed on a figure and can provide documentary evidence." (*Id.* at 9.)

112.    Further, the ATG states that § 107 applies only if "the employing church designates the amount of the parsonage allowance in advance of the tax year. The designation may appear in the minister's employment contract, the church minutes, the church budget, or any other document indicating official action. Treas. Reg. § 1.107-1(b)." (*Id.*)

113.    Publication 1828, last issued by the IRS in November 2009, is the "Tax Guide for Churches and Religious Organizations: Benefits and Responsibilities Under the Federal Tax Law" ("Tax Guide"). (Ex. 30.)

114.    Among other things, the Tax Guide identifies the parsonage or housing allowance in

§ 107 as one of the rules applicable to the compensation of "ministers." (*Id.* at 19.)

115.    The Tax Guide goes on to describe its use of the word "minister":

> The term minister is not used by all faiths; however, in an attempt
> to make this publication easy to read, we use it because it is
> generally understood. As used in this booklet, the term minister
> denotes members of clergy of all religions and denominations and
> includes priests, rabbis, imams, and similar members of the clergy.

(*Id.* at 27.)

116.    Similarly, Publication 517, "Social Security and Other Information for Members of the

Clergy and Religious Workers" (2012) ("Pub. 517"), states that for its purposes "the term

"church" is generally used in its generic sense and not in reference to any particular religion."

(Ex. 32 at 2.)

117.    Pub. 517 defines "ministers" in the following way:

> Ministers are individuals who are duly ordained, commissioned, or
> licensed by a religious body constituting a church or church
> denomination. They are given the authority to conduct religious
> worship, perform sacerdotal functions, and administer ordinances
> or sacraments according to the prescribed tenets and practices of
> that church or denomination.
>
> If a church or denomination ordains some ministers and licenses or
> commissions others, anyone licensed or commissioned must be
> able to perform substantially all the religious functions of an
> ordained minister to be treated as a minister for social security
> purposes.

(*Id.* at 3.)

118.    Pub. 517 sets forth the technical requirements for ministers to properly complete and file

their federal income tax returns and to address issues regarding their self-employment tax

requirements. (*See generally id.*)

119.    In its section regarding the "Exclusion of Rental Allowance and Fair Rental Value of a Parsonage," Pub. 517 sets forth the administrative requirements to qualify for an exemption under § 107. (*Id.* at 9.)

## V.    IRS ADMINISTRATION OF OTHER TAX PROVISIONS TOUCHING ON RELIGION

### A.    The Internal Revenue Manual, Generally

120.    The Internal Revenue Manual ("IRM") "is the primary, official source of instructions to employees relating to the organization, administration and operation of the IRS. The IRM contains directions employees need to carry out their responsibilities in administering IRS obligations." (Ex. 36, IRM § 1.11.6, "Using and Researching the Internal Revenue Manual (IRM)" at .3(1).)

121.    "The IRM enables employees to have access to current, consistent procedures. It is used by all IRS employees, other Federal agencies such as the Treasury Inspector General for Tax Administration (TIGTA), Government Accountability Office (GAO), Treasury, and the public, including attorneys, Certified Public Accountants (CPAs), enrolled agents and taxpayers." (*Id.* IRM § 1.11.6.3(3).)

122.    The IRM also "[p]rovides policies of the IRS issued by the Commissioner or Deputy Commissioners." (*Id.* IRM § 1.11.6.3(4)(D).)

123.    IRS employees use the IRM to learn the "daily operations of tax administration" including general informational material and "step-by-step procedures on a specific action" where indicated. (*Id.* IRM § 1.11.6.2(1).)

### B.    Section 1402 and Who is a "Minister"

124.    Duly ordained, commissioned, or licensed ministers, in certain circumstances, are eligible to be exempt from paying self-employment tax. § 1402(e).

125.   To seek the exemption, a minister must file Form 4361, "Application for Exemption

From Self-Employment Tax for Use by Ministers, Members of Religious Orders and Christian

Science Practitioners" ("Form 4361"). (Ex. 33); *see* § 1402(e).

126.   To qualify for the exemption, the minister must certify that the minister (1) is

conscientiously or because of religious principles opposed to accepting public insurance which

makes payments in the event of death, disability, old age, or retirement or makes payments

toward the cost of, or provides services for, medical care (including social security benefits) with

respect to services performed as a minister; and (2) informed the ordaining, commissioning, or

licensing body of the church of this opposition. § 1402(e)(1); (*Id.* at 1.)

127.   The minister must also confirm that he has been ordained, commissioned, or licensed.

(*Id.*)

128.   To demonstrate that qualification, the minister must provide the date that he was

ordained, licensed, or commissioned and "[a]ttach a copy of the certificate (or, if [he] did not

receive one, a letter from the governing body of [his] church) that establishes [his] status as an

ordained, commissioned, or licensed minister." (*Id.* at 1-2.)

129.   If a minister applies for the self-employment tax exemption as a licensed or

commissioned minister and his denomination also ordains ministers, he must "indicate how [his]

ecclesiastical powers differ from those of an ordained minister of [his] denomination[ and]

[a]ttach a copy of [his] denomination's bylaws relating to the powers of ordained, commissioned,

and licensed ministers." (*Id.* at 1.)

130.   A "commissioned or licensed minister of a religious denomination or church that ordains

its ministers," Form 4361 instructs, may be treated in the same manner as an ordained minister if

he "performs substantially all the religious functions within the scope of the tenets and practices of [his] religious denomination or church." (*Id.*)

131.    In the event that a minister is applying for the self-employment tax exemption as a minister of a denomination that does not ordain its ministers, the IRS will:

> consider all available facts including whether they are licensed or commissioned. Ministerial duties include: the performance of sacerdotal functions, such as Marriages, Baptisms, Funerals and Holy Communion[,] the conduct of religious worship, [t]he performance of services in the control, conduct and maintenance of religious organizations. Treas. Reg. 1.1402(c)-5(b)(2). Whether the church or denomination recognizes the taxpayer as a religious leader has also been considered indicative. See e.g., Haimowitz v. Commissioner, T.C. Memo. 1997-40.

(Ex. 34, IRM § 4.19.6.3 "Introduction to Religious Waivers" at 7(1)(F).)

132.    Further, if the applicant "states in an authorized letter that their ministerial position is a Reader," the IRS will accept the letter "as a substitute for [a] certificate." (*Id.* IRM § 4.19.6.3.7(1)(H).) The IRS will consider the applicant "as an ordained minister, priest or rabbi." (*Id.* IRM § 4.19.6.3.7(1)(F).)

133.    An IRS employee must conclude that five criteria are satisfied before approving a Form 4361: 1) the minister must sign and return a declaration verifying that he is aware of the grounds for the self-employment tax exemption; 2) the application must be timely; 3) the application "must be complete (i.e., Bylaws, Certificate or License, and list of sacerdotal duties);" 4) the ordaining organization must be a qualifying organization; and 5) the minister must not have filed a form revoking his exemption from self-employment tax. (*Id.* IRM § 4.19.6.3.4 "Introduction to Minister Waivers/Criteria for Approving Form 4361," at (1).)

134.    Form 4361 is complete when the minister, whether ordained, commissioned, or licensed, has submitted the required paperwork and/or statements regarding his ordination, commissioning

or licensing (and completed the other administrative requirements). (*Id.* IRM § 4.19.6.3.7(1); *see also* Ex. 33 at 1-2.)

135.    Assuming all other criteria are met, the IRS will approve the minister's application for exemption from self-employment tax. (Ex. 34, IRM § 4.19.6.3.12(1).)

C.    **Other IRM Instructions Regarding Contact with Religion or Religious Organizations**

136.    IRS personnel "should be mindful of the rights granted by the First Amendment to the Constitution, which limits government interference with the free exercise of religion to cases of compelling government interest. The IRS's legitimate interest of enforcing compliance with federal tax laws does not extend to the source and content of sincerely held religious beliefs." (Ex. 37, IRM § 4.76.7.3(1).)

137.    If an IRS employee examines an organization, having complied with the procedures of § 7611, for the purpose of determining whether it qualifies for tax-exempt status as a church under § 501(a), the IRM states that, among other things, the organization's members must "have a sincere and meaningful belief in whatever doctrine is espoused, and this belief occupies in the lives of those members a place parallel to that filled by God in the lives of traditionally religious persons." (*Id.* IRM § 4.76.7.14(1); *accord* Ex. 38, IRM § 7.25.3.6.5(1)).

138.    Further guidance elsewhere in the IRM for determining "religious belief" for purposes of a § 501(c)(3) application for status as a religious organization quotes the Supreme Court:

> "[i]f an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual a place parallel to that filled by... God in the lives of traditionally religious persons." [quoting *Welsh v. United States*, 398 U.S. 33 (1970).] Thus, religious beliefs include many beliefs (for example, Taoism, Buddhism, and Secular Humanism) that do not posit the existence of a Supreme Being in the conventional sense.

(Ex. 38, IRM § 7.25.3.6.5(2).)

139. The IRS evaluates the organization's actions. (*Id.* IRM § 7.25.3.6.6-.12; Ex. 40, IRM § 4.76.6.6.)

140. But the IRS will not "consider the content or sources of a doctrine which is alleged to constitute a particular religion," and will "make no attempt to evaluate the content of whatever doctrine a particular organization claims is religious. However, a mere allegation that a specific doctrine is religious is not sufficient to warrant that doctrine's designation as a religion." (Ex. 37, IRM § 4.76.7.14(1); *see* Ex. 40, IRM § 4.76.6.2(1).)

141. Specifically on the point of "validity of religious belief" for purposes of an application for § 501(c)(3) status, the IRM states that the IRS:

   a. may not pass judgment on the merits of the applicant's asserted religious belief (Ex. 38, IRM § 7.25.3.6.4(1), and

   b. may not require a 501(c)(3) applicant to prove "the validity of the religious doctrines or beliefs of the applicant or its members. It is the government's duty to 'make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary.' *Zorach v. Clausen*, 343 U.S. 306 (1952)." (*Id.* IRM § 7.25.3.6.4(2).

142. The IRM further informs employees that:

> This concept is also discussed in *U.S. v. Ballard*, 322 U.S. 78 (1943), in which the Court stated "The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views...The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain."

(*Id.* IRM § 7.25.3.6.4(3).

Dated: June 28, 2013                                    Respectfully submitted,

                                                        JOHN W. VAUDREUIL
                                                        United States Attorney

                                                        */s/ Erin Healy Gallagher*
                                                        ERIN HEALY GALLAGHER
                                                        D.C. Bar Number: 985670
                                                        U.S. Department of Justice, Tax Division
                                                        Post Office Box 7238
                                                        Washington, D.C. 20044
                                                        Telephone: (202) 353-2452
                                                        Fax: (202) 514-6770
                                                        E-mail: erin.healygallagher@usdoj.gov

                                                        */s/ Richard Adam Schwartz*
                                                        RICHARD ADAM SCHWARTZ
                                                        California Bar Number: 267469
                                                        U.S. Department of Justice, Tax Division
                                                        Post Office Box 683
                                                        Washington, D.C. 20044
                                                        Telephone: (202) 307-6322
                                                        Fax: (202) 307-0054
                                                        E-mail: richard.a.schwartz@usdoj.gov

                                                        Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that, on June 28, 2013, service of the foregoing United States' Statement of Proposed Findings of Fact was made upon Plaintiffs by filing it with the Clerk of Court using the CM/ECF system.

*/s/ Erin Healy Gallagher*
ERIN HEALY GALLAGHER