IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FREEDOM FROM RELIGION | ) | |
| FOUNDATION, INC., | ) | Case No. 11-cv-0626 |
| ANNIE LAURIE GAYLOR, and | ) | |
| DAN BARKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**UNITED STATES' BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs ask this Court to declare 26 U.S.C. § 107,[1] a tax statute, unconstitutional and

enjoin the United States from enforcing it. They allege that § 107 and the manner in which the

Treasury Department and the IRS administer it violate the Establishment Clause of the First

Amendment and the Due Process Clause of the United States Constitution. But this Court lacks

subject matter jurisdiction to hear their claims and, in any event, § 107 is constitutional.

Section 107 states:

> In the case of a minister of the gospel, gross income does not
> include–
> (1) the rental value of a home furnished to him as part of
> his compensation; or
> (2) the rental allowance paid to him as part of his
> compensation, to the extent used by him to rent or provide a home
> and to the extent such allowance does not exceed the fair rental
> value of the home, including furnishings and appurtenances such
> as a garage, plus the cost of utilities.

---

[1] All statutory references refer to the Internal Revenue Code (26 U.S.C.), unless otherwise noted.

Plaintiffs Anne Laurie Gaylor and Dan Barker are atheists. (United States' Stmt. of Prop. Findings of Fact ("Facts") ¶ 5.) They are Co-Presidents of Plaintiff Freedom From Religion Foundation, a non-profit, atheist membership organization that advocates for the separation of church and state and educates on matters of non-theism. (*Id.* ¶¶ 3-4.) Beginning in the summer of 2011, and continuing for each year through 2013, FFRF has designated and paid a housing allowance for Ms. Gaylor and Mr. Barker to enable them to bring a lawsuit to challenge § 107(2). (*Id.* ¶¶ 19-33.) Plaintiffs highlight the phrase "minister of the gospel" in § 107 and claim that because they do not self-identify as "religious clergy," § 107(2) discriminates against them. (*See* Doc. 13, Am. Compl., ¶¶ 20, 41.) They claim that they would not qualify for an exclusion from their gross income for their housing allowances under its terms because of its "religious criteria." (*See* Doc. 13 ¶¶ 20, 41.) Ms. Gaylor and Mr. Barker have made no effort to claim their housing allowances are excludable from federal income tax under § 107(2). (Facts ¶¶ 26-27, 29-30.) Ms. Gaylor and Mr. Barker claim that they would be entitled to claim the exclusion "but for the religious criteria applied by the IRS and [Department of Treasury] in administering and applying § 107" (Doc. 13 ¶ 48) and that the United States' administration of § 107 results in "excessive entanglement" between government and religion (*id.* ¶ 22).

On the contrary, in light of the governing law and the undisputed material facts, § 107 is constitutional. It cannot be viewed in the narrow vacuum in which Plaintiffs attempt to cabin it. Section 107 results from the congressional exercise of its authority to "lay and collect [t]axes," U.S. Const. art. I, § 8, in a manner consistent with the Establishment Clause. Because Congress is charged with the power to tax, it has two options with respect to religion and religious entities: it may ignore them completely or it may address them in a manner that navigates the space between accommodating the free exercise of religion and establishing religion. Congress has

chosen to tax ministers' (and all other taxpayers') "gross income," which "means all income from whatever source derived." § 61(a). The exemption from gross income in § 107was created to eliminate discrimination between secular and non-secular employees, and among employees of different religious groups, all while limiting government contact with religion to objectively verifiable information that does not inquire in to the content of religious tenets. Plaintiffs can show no facts to suggest otherwise. For these reasons, this Court should grant summary judgment to the United States on all of Plaintiffs' claims.

## I.      Procedural Posture

Plaintiffs ask this Court to declare that § 107, "both on its face and as administered by the [IRS] and the [Treasury]," violates the Establishment Clause of the First Amendment and the Due Process Clause of the United States Constitution, and to enter an injunction prohibiting its enforcement. (Doc. 13 ¶ 1; *id.*, Prayer for Relief, ¶¶ A, B.) FFRF asserts no independent claims of its own and appears in the case in a representational capacity only. (Facts ¶ 2.) This Court denied the United States' motion to dismiss the Amended Complaint on August 29, 2012. (Doc. 30.) Now, the United States moves for summary judgment on all counts of Plaintiffs' Amended Complaint.

## II.     Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable [factfinder] to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (quotation omitted). To determine whether there is a genuine dispute as to any material fact, the court must consider the

3

materials cited in the record on the motion, Fed. R. Civ. P. 56(c)(3), and consider those facts and "all *reasonable* inferences in favor of the non-moving party," *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011) (emphasis added). But "conclusory allegations . . . should be disregarded on summary judgment." *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998); *accord Zilisch v. R.J. Reynolds Tobacco Co.*, 2011 U.S. Dist. LEXIS 154501, at *2-4 (W.D. Wis. Jun. 21, 2011) (Crabb, J.).

The court must review the submissions on summary judgment in light of a plaintiff's heightened standard of proof when deciding whether a reasonable factfinder could return a verdict for the non-moving party. *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 866 (7th Cir. 1994). In light of Plaintiffs' facial challenge to § 107 and its implementing regulations, Plaintiffs hold a heavy burden: "A facial challenge to a [statute] is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the [statute] would be valid*." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added); *accord Doe v. Heck*, 327 F.3d 492, 528 (7th Cir. 2003). Further, the standard for summary judgment must incorporate certain canons of constitutional construction "out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). Thus, "'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2594 (2012) (quoting *Hooper v. California*, 155 U.S. 648, 657, (1895)); *accord Mueller v. Thompson*, 858 F. Supp. 885, 900 (W.D. Wis 1994) (quoting *Rust*, 500 U.S. at 190) (Crabb, J.), *vacated on other grounds sub nom Mueller v. Reich*, 54 F.3d 438 (7th Cir. 1995), *vacated on other grounds sub nom Wisconsin v. Mueller*, 519 U.S. 1144 (1997).

"[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [the Court's] plain duty is to adopt that which will save the Act." *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring) *quoted in Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2593; *accord Parsons v. Bedford*, 28 U.S. 433,448-49 (1830) ("No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution."); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979). Though the Court should not engage in "disingenuous evasion" to uphold a statute's constitutionality, *Rust*, 500 U.S. at 191 (quotation omitted), the Court should opt for an interpretation consistent with the Constitution "[e]ven to avoid a serious doubt" about the constitutionality of a statute. *Blodgett*, 275 U.S. at 148 (Holmes, J., concurring); *accord Mueller*, 858 F. Supp. at 900.

III.     **Argument**

A.       **This Court lacks subject matter jurisdiction over Plaintiffs' claims for relief.**

The United States moved to dismiss Plaintiffs' Amended Complaint arguing that they lacked Article III standing. In denying the motion, this Court observed that Ms. Gaylor and Mr. Barker neither sought nor had standing based on their status as taxpayers or based on a psychic injury.[2] (Doc. 30 at 5-6; *see also* Doc. 20 at 2.) Instead, the Court observed, Plaintiffs' "injury is not just that they object to the exemption that ministers of the gospel receive, but that plaintiffs are being denied the same benefit," (Doc. 30 at 6) which denial, Plaintiffs allege, is the result of

---

[2] As this Court observed, FFRF's representational standing "rises and falls" with Individual Plaintiffs'. (Doc. 30 at 4.) FFRF makes no independent allegations of its own. (Facts ¶ 2.) As described below, Individual Plaintiffs do not have standing to sue, therefore FFRF itself does not.

the "religious criteria applied by the IRS and Treasury Department in administering and applying § 107" (Doc. 13 ¶ 48).  The Court inferred that Ms. Gaylor and Mr. Barker would "apply for the exemption if they qualified for it." (Doc. 30 at 18.)

The Court observed that "plaintiffs have standing to challenge a statute before it has been applied to them when the injury to their First Amendment rights is clear from the face of the statute." (*Id.* at 8.) The Court quoted *Harp Advertising Illinois, Inc. v. Village of Chicago Ridge, Illinois*, 9 F.3d 1290, 1291-92 (7th Cir. 1993), in observing that "[i]n general, '[c]hallenges to statutes as written, without inquiring into their application, are appropriate when details of implementation are inconsequential.'" (Doc. 30 at 7-8.) Upon the motion to dismiss, the United States did not endeavor to show that the individual plaintiffs might be able to make a plausible claim to exclude their housing allowances from their gross income under § 107(2). Thus, this Court concluded that § 107on its face discriminated against Plaintiffs. This Court asked "What purpose would it serve for plaintiffs to attempt to claim the exemption before challenging it in court? If the meaning of § 107 as applied to plaintiffs were in doubt, then defendant might have a valid point that plaintiffs' claims of injury are premature." (Doc. 30 at 8.) Thus, at the motion to dismiss stage, this Court determined that Plaintiffs had standing to maintain their suit as a pre-enforcement challenge. Now, the parties have completed discovery to the extent necessary for dispositive motions and in light of the undisputed facts, Plaintiffs lack standing to challenge § 107. For similar reasons, the facts show that the Amended Complaint should be dismissed because Plaintiffs' claims are unripe.

### 1. Plaintiffs lack Article III standing.

Article III of the United States Constitution requires that the federal judiciary resolve only "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. For more than 200 years, the federal judiciary has limited its exercise of power "solely, to decide on the rights of individuals,"

*Marbury v. Madison*, 5 U.S. 137, 170 (1803), and therefore has refrained from reviewing the constitutionality of statutes except when the resolution of some actual injury requires that the Court adjudicate the constitutionality of a challenged act. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597-598 (2007) (plurality opinion) ("The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution."). The limitation imposed by the case-or-controversy requirement of Article III standing is "fundamental to the judiciary's proper role in our system of government." *Id.* at 598 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997) and *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).

The party invoking federal court jurisdiction bears the burden of proving each element of Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To do so, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv*, 528 U.S. 167, 180-81 (2000); *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012). The undisputed facts show that Plaintiffs' challenge to § 107 fails to satisfy the requirements that they have suffered an injury in fact that is traceable to challenged action taken by the United States.[3]

_____

[3] In a properly presented constitutional challenge, nullification of a statute is an available remedy when there is no other option to redress an actual injury. Here, however, and as discussed thoroughly below, Plaintiffs cannot show facts to support their alleged injury that is fairly traceable to challenged action by the United States as a result of § 107 or the way in which it is administered.

### a.    Plaintiffs have not suffered an injury in fact.

Constitutional challenges that are abstract, conjectural, or hypothetical may not be heard because federal courts "have no power per se to review and annul acts of Congress on the ground that they are unconstitutional." *Frothingham v. Mellon*, 262 U.S. 447, 488 (1923), decided with *Massachusetts v. Mellon*; *accord Ariz. Christian Sch. Tuition Org. v. Winn*, — U.S. —, 131 S. Ct. 1436, 1441-42 (2011) (hereafter, "*ACSTO*"). It is simply not sufficient for a plaintiff to claim "only harm to [its] and every citizen's interest in proper application of the Constitution and laws and [seek] relief that no more directly and tangibly benefits him than it does the public at large." *Lujan*, 504 U.S. at 573-74. Nor is it sufficient that "the party invoking the power of the court have a keen interest in the issue." *Hollingsworth v. Perry*, --- S. Ct. ---, 2013 U.S. LEXIS 4919, at *9 (Jun. 26, 2013) . By refusing to entertain generalized grievances, federal courts "respect[ ] the proper—and properly limited—role of the courts in a democratic society." *Id.* at *34 (quotation omitted). "[A]t an irreducible minimum, Article III [of the Constitution] requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (quotation omitted).

The requirement that an injury in fact be concrete or imminently impending, as opposed to hypothetical or conjectural, and particular, as opposed to general, ensures that the action is susceptible to judicial adjudication. *Allen v. Wright*, 468 U.S. 737, 751-52 (1984). The imminence requirement is necessary "to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis in original) (quotation omitted). "Article III standing is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the

vindication of value interests." *Hollingsworth*, 2013 U.S. LEXIS 4919, at *20 (quotation omitted).

Ms. Gaylor and Mr. Barker allege that they face discrimination because of the statutory text of § 107(2),[4] its implementing regulations, and the manner in which the IRS enforces it. They neither sought nor were denied its benefits, in which case they would have had resort to a timely refund suit under § 7422. Plaintiffs have had no communication at all with the IRS about the federal income tax effect of their housing allowances. (Facts ¶¶ 35-37.) Ms. Gaylor and Mr. Barker have made no effort to claim their housing allowances are excludable from federal income tax. (*Id.* ¶¶ 26-27, 29-30, 35-37.) Rather, Mr. Barker's and Ms. Gaylor's purported injury is that there has been or will be some *hypothetical* and imminent "discrimination" on the basis of religious criteria in light of any attempt by them to claim an exclusion under § 107(2). (*See* Doc. 13 ¶ 41.)

Thus, this Court permitted their action to continue as a pre-enforcement challenge. "To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but

---

[4] Section 107(1) provides: "In the case of a minister of the gospel, gross income does not include the rental value of a home furnished to him as part of his compensation." Plaintiffs have not suffered any injury, nor allege that they face any potential enforcement against them as a result of § 107(1), its implementing regulations, or the manner in which the IRS administers it. Ms. Gaylor and Mr. Barker own their home and are not provided in-kind housing from FFRF. (Facts ¶¶ 19-20, 34.) FFRF does not own any real property that could be used as a home for Ms. Gaylor and Mr. Barker. (*Id.* ¶¶ 17-18.) There are no facts suggesting that either FFRF or Ms. Gaylor and Mr. Barker will seek in-kind housing from FFRF. Instead, Ms. Gaylor and Mr. Barker receive housing allowances from FFRF (*id.* ¶¶ 21-32), which invokes comparison with § 107(2). Plaintiffs can show no facts to support any alleged injury caused by § 107(1), thus they lack standing to seek a declaration that it is unconstitutional or an injunction against it. *See Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) ("When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.").

proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'"
*ACLU v. Alvarez*, 679 F.3d 583, 590-591 (7th Cir. 2012) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)) (bracketed material in original). However, where "the statute is susceptible to an interpretation that would remove the need for resolving the constitutional questions raised," *Cal. Medical Ass'n v. Fed. Election Comm'n*, 453 U.S. 182, 192 n.14 (1981), plaintiffs may not simply assume that their desired course of conduct is proscribed and proceed directly to court to file a pre-enforcement challenge.

In light of the undisputed facts, the enforcement of § 107(2) with respect to Ms. Gaylor and Mr. Barker is not nearly as clear-cut as it initially may have appeared. The "details of implementation" of § 107 are, in fact, highly consequential to this action, *cf. Harp Advertising Illinois*, 9 F.3d at 1291-92, in light of the statutory text, regulations, and case law applicable here. The United States is not taking the position that any particular person would, in fact, qualify to claim the exclusion under § 107(2). But the facts here illustrate that it is conceivable that an atheist who does things that Ms. Gaylor and Mr. Barker do in light of their personally held beliefs and in the course of their employment could meet the requirements for the exclusion in § 107(2), including the definition for "minister" under its terms. It follows that Ms. Gaylor and Mr. Barker cannot show that they face a "certainly impending" discriminatory application of § 107(2) based on the "religious criteria" that they allege. (*See* Doc. 13 ¶ 47-49.) Thus, Ms. Gaylor and Mr. Barker are not suffering an "imminent" injury. To so find would stretch the imminence requirement "beyond its purpose," as Plaintiffs have nothing more to rely on than "[a]llegations of *possible* future injury" rather than facts to support their allegations. *Clapper*, 133 S. Ct. at 1147 (brackets and emphasis in original) (quoting *Lujan*, 504 U.S. at 565; *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

### i.      Non-theistic beliefs may qualify as religious beliefs.

Non-theistic beliefs, including atheism, may qualify as "religious" beliefs in various

contexts because they pertain to religion and fulfill a similar role in a person's life:

> [W]hen a person sincerely holds beliefs dealing with issues of
> "ultimate concern" that for her occupy a "place parallel to that
> filled by . . . God in traditionally religious persons," those beliefs
> represent her religion. We have already indicated that atheism may
> be considered, in this specialized sense, a religion.

*Kaufman v. McCaughtry*, 419 F.3d 678, 681-682 (7th Cir. 2005) (quoting *Fleischfresser v. Dirs.*

*of Sch. Dist. 200*, 15 F.3d 680, 688 n.5 (7th Cir. 1994) (internal citation and quotation omitted))

(citing *Welsh v. United States*, 398 U.S. 333, 340 (1970); *United States v. Seeger*, 380 U.S. 163,

184-88 (1965); *Reed v. Great Lakes Cos.*, 330 F.3d 931, 934 (7th Cir. 2003)). Plaintiffs may not

presume that a law's reference to religion necessarily excludes beliefs that are specifically non-

theistic in nature. *Accord Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) ("Among religions

in this country which do not teach what would generally be considered a belief in the existence

of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others." (citing

*Washington Ethical Society v. District of Columbia*, 249 F.2d 127 (D.C. Cir. 1957); *Fellowship*

*of Humanity v. County of Alameda*, 153 Cal. App. 2d 673 (Cal. App. 1st Dist. 1957)).

The IRS has incorporated into the Internal Revenue Manual ("IRM") provisions

consistent with case law and precedent regarding non-theistic belief systems to provide guidance

for IRS employees confronted with issues touching on religion (Facts ¶¶ 136-142), so that the

IRS acts in a manner consistent with the Constitution.[5] For example, the IRS does not "consider

---

[5]  The IRM provides applicable policies and directions to IRS employees to carry out their duties
in administering IRS obligations. (Facts ¶¶ 120-123.)

the content or sources of a doctrine which is alleged to constitute a particular religion" and "make[s] no attempt to evaluate the content of whatever doctrine a particular organization claims is religious." (*Id.* ¶ 40 (citing IRM § 4.76.7.14(1)).) Specifically with respect to the issue of the validity of religious belief, the IRS "may not pass judgment on the merits of the applicant's asserted religious belief" or require an organization claiming tax-exempt status as a church "to prove 'the validity of the religious doctrines or beliefs of the applicant or its members.'" (*Id.* ¶ 141 (citing IRM § 7.25.3.6.4).) Other IRS publications applicable to the administration of § 107 make it clear that the terms "minister" and "church" are meant to be inclusive and not exclusive. (*See* Facts ¶¶ 115-117.)

Because Plaintiffs can show no facts to suggest that the IRS will apply terms like "minister" and "religious organization" as if they turn on adherence to some theistic belief or other content, this Court should not presume that the IRS would act inconsistently with the governing law regarding whether atheism a religion for purposes of an atheist's claim under § 107. *Blodgett*, 275 U.S. at 148 (Holmes, J., concurring) (a court should opt for an interpretation consistent with the Constitution "[e]ven to avoid a serious doubt" about the constitutionality of a statute). To do so would beg the ultimate question in this case.

### ii.    Section 107 does not discriminate on the basis of religious belief.

In administering § 107, the IRS must determine whether the taxpayer is a minister, whether the taxpayer performs the duties of a minister, the status of the entity employing the taxpayer, whether there was a proper designation of a housing allowance, and the proper amount

of the housing allowance. *See* 26 C.F.R. § 1.107-1.[6] Plaintiffs do not appear to be challenging the provisions requiring that a housing allowance be properly designated, *see* § 1.107-1(b), and excluded from income in the proper amount, *see* § 1.107-1(c). But if either one of those issues are in dispute in an examination, the IRS looks to existing, objective documentary evidence, like the taxpayer's employment contract, the minutes from the employer's board meetings, or the employer's budget, for proof. (Facts ¶ 112.) It does not inquire into substantive matters of religious doctrine. (*See id.* ¶¶ 136, 140-142.)

Similarly, neither the inquiry of whether the taxpayer performs the duties of a minister nor the status of the entity employing the taxpayer involve examining the content of the religious practices of a taxpayer or his or her employing entity. *See* 26 C.F.R. §§ 1.107-1(a), 1.1402(c)-5; *Knight v. Comm'r*, 92 T.C. 199 (1989); *Wingo v. Comm'r*, 89 T.C. 922 (1987). To determine whether a taxpayer qualifies as a "minister of the gospel" to claim the exclusion from gross income in § 107, the IRS looks to § 1402(c), § 1.1402(c)-5, and controlling legal precedent, including *Knight* and *Wingo*. Pursuant to these authorities, there are five factors that collectively determine whether a person qualifies as a minister of the gospel. Those factors include whether the individual:

- administers sacerdotal functions;

- conducts worship services;

- performs services in the control, conduct and maintenance of a religious organization;

---

[6] All regulatory references refer to the Code of Federal Regulations, Title 26 – Internal Revenue (26 C.F.R.) unless otherwise noted.

13

- is considered a spiritual leader by his or her religious body; and

- is ordained, licensed or commissioned.[7]

*See Knight*, 92 T.C. at 204-205; *Wingo*, 89 T.C. at 934-937. These factors only require a

taxpayer to provide the IRS with evidence that exists or can be obtained to consider without

creating a need to examine or question the contents of an individual's religious beliefs. (*See*

Facts ¶¶ 104-107, 124-142.)

At bottom, this test applies § 107 by respecting distinctions already made by taxpayers'

respective religious denominations, not by scrutinizing the content of any religious beliefs,

theistic or otherwise. That was the review applied by *Salkov v. Commissioner*, 46 T.C. 190, 197-

98 (1966) and *Silverman v. Commissioner*, 57 T.C. 727, 730-32 (1972), and other cases which

have held that § 107 is not confined to any one faith or set of religious tenets, but rather that

applicability of § 107 depends on the tenets and principles of whatever set of beliefs "occupies a

place parallel" to religion for that individual. This law, and other procedures for IRS employees

to use in determining how ministers should be treated under the Internal Revenue Code, is

reflected in the "Audit Technique Guide" for ministers published by the IRS. (*See* Facts ¶¶ 104-

110.)

Compensation paid for services performed by a minister may qualify for § 107 either

because of the nature of the services performed or the entity for which the services are

---

[7] Although the phrase "duly ordained, licensed or commissioned" is not used in § 107, the
concept has been incorporated through § 1.107-1's incorporation of the rules contained in
§ 1.1402(c)-5, which applies to ministers who are "duly ordained, commissioned or licensed,"
and has been interpreted to include, for example, a "congregation's formal selection of the
taxpayer" for certain positions within the religious denomination, *Wingo*, 89 T.C. at 933 (citing
*Salkov v. Comm'r*, 46 T.C. 190 (1966)), considering "whether the particular church or
denomination recognizes the person as a minister or religious leader." *Id.* at 936.

performed. On one hand, the employer need not be a religious organization when the minister performs services including the performance of whatever is considered "sacerdotal functions" by the particular religious body, such as officiating at weddings, funerals, and the like. *See* §§ 1.107-1(a), 1.1402(c) -5(b)(2)(i), (iii). On the other hand, a minister's services for a "religious organization" qualify where the services are in the control, conduct, or maintenance of the religious organization. *See* §§ 1.107-1(a), 1.1402(c) -5(b)(2)(ii).

None of these factors involve assessing the content of any beliefs. Instead, whether service performed by a minister constitutes the "conduct of religious worship" or the "ministration of sacerdotal functions" "depends on the tenets and practices of the particular religious body," not any normative viewpoint about what religion is, as understood by an IRS employee or required by the statute. *See* § 1.1402(c)-5(b)(2)(i) & (ii) ; (*see also* Facts ¶¶ 105-110, 127-142.) Indeed, although the term "religious organization" is not defined by statute, the IRM states that an organization should be deemed religious if the organization's members "have a sincere and meaningful belief in whatever doctrine is espoused, and this belief occupies in the lives of those members a place parallel to that filled by God in the lives of traditionally religious persons." (*See* Facts ¶¶ 137- 142). As such, qualification as a minister under § 107 is dependent on whether the taxpayer is recognized by some ordainment, commission, or license, and performs services like those identified in § 1.1402(c)-5 on behalf of, a group organized around a "sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God in traditionally religious persons." *See Welsh*, 398 U.S. at 341-43; *Kaufman*, 419 F.3d at 681-84; *id.* at 682, 684 (holding that "[a]theism is [plaintiff's] religion" and that he had been denied permission to start a group that "was religious in nature even though it expressly

rejects a belief in a supreme being" because "the [Supreme] Court has adopted a broad definition of 'religion' that includes non-theistic and atheistic beliefs, as well as theistic ones").

The IRM also contains instructions on how an IRS employee is to determine whether an individual qualifies as a minister. (Facts ¶¶ 127-135). The IRM states that the employee should consider evidence furnished by the taxpayer in a form that does not require any examination into the contents of any religious belief or practice. (*See id.*) For example, to show that the individual has been ordained, commissioned, or licensed, the individual must show "a copy of the certificate (or, if [he] did not receive one, a letter from the governing body of [his] church) that establishes [his] status as an ordained, commissioned, or licensed minister." (*Id.* ¶ 128.) If the individual does not have such a certificate, the individual may demonstrate that, under "the tenets and practices of [his] religious denomination or church" he "performs substantially all the religious functions" of an ordained minister. (*Id.* ¶130.) Thus, the IRS seeks only to confirm that the individual engages in the requisite job tasks of the denomination. Because the IRS does not attempt to resolve any issues of religious doctrine or responsibility, but rather seeks simply to verify an individual's position according to the religion's self-evaluated tenets and practices, the IRS's methodology was impliedly approved by the Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, which undertook a parallel analysis. --- U.S. ---, 132 S. Ct. 694, 707-09 (2012) *see id.* at 705 (holding that government may not resolve "quintessentially religious controversies" because "the Constitution requires that civil courts accept [ecclesiastical tribunals'] decisions as binding upon them") (quotations omitted).

Neither the law nor the IRS conditions the availability of the exclusion in § 107 on the basis of adherence to theistic or non-theistic beliefs. Rather, the IRS has interpreted and administered § 107 in a constitutional manner. Therefore, Plaintiffs can show no facts to support

their allegation that § 107 "as administered and applied by the IRS and Treasury Department, . . . discriminat[es] against the individual plaintiffs *solely on the basis of religious criteria*." (Doc. 13 ¶ 41; *see also id.* ¶¶ 47-49.) After all, as the Seventh Circuit has observed, "[i]f we think of religion as taking a position on divinity, then atheism is indeed a form of religion." *Reed*, 330 F.3d at 934.

> ### iii.    It is not a foregone conclusion that an atheist like Ms. Gaylor and Mr. Barker could not qualify as a "minister" for purposes of § 107(2).

The five-factor test enunciated by the *Knight* and *Wingo* courts, which are consistent with the Treasury Regulations and IRS guidance on how it administers § 107, utilizes factors that do not inherently preclude an atheist from claiming an exclusion under § 107(2). Because atheism has been considered a religion, it is possible that an atheist might qualify for status as a "minister" under § 107(2). Ms. Gaylor and Mr. Barker, by their own descriptions, provide an example of atheists who engage in the profusion of certain beliefs which occupy a "place parallel to that filled by . . . God in traditionally religious persons," and controlling an organization that has "taken a position on divinity." *Kaufman*, 419 F.3d at 681-682. These factual similarities are precisely the reason Plaintiffs cannot establish that claiming an exclusion from their gross income for their housing allowance under § 107(2) certainly would have been proscribed under its terms.

For example, nothing precludes an individual with non-theistic beliefs from obtaining some sort of ordination, license, commission, or other objective evidence that he or she is responsible for leading others in the exercise and maintenance of whatever "belief occupies in the lives of those members a place parallel to that filled by God in the lives of traditionally religious persons." *See* § 1-1402(c)(5)(b). There is simply nothing in the licensure requirement that refers to the content of any belief, theistic or otherwise. The licensure requirement simply

ensures that some objective evidence demonstrates that an individual has been recognized as able to engage in certain functions within the religion or with respect to religious beliefs, like the ordination certificate that Mr. Barker obtained from the Standard Christian Center in 1975 when he became a theistic minister. (*See* Facts ¶ 9.) As the court in *Salkov* held:

> [T]here is in the regulations no test, or even a suggestion of it, that the ordination, commissioning, or licensing must come from some higher ecclesiastical authority. In a religious discipline having the lay democratic character of Judaism and lacking any central ecclesiastical organizations, this ministerial authority can be conferred by the church or congregation itself.

46 T.C. at 196. FFRF issues positions and titles to Ms. Gaylor and Mr. Barker in that they have the title "Co-President." (Facts ¶ 3.) It therefore appears that they are recognized as leaders among members of FFRF who hold atheistic beliefs, and the facts indicate that members turn to them to perform certain functions with significance among those who share their beliefs. There is no indication that Ms. Gaylor and Mr. Barker are somehow precluded from obtaining objectively verifiable recognition of their unique role and ability to perform the functions such as those which they currently perform within FFRF

Further, an atheist organization may be considered a "religious organization" under the applicable law and IRS procedure. *See supra* § III.A.1.a.i. Had Ms. Gaylor and Mr. Barker attempted to claim the exclusion under § 107(2), they might have taken the position that FFRF is a religious organization. FFRF is an organization that explicitly deals with religious topics and which has taken a position on divinity. While we draw no conclusions on whether the facts would ultimately support such a contention specifically with respect to FFRF, there is no basis to conclude that an organization formed around non-theistic beliefs could not qualify as a religious organization. (*See* Facts ¶ 1); *see also Welsh*, 398 U.S. at 340; *Seeger*, 380 U.S. at 184-88; *Kaufman*, 419 F.3d at 681-682. And Ms. Gaylor and Mr. Barker have admitted that they are the

two individuals responsible for overseeing the day-to-day activities of FFRF in furtherance of FFRF's purpose. (Facts ¶¶ 6(g), 14(c).) Arguably, that could make them responsible for performing services in the "control, conduct and maintenance of a religious organization." *See* §§ 1.107-1(a), 1.1402(c) -5(b)(2)(ii).

Next, an atheist could show that the "tenets and practices" of atheism include certain sacerdotal functions. *See* § 1.1402(c)-5(b)(2)(i). The facts show that Mr. Barker performs a variety of functions that he compares to religious practices within theistic denominations "like the flip side of a coin" (Facts ¶ 13), "doing much of what I used to do as a minister, but now for a totally different message, for a nonminister of the gospel type of message" (*Id.* ¶ 6(a)). These functions include "de-baptisms," lecturing, performing marriages, "counseling," "traveling promotion for freethought," and writing "freethought songs" and "irreverent music." (*Id.* ¶¶ 6-8, 12-13.) Ms. Gaylor and Mr. Barker also instruct their non-theistic constituency on things like how to conduct "godless funerals and secular memorials" and how to teach children about morality without religion. (*Id.* ¶¶ 6(a), 14(d) & (e).) Indeed, Ms. Gaylor and Mr. Barker perform services in order to promote beliefs and oriented around religion. (*See id.* ¶¶ 6-8, 12-14.) Thus, an atheist could certainly assert that they conduct sacerdotal functions; though those functions are devoid of theistic content, the functions themselves are the same as those conducted by ministers and rooted in personally held beliefs.

There is no reason to conclude that an atheist would not "be considered a spiritual leader by his or her religious body." *See Knight*, 92 T.C. at 204-205; *Wingo*, 89 T.C. at 934-937. Again using Plaintiffs as an example, the facts show that Ms. Gaylor and Mr. Barker are considered leaders among FFRF members. (Facts ¶¶ 1-18.) Moreover, at least one past president of FFRF has been viewed by the community as a religious leader. (*Id.* ¶ 15 (former President of FFRF and

former Plaintiff Anne Nicol Gaylor was voted "Madison's favorite religious leader" by Madison Magazine).) Mr. Barker refers to members of FFRF "somewhat as members or congregants." (*Id.* ¶ 6(a).) He has been "in demand" for "de-baptisms" and has been sought out by atheists for counseling and other services, given his special qualification as former theistic clergy. (*Id.* ¶¶ 6-8, 12-13.) Thus, Plaintiffs are not necessarily precluded from asserting that they qualify as a minister for purposes of § 107(2) under this factor.

Finally, with respect to whether or not an atheist might conduct worship services, *see* § 1.1402(c)-5(b)(2)(i), "worship services" is not a defined term, but Black's Law Dictionary defines "worship" as "[a]ny form of religious devotion, ritual, or service showing reverence, esp. for a divine being or supernatural power." BLACK'S LAW DICTIONARY, "Worship" (9th Ed. 2009). Certainly, if non-theism were excluded from the definition of "worship," there would be no need for the qualification that worship "especially," though not exclusively, refers to a divine being or supernatural power. Thus, some non-theistic ritual might fit within the definition of worship services. (*Cf.* Facts ¶ 16.)

Thus, Plaintiffs cannot demonstrate that they have standing to continue further with this pre-enforcement challenge. In light of the foregoing, § 107(2) is "susceptible to an interpretation that would remove the need for resolving the constitutional questions raised," *see Cal. Medical Ass'n*, 453 U.S. at 192 n.14, so Plaintiffs do not have a "credible threat of prosecution" due to religious discrimination under its terms if they were to claim the exclusion in § 107(2), *see Alvarez*, 679 F.3d at 590-591. Ms. Gaylor and Mr. Barker cannot show that they face a "certainly impending" application of § 107(2) that discriminates against them on the basis of religious criteria or any other "imminent" injury. They have no facts to support their allegation of hypothetical future injury as a result of the potential enforcement of § 107(2) against them, and

therefore do not have standing to sue. *See Clapper*, 133 S. Ct. at 1147. At a minimum, sufficient

doubt exists as to the meaning of § 107(2) as applied to Plaintiffs or to some other set of non-

theistic litigants who might attempt to qualify for the exclusion under § 107, it is impossible to

conclude, in a vacuum, that they have suffered or certainly will suffer some injury. Therefore,

this Court should reject Plaintiffs' unsupported position that § 107 would necessarily be

administered in a manner that would discriminate against them on the grounds that the

Constitution prohibits speculative, non-imminent injuries. *See also Nat'l Fed'n of Indep. Bus.*,

132 S. Ct. at 2594 ("every reasonable construction must be resorted to, in order to save a statute

from unconstitutionality" (quotation omitted)).

### b. Plaintiffs' alleged, but unproven, injury is not traceable to government conduct.

Plaintiffs can show no facts to support their allegations that some injury to them is fairly

traceable to any government action. *See Lujan*, 504 U.S. at 560. The undisputed facts show that

the IRS addresses religion in a non-discriminatory manner. Conversely, Plaintiffs can show no

facts to support their beliefs that that they would be treated in a discriminatory fashion if they

attempted to claim the exclusion in § 107(2). Rather, the undisputed facts show that Ms. Gaylor

and Mr. Barker have never attempted to claim the exclusion. (Facts ¶¶ 26-27, 29-30.) They have

not communicated with the IRS or with the Treasury with respect to their housing allowances.

(*Id.* ¶¶ 35-37.) Ms. Gaylor's and Mr. Barker's failure to obtain an exclusion pursuant to § 107 is

not traceable to any government policy, but rather is solely traceable to their failure to even

attempt to claim it. And even if Ms. Gaylor and Mr. Barker did not qualify for the exclusion, it

would not be because of the contents of their beliefs. Indeed, in this factual vacuum, it is

impossible for Plaintiffs to refute that any such failure would only be attributable to non-

religious differences between themselves and those who qualify for an exclusion under § 107.

### 2.      Plaintiffs' claims are not ripe for adjudication.

Just as a litigant must establish that it has suffered an injury in fact in order to invoke the jurisdiction of the federal judiciary, so too must a litigant establish that its claims are ripe for adjudication. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). The ripeness requirement serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967) *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977); *see also Patel v. City of Chicago*, 383 F.3d 569, 572 (7th Cir. 2004). "Various considerations underpin the ripeness doctrine, including . . .  whether the facts of the case are sufficiently developed to provide the court with enough information on which to decide the matter conclusively, and whether a party is genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one." *Khodara Envtl., Inc. v. Blakely*, 376 F.3d 187, 196 (3d Cir. 2004) (quotations omitted). "Courts should not issue declaratory judgments until the dispute is ripe, and must avoid unnecessary constitutional adjudication." *Brandt v. Village of Winnetka*, 612 F.3d 647, 650 (7th Cir. 2010) (citation omitted).

This case is premature because Ms. Gaylor and Mr. Barker cannot show that § 107(2) would be enforced against them in a discriminatory fashion. While there is an exception allowing certain pre-enforcement cases to be heard, *see Rock Energy Coop. v. Village of Rockton*, 614 F.3d 745, 749 (7th Cir. 2010), "the ripeness of a pre-enforcement challenge hinges on 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbot Labs.*, 387 U.S. at 149). According to the Seventh Circuit, to

demonstrate that a court should hear a pre-enforcement challenge, a party must assert "how a decision on [a] declaratory judgment complaint would resolve some *present hardship*." *Id.* (emphasis added). But when the manner in which a statute could be applied to a plaintiff "is uncertain," the dispute is "unripe" and "it is unwise to exercise discretion to issue a declaratory judgment that may occasion premature constitutional adjudication." *Brandt*, 612 F.3d at 649.

Here, just as Plaintiffs cannot show an injury in fact, Plaintiffs cannot show that they suffer any present hardship. Because Plaintiffs have no facts to support their allegation that § 107(2) would be applied in a discriminatory fashion against them, and instead the application of § 107(2) to Ms. Gaylor and Mr. Barker is uncertain, *see Brandt*, 612 F.3d at 649, there is no "probability of future injury" from an implied threat of prosecution to substitute for a present hardship. *See Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010). This is a case in which "it is hard to see how a court can evaluate an as-applied challenge sensibly until a law *is* applied, or application is soon to occur and the way in which it works can be determined." *Brandt*, 612 F.3d at 649 (emphasis in original). Therefore, a declaratory judgment regarding the constitutionality of the challenged statute is unwarranted.

### 3.   Because Plaintiffs lack standing to sue, the Administrative Procedure Act does not waive the United States' sovereign immunity in this case.

Before a federal district court may entertain a suit against the United States, a plaintiff must identify (1) "a statute that confers subject matter jurisdiction on the district court" and (2) "a federal law that waives the sovereign immunity of the United States to the cause of action." *Macklin v. United States*, 300 F.3d 814, 819 (7th Cir. 2002); *accord United States v. Dalm*, 494 U.S. 596, 608-10 (1990) (the "rules of jurisdiction" require that federal courts remain within "the authority Congress has given [them] in permitting suits against the Government"). Failure to satisfy both of these requirements "mandates the dismissal of the plaintiff's claim." *Id.*; *see also*

*United States v. Mitchell*, 445 U.S. 535, 538 (1980) (plaintiffs must "look beyond the jurisdictional statute for a waiver of sovereign immunity").

Plaintiffs fail to identify any federal law that effectively waives the sovereign immunity of the United States for their claims. "It is axiomatic that a suit cannot be maintained against the United States without its consent." *Balistrieri v. United States*, 303 F.2d 617, 619 (7th Cir. 1962). "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citations omitted).

Section 702 of the Administrative Procedure Act ("APA") does not waive sovereign immunity for this case. The APA does not provide an independent or sufficient basis for subject matter jurisdiction for Plaintiffs' claims. *See Califano*, 430 U.S. at 107 ("the APA does not afford an implied grant of subject matter jurisdiction"). The statute states, in pertinent part, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." *Id.* It permits "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." *Id.* This provision does not "affect[ ] other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." *Id.*

Thus, for § 702 to operate as a waiver of sovereign immunity, a plaintiff must allege an injury in fact sufficient to provide Article III standing to sue. *Apter v. Richardson*, 510 F.2d 351, 353 (7th Cir. 1975). This requirement ensures "that the plaintiff has a sufficient personal stake in

the outcome of the controversy to ensure vigorous presentation of the issues." *Id.* (citing *Flast v. Cohen*, 392 U.S. 83, 102-03 (1968)); *see also United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689-90 & n.14 (1973) ("Of course, pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action.").

As just discussed, Plaintiffs do not have standing to bring this action. The APA does not cure this deficiency and does not waive sovereign immunity in this case. Nor do Plaintiffs' remaining jurisdictional citations in the Amended Complaint waive sovereign immunity. *Beale v. Blount*, 461 F.2d 1133, 1138 (5th Cir. 1972) (28 U.S.C. §§ 1331 and 1343 "may not be construed to constitute waivers of the federal government's defense of sovereign immunity"); *Balistrieri*, 303 F.2d at 619 (28 U.S.C. § 2201 does not waive sovereign immunity). Because Plaintiffs have failed to identify "a federal law that waives the sovereign immunity of the United States to the cause of action," *see Macklin*, 300 F.3d at 819, this Court lacks subject matter jurisdiction. *See also Schilling v. Wis. Dep't of Natural Res.*, 298 F. Supp. 2d 800, 802-04 (W.D. Wis. 2003).

**B.     Section 107 and its implementing regulations are constitutional.**

     **1.     Plaintiffs' equal protection claim should be evaluated under the Establishment Clause analysis.**

Plaintiffs attempt to articulate two distinct claims in their Amended Complaint: one under the Establishment Clause and one under the Due Process Clause for violation of their equal protection rights. (Doc. 13 ¶ 1; *id.*, Prayer for Relief, ¶ A.) At base, however, their equal protection claim adds nothing to their Establishment Clause claim. *See World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 534 (7th Cir. 2009). Even when challenged under equal protection, the Establishment Clause analysis is the proper one to undertake first for a statute like

§ 107 that "afford[s] a uniform benefit to all religions" and does not discriminate among them. *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338-39 (1987); *accord Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004); *Larson v. Valente*, 456 U.S. 228, 252 (1982); *see World Outreach Conf. Ctr.*, 591 F.3d at 534; *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) (holding that a plaintiff's "free-exercise claim arises under the First Amendment and gains nothing by attracting additional constitutional labels" like equal protection); *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 354 (1st Cir. 2004). A statute that is consistent with the Establishment Clause then receives only rational basis scrutiny in the equal protection analysis. *Locke*, 540 U.S. at 720 n.3; *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007).

### 2.    Section 107 is constitutional under the Establishment Clause analysis.

The Establishment Clause of the First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. The Supreme Court "will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Walz v. Tax Com. of City of New York*, 397 U.S. 664, 669 (1970). "The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Id.* at 673.

To navigate the "play in the joints" for any statute challenged under the Establishment Clause for affording some benefit to religion, the typical analysis is what has become known as the *Lemon* test. First articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), and further developed in myriad additional precedent, the Lemon test "remains the prevailing analytical tool

for the analysis of Establishment Clause claims." *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012), *petition for cert. filed*, (U.S. Dec. 20, 2012) (No. 12-755) (quotation omitted). To be consistent with the Establishment Clause (1) a challenged statute must have "a secular legislative purpose;" (2) the principal or primary effect of the statute "must be one that neither advances nor inhibits religion;" and (3) the statute "must not foster 'an excessive government entanglement with religion.'"[8] *Lemon*, 403 U.S. at 612-613 (quoting *Walz*, 397 U.S. at 674); *Elmbrook Sch. Dist.*, 687 F.3d at 849. Like other tax provisions that touch on religion, § 107 is consistent with the Establishment Clause. *E.g.*, *Droz v. Comm'r*, 48 F.3d 1120, 1124-25 (9th Cir. 1995) (applying the *Lemon* test, and upholding the constitutionality of § 1402(g) against an Establishment Clause challenge); *Ballinger v. Comm'r*, 728 F.2d 1287, 1292-93 (10th Cir. 1984) (rejecting Establishment Clause challenge to § 1402(e)); *Templeton v. Comm'r*, 719 F.2d 1408, 1412 n.5 (7th Cir. 1983) (rejecting a constitutional challenge to § 1402(g) for lack of standing, but also noting that courts reaching the merits of that question had "uniformly held that this section is not unconstitutional").

> **a.   The secular purpose of § 107 is to eliminate discrimination between religious and secular employees, and among religious employees.**

On its face, § 107 is related to religion. But that does not end the inquiry, because a statute does not need to be "unrelated to religion" to have a secular purpose. *Amos*, 483 U.S. at 335. "[T]he Establishment Clause has never been so interpreted." *Id.*; *accord Texas Monthly*, 489

---

[8] While the Supreme Court has occasionally discussed whether "excessive entanglement" is "a factor separate and apart from 'effect,'" *Agostini v. Felton*, 521 U.S. 203, 232 (1997), or "an aspect of the inquiry into a statute's effect," *Mitchell v. Helms*, 530 U.S. 793, 806 (2000), it is clear that purpose, effect, and entanglement remain integral to Establishment Clause jurisprudence.

U.S. 1, 10 (1989) (Brennan, Marshall, & Stevens, JJ.) (the Supreme Court has never required "that legislative categories make no explicit reference to religion"). "Rather, *Lemon*'s 'purpose' requirement aims at preventing the relevant governmental decisionmaker -- in this case, Congress -- from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Amos*, 483 U.S. at 335. There is no requirement for complete separation between church and state because "total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Lemon*, 403 U.S. at 614. "A statute may be motivated in part by a religious purpose and nonetheless satisfy the first criterion of *Lemon*" because the law also serves a secular purpose. *Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010). A reviewing court generally defers to the United States' articulation of a secular purpose "unless it is a sham." *Id.* at 508; *see also Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2594 ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" (quotation omitted)).

"The eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." *McCreary County v. ACLU*, 545 U.S. 844, 862 (2005) (quotations omitted). A court may also look to the statute's "interpretation by a responsible administrative agency, . . . the historical context of the statute, and the specific sequence of events leading to passage of the statute." *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987) (internal citations omitted); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1019-21, 1028 (9th Cir. 2010); *Katcoff v. Marsh*, 755 F.2d 223, 232-35 (2d Cir. 1985); *see Karlin v. Foust*, 975 F. Supp. 1177, 1210 (W.D. Wis. 1997) (Crabb, J.) *aff'd in part, rev'd in part on other grounds by* 188 F.3d 446 (7th Cir. 1999).

Here, the secular purpose of § 107 should be interpreted not only in light of the Establishment Clause, but also in light of "other equally valid provisions of the Constitution, including the Free Exercise Clause, when they are implicated." *Katcoff*, 755 F.2d at 233. Here, the additional and "equally valid" provision of the Constitution is Congress' authority to "lay and collect [t]axes." U.S. Const. art. 1 § 8. Because Congress is charged with the power to lay and collect taxes, it has two options with respect to religion and religious entities: it may ignore them completely or it may address them in a manner that navigates the space between accommodating the free exercise of religion and establishing religion. "Either course, taxation of churches or exemption, occasions some degree of involvement with religion." *Walz*, 397 U.S. at 674.

In the exercise of its power to lay and collect taxes, Congress has chosen to tax a minister's (and all other taxpayers') "gross income," which "means all income from whatever source derived." § 61(a). There is no exception for wages derived from an occupation as a religious leader. Section 107, though, provides an exception from gross income for the in-kind housing, or housing allowance, that a minister receives from his employer. The secular purpose of § 107, as it exists today and as described more fully below, is to eliminate discrimination between secular and non-secular employees, and among employees of different religious groups. Eliminating discrimination between secular and non-secular employees, and among religious employees, is a valid secular purpose for a statute and, here, is consistent with the Establishment Clause. *See Warnke v. United States*, 641 F. Supp. 1083, 1092 (E.D. Ky. 1986) ("Section 107(2) was added to equalize the disparate treatment between ministers who were provided a parsonage and those who were compensated more generously to provide one for themselves."); *see also Cutter v. Wilkinson*, 544 U.S. 709, 724 (2005) (finding the lack of discrimination between bona fide faiths relevant to finding valid accommodation); *Found. of Human Understanding v. United*

29

*States*, 88 Fed. Cl. 203, 216 (2009) (not reaching the constitutionality of a challenged provision, but observing that "[w]hile the government may constitutionally tax the income of religious organizations and may decide not to exercise this power and grant reasonable exemptions to qualifying organizations while continuing to tax those who fail to meet these qualifications, unconstitutional discrimination may nevertheless arise if benefits granted to one religious group are denied to others of essentially the same class." (quotations and alteration omitted)); *Kaufman*, 419 F.3d at 684 (by accommodating only some religious meetings and not all (including the requested atheist group), according to the Seventh Circuit, the prison officials were "promoting the favored [religious views]" in a manner inconsistent with the Establishment Clause and the first prong of *Lemon*).

These goals satisfy the secular purpose requirement even under the logic of the plurality opinion in *Texas Monthly*. In applying a more narrow view of the secular purpose prong to tax exemptions, the Court suggested that an otherwise constitutionally suspect benefit could be saved if it "remov[ed] a significant state-imposed deterrent to the free exercise of religion" and did not "burden[] nonbeneficiaries markedly." *Texas Monthly*, 489 U.S. at 15 (citing *Amos*, 483 U.S. at 348 (O'Connor, J., concurring in judgment)). With respect to what might qualify as removing state-imposed burdens on the free exercise of religion, Justice O'Connor opined that "lift[ing] from a nonprofit  activity of a religious organization the burden of demonstrating that the particular nonprofit activity is religious as well as the burden of refraining from discriminating on the basis of religion" should be viewed as "an accommodation of the exercise of religion rather than . . . a Government endorsement of religion." *Amos*, 483 U.S. at 348-49 (O'Connor, J., concurring in judgment); *see also Rust*, 500 U.S. at 191 ("assum[ing Congress] legislates in the light of constitutional limitations").

### i.    The historical context and legislative history of § 107 show its secular purpose of nondiscrimination.

The path of enactment of the current version of § 107, and its historical context, illustrate its secular purposes: (1) to eliminate tax discrimination between secular employees who received lodging for the convenience of their employer and ministers who did the same and (2) to eliminate discrimination among ministers of various faiths, not all of whom received lodging from their religious employers. Long before there was an income tax in the United States, it was the standard ecclesiastic housing practice in Western Europe for religious organizations to provide housing for their spiritual leaders on church grounds or nearby to church grounds. (Facts ¶¶ 38-40.); ALAN SAVIDGE, THE PARSONAGE IN ENGLAND 7-9 (1964). When American colonists, many of them Christians of some denomination, arrived in what would become the United States, they brought this practice with them. (*Id.* ¶¶ 38-42.) Among the motivating reasons for providing ministers such housing were: the need for immediate spiritual care for congregants at unpredictable times, day or night; to reinforce the faith's expectations for simple living among its clergy; to free the minister from temporal concerns to focus on spiritual work; and to facilitate quick and easy deployment of clergy. (*Id.* ¶ 39-40.) Being able to fulfill these tasks were at the heart of a minister's job requirements. (*See id.*)

A minister's home was typically used for religious purposes "such as a meeting place for various church groups and as a place for providing religious services such as marriage ceremonies and individual counseling." *Immanuel Baptist Church v. Glass*, 497 P.2d 757, 760 (Okla. 1972); *State v. Erickson*, 182 N.W. 315, 319-20 (S.D. 1921); *see generally* Maurice T. Brunner, *Taxation: Exemption of Parsonage or Residence of Minister, Priest, Rabbi, or Other Church Personnel*, 55 A.L.R.3d 356, 404 (1974) ("Most ministerial residences can be expected to be incidentally used to some considerable extent as an office, a study, a place of counseling, a

place of small meetings, such as boards or committees, and a place in which to entertain and lodge church visitors and guests."); (Facts ¶¶43-44.). Recognizing that a minister's residence may be used to conduct church business, the constitutions or statutes of many states specifically exempt residences of clergy from property tax. John Witte, Jr., *Taxation of Church Property: Historical Anomaly or Valid Constitutional Practice*, 64 S. CAL. L. REV. 363, 391-392 (1991); *Walz*, 397 U.S. at 666-67. In the nineteenth and early twentieth centuries, the parsonage system was in "very wide use," especially among the most established religions like the Roman Catholic Church and Methodist Episcopal churches. (Facts ¶¶ 45-52.)

The modern federal income tax was authorized by the ratification of the 16th Amendment to the Constitution and the first statutes providing for individual income tax were enacted in 1913. *See Brushaber v. Union P. R. Co.*, 240 U.S. 1, 20 (1916). Once income was to be taxed, questions arose about whether certain income would be excluded or exempt from that tax, and if so, which income. (Facts ¶¶ 60-61.) During 1919, 1920, and 1921, the Treasury Department determined that some secular employees would be permitted to exclude employer-provided housing from their taxable income. *See generally Comm'r v. Kowalski*, 434 U.S. 77, 84-90 (1977) (describing history of tax exemptions for employer-provided housing); (Facts ¶ 65). They included seamen living aboard ship (O.D. 265, 1 C.B. 71 (1919)); persons living in "camps" (T.D. 2992, 2 C.B. 76 (1920)); cannery workers (O.D. 814, 4 C.B. 84, 84-85 (1921)); and hospital employees (O.D. 915, 4 C.B. 85, 85-86 (1921)). These rulings began the "convenience of the employer doctrine," which were supported by the rationale that the housing benefits supplied by the employer to the employee were not "compensation for services and hence not income" and/or that the employees were granted the benefit "solely because the employer's

business could not function properly unless an employee was furnished that benefit on the employer's premises." *Kowalski*, 434 U.S. at 85-86; (*see also* Facts ¶ 65.)

In 1921, however, the Department of Treasury announced that clergy would be taxed on the fair rental value of parsonages provided as living quarters, O.D. 862, 4 C.B. 85 (Apr. 1921), even though ministers traditionally resided in church-provided housing for the convenience of their employers (Facts ¶¶ 39-40, 46-47, 49, 59, 61), Congress reversed Treasury's decision by enacting § 213(b)(11) of the Revenue Act of 1921, which provided an exclusion for "[t]he rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel as part of his compensation." In this way, Congress eliminated the discrimination between secular employees who received lodging on their employer's premises for their employer's convenience and religious employees who received the same. It is likely that Congress enacted § 213(b)(11) with the awareness that ministers were housed in parsonages for the convenience of their employers and in furtherance of their job duties. (Facts ¶¶ 62-66; *see also id.* ¶¶ 51-59.)

The language of § 213(b)(11) was carried forward in successive revenue acts and was incorporated into the Internal Revenue Code of 1939 without substantive change. *See* Report of the Joint Committee on Internal Revenue Taxation, Vol. I at 7 (1927); Revenue Act of 1928, Pub. L. No. 562, ch. 582, § 22(b)(8), 45 Stat. 791, 798; Revenue Act of 1932, Pub. L. No. 154, ch. 209, § 22(b)(6), 47 Stat. 169, 179; Internal Revenue Code of 1939, Pub. L. No. 1, 53 Stat. 1, 10.

But, at the time, less-established and less wealthy religions were not able to provide housing for their spiritual leaders; among them were denominations that employed part-time ministers and rabbis "characteristic of smaller, newer, and less affluent religious groups such as Pentecostals, evangelical churches, and independent African-American congregations. (Facts

¶¶ 48-49, 67-76.) When churches that did not own parsonages provided their ministers with cash housing allowances in lieu of housing in kind (*id.* ¶¶ 72-74), Treasury took the position that such allowances must be included in income. *See* I.T. 1694, C.B. II-1, 79 (1923) ("the statute [section 213(b)(11)] applies only to cases where a parsonage is furnished to a minister and not to cases where an allowance is made to cover the cost of a parsonage"); (Facts ¶ 73). Several courts, however, rejected Treasury's position and held such allowances to be excludable. *See Conning v. Busey*, 127 F. Supp. 958, 959 (S.D. Ohio 1954); *MacColl v. United States*, 91 F. Supp. 721, 722 (N.D. Ill. 1950); *Williamson v. Comm'r*, 224 F.2d 377, 381 (8th Cir. 1955), *rev'g* 22 T.C. 566 (1954). As the Eighth Circuit stated in *Williamson*, "it was not the intent nor purpose of Congress that a house allowance in lieu of the rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel should be included in his gross income." *Williamson*, 224 F.2d at 381; (*see also* Facts ¶ 73 ). It was just as important to those denominations lacking a parsonage to provide housing for their ministers for the same reasons that housing a minister in a parsonage was important. (Facts ¶¶ 68-69.)

When § 107 came into the Code in its present form in 1954, Congress added § 107(2), which allowed ministers to exclude certain "rental allowance[s]." Pub. L. No. 591, ch. 736, sec. 107, 68A Stat. 3, 32. The 1954 amendment that added Section 107(2) was expressly intended to eliminate discrimination between ministers who received housing in-kind and those who received a cash housing allowance. *See* H.R. Rep. No. 1337, at 15 (1954); S. Rep. No. 1622, at 16 (1954); *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 117 n.13 (quoting *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) ("'It is not only appropriate but realistic to presume that Congress was thoroughly familiar'" with pertinent judicial precedents "'and that it expects its enactments to be interpreted in conformity with them.'")); (see also Facts ¶¶ 51-58, 62-66).

Indeed, Congress was urged to include the housing allowance provision in the 1954 Code

precisely because the Commissioner "had not acquiesced [in *MacColl*], and those ministers

entitled to relief must litigate in order to get relief." *See* Forty Topics Pertaining to the General

Revision of the Internal Revenue Code: Hearings Before the House Comm. on Ways and Means,

83rd Cong. at 1574 (1953) (statement of Ray G. McKennan). The House Report stated explicitly:

> Under present law, the rental value of a home furnished a minister
> of the gospel as a part of his salary is not included in his gross
> income. This is unfair to those ministers who are not furnished a
> parsonage, but who receive larger salaries (which are taxable) to
> compensate them for expenses they incur in supplying their own
> home. Your committee has removed the discrimination in existing
> law by providing that the present exclusion is to apply to
> rental allowances paid to ministers to the extent used by them to
> rent or provide a home.

H.R. Rep. No. 1337, at 15 (1954); *accord* S. Rep. No. 1622, at 16 (1954) (making no changes to

the House Report).

When Congress clarified the extent of the parsonage exclusion provided in § 107 by

adding § 107(2), it simultaneously created § 119 in order to clarify the law of employer-provided

lodging. Over time, Congress added still more provisions to the Internal Revenue to

acknowledge other groups of taxpayers who have unique housing needs because of their

employment and who, therefore, need not include housing benefits in their gross income. *See*

§§ 134, 911, & 912 (discussed below in § III.B.2.a.ii). These exclusions all possess the valid

secular purpose of lessening the burden of housing costs for persons whose occupations often

require particular housing, rather than housing according to the individual's own free choice.

Although the IRS and the Tax Court had always interpreted § 107(2) to require a

limitation on amounts excludable up to the fair rental value of a minister's house, *see, e.g.*, Rev.

Rul. 71-280, 1971-2 C.B. 92; *Marine v. Comm'r*, 47 T.C. 609 (1967); *Reed v. Comm'r*, 82 T.C.

208 (1984), the statutory language did not reflect that limitation until the passage of the Clergy

Housing Allowance Clarification Act of 2002, P.L. 107-181 (2002).

Even today, both provisions of § 107 are necessary because different religions address

their clergy housing needs in different ways in light of the changing culture and demographics of

the United States. (Facts ¶¶ 68-103.) It is still the case that more established and wealthier

churches, or those with a long history of parsonage, are more likely to have on-site or nearby

church-owned property for their clergy. (*Id.* ¶¶ 45-47, 51, 67, 70-71, 76, 80.) In many rural or

high-priced areas of the country, a church-owned home might be the only way that a minister can

live near her congregation, especially in light of the generally low wages for ministers. (*Id.* ¶¶

90-96.) In other situations, a housing allowance is more suited to the needs of the church

because, for example, it can only afford a part-time minister (*id.* ¶¶ 49-54, 67, 70), the

congregation is newer and has not yet determined where to establish a place of worship (but still

needs to support its minister) (*id.* ¶¶ 77-79, 100-101), or to eliminate some of the temporal

concerns of its spiritual leader (*id.* ¶¶ 83-88, 97-99, 102). Therefore, § 107 has the permissible

secular purpose of eliminating government discrimination between secular and non-secular

employees and among religious employees, and therefore furthers one of the core purposes of the

Establishment Clause. *Cf. Larson*, 456 U.S. at 255 (holding that a statute that discriminates

among religions violates the Establishment Clause); *Fowler v. Rhode Island*, 345 U.S. 67, 69-70

(1953) (state statute under which minister-appellant was arrested held to violate the

Establishment Clause for preferring one religion over another). For the same reasons, § 107

"remov[ed] a significant state-imposed deterrent to the free exercise of religion," *see Texas

Monthly*, 489 U.S. at 15, because it "lift[ed] from a nonprofit activity of a religious organization

the burden of demonstrating that the particular nonprofit activity is religious as well as the

36

burden of refraining from discriminating on the basis of religion." *Amos*, 483 U.S. at 348-349

(O'Connor, J., concurring in judgment).

> **ii.** **The context of the current administration of § 107 and other tax statutes regarding housing benefits for employees show § 107's secular purpose of nondiscrimination.**

In addition to § 107, there are other provisions of the Internal Revenue Code that, like

§ 107, acknowledge groups of taxpayers who have unique housing needs because of their

employment. These statutes provide a similar income tax exclusion as § 107 does for in-kind

housing provided by an employer or for a housing allowance. *See* §§ 119, 134, 911, & 912. The

provisions that exclude housing allowances from gross income reflect the congressional decision

that various housing allowances should effectively be treated as provided for the convenience of

the employer, even though the employee does not receive the lodging in-kind, in order to

eliminate discrimination between similarly situated groups.

Section 119 of the Internal Revenue Code provides an exclusion from gross income for

employer-provided lodging. Under § 119, an exclusion is available for the value of housing

provided on the "business premises," when the housing is provided "at the convenience of

employer," and if the housing is provided "as a condition of employment" such that the

employee is "required to accept the lodging in order to enable him properly to perform the duties

of his employment" *See* § 1.119-1(b)-(c). All taxpayers, regardless of profession, may qualify for

an exclusion from gross income of the value of employer-provided lodging, so long as the

taxpayer meets those criteria.

More specifically, § 134 of the Code excludes from gross income "any qualified military

benefit," meaning "any allowance or in-kind benefit (other than personal use of a vehicle),"

which is received by reason of the taxpayer's status as a member of the uniformed services. As is

relevant here, one excludable allowance is the "basic allowance for housing" authorized in 37

U.S.C. § 403, which varies according to pay grade, dependency status, and geographic location.

The basic housing allowance is to furnish housing for members of the military and their families

when they are not housed on government property. *See* Department of Defense, Basic Allowance

for Housing (BAH), available at http://www.defensetravel.dod.mil/site/bah.cfm (last visited Jun.

22, 2013).

In addition, § 912 of the Internal Revenue Code excludes from gross income, among

other things, certain "foreign area allowances" paid to civilian officers and employees of the

Foreign Service, the CIA, and other agencies, as well as Peace Corps allowances. Although the

statute itself does not explicitly mention housing, the Overseas Differential and Allowances Act

(ODAA), codified in § 912(1)(C), is the main vehicle for tax-exempt housing allowances for

government workers overseas. *See*, *e.g.*, *Induni v. Comm'r*, 98 T.C. 618 (1992), aff'd, 990 F.2d

53 (2d Cir. 1993) (INS employee); *Anderson v. United States*, 16 Cl. Ct. 530 (1989), aff'd, 929

F.2d 648 (Fed. Cir. 1991) (civilian teachers in overseas military schools); *Bell v. United States*,

1977 U.S. Ct. Cl. LEXIS 586 (Ct. Cl. 1977) (Foreign Service officer). The legislative history of

the ODAA reflects that Congress wanted to equalize the treatment afforded to United States

employees in foreign countries who were provided free housing, and those who were not, just as

§ 107(2) was intended to remove discrimination against ministers who receive a cash allowance

instead of a parsonage. *See Anderson*, 16 Cl. Ct. at 533-535. The purpose of the ODAA was "to

improve and strengthen government overseas activities by establishing a uniform system for

compensating all government employees in overseas posts irrespective of the agency by which

they are employed" and to "provide uniformity of treatment for all overseas employees to the

extent justified by relative conditions of employment." S. Rep. No. 1647, 86th Cong., 2d Sess., 3338, n.7.

Section 911 permits a United States citizen or resident living abroad to exclude from her gross taxable income a portion of her foreign housing expenses. § 911(a)(2) & (c)(4). The total exclusion allowed is the amount of her foreign housing expenses for the year, minus a base amount. § 911(c)(1). The exclusion is limited to a maximum cap, which varies depending on the location of the taxpayer's foreign home. § 911(c)(2). In the event that the taxpayer maintains more than one home outside the United States, one for herself and one for her spouse and dependents, she may claim the foreign housing exclusion for both homes if her family does not reside with her due to "living conditions which are dangerous, unhealthful, or otherwise adverse." § 911(c)(3)(B)(ii).

Thus, § 107 is part of an overall effort in the Internal Revenue Code to recognize situations – all worthy, in the view of Congress – in which the particular housing requirements of a particular group of employees call for a particular tax exclusion arising out of the nature of their job duties. These exclusions lessen the burden of housing costs for persons whose occupations – whether minister, soldier, diplomat, Peace Corps volunteer, or United States citizen or resident living and working abroad – often require particular housing, rather than housing according to the individual's own free choice. Therefore, § 107 does not "burden[] nonbeneficiaries markedly" because it is just one of the provisions in the Internal Revenue Code that provides an exclusion from gross income for employees who have unique housing needs

because of their employment.[9] *See Texas Monthly*, 489 U.S. at 15. Therefore, all contextual evidence available shows that the secular purpose of § 107 is not to advance religion, but to fit in with other provisions of the Internal Revenue Code that address housing realities for different groups of taxpayers.

For all of these reasons, § 107 meets the first prong of the *Lemon* test: it has a secular purpose. Plaintiffs can show no facts to demonstrate otherwise.

> **b.    The primary effect of § 107 does not advance or inhibit religion.**

A law does not have the primary effect of advancing religion merely because "religious groups [are] better able to advance their purposes on account of [the law]." *Amos*, 483 U.S. at 336 (citations omitted); *accord Bd. of Educ. of Kiryas Joel Vill Sch. Dist. v. Grumet*, 512 U.S. 687, 719 (1994); *Bowen v. Kendrick*, 487 U.S. 589, 607 (1988); *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). Rather, the test is whether "the *government itself* has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337 (emphasis in original); *accord Cohen v. City of Des Plaines*, 8 F.3d 484, 491 (7th Cir. 1993). "Under this prong, the question is: irrespective of government's actual purpose, whether the practice under review in fact conveys a message of endorsement or disapproval."[10] *Sherman*, 623 F.3d at 517 (quotation omitted). Here, under § 107, the United States neither advances nor inhibits religion. Instead, and as described *supra*, the primary effect of § 107 is to implement its secular purpose of nondiscrimination.

---

[9] Section 107 also avoids a marked burden to nonbeneficiaries because it is an income tax exclusion and does not spend taxpayer money in support of religion. *See infra* § III.B.2.b.i(a).

[10] Although some courts identify the "endorsement test" as distinct from the *Lemon* test, the Seventh Circuit appears to include it in the "effects" prong of *Lemon*. *See Elmbrook Sch. Dist.*, 687 F.3d at 849-50; *Sherman*, 623 F.3d at 517.

### i.    The United States does not advance religion through § 107.

#### (a)    A tax exclusion like § 107 does not "advance religion" because it leaves religion alone.

Section 107 permits a "minister" to exclude from gross income (and therefore exclude from federal income taxation) a housing allowance provided as part of his or her compensation by an employer. § 107(2). It does not spend taxpayer dollars in support of religion or religious entities. The fact that § 107 involves a tax *exclusion*, rather than the granting of a *direct subsidy* from government to religion, is crucial to an understanding of its constitutional soundness. *See* Douglas Laycock, *Towards a General Theory of the Religion Clauses*, 81 COLUM. L. REV. 1373, 1416 (1981) (Government "does not . . . establish religion by leaving it alone."). A line of cases going back at least 90 years instructs that government may, consistent with the Constitution, refrain from imposing a burden on religion through a regulatory or tax exemption, even though the scope of the provision is religion-specific. In *Arver v. United States*, the Supreme Court said that "the unsoundness" of an Establishment Clause challenge to draft exemptions for ministers and theological students was "too apparent" to require further comment. 245 U.S. 366, 389-390 (1918). More than 60 years ago, in *Zorach v. Clauson*, the Court held that the religion-specific exemption did not offend the First Amendment, because the Establishment Clause did not require "that the government show callous indifference to religious groups." 343 U.S. at 314. To do so "would be preferring those who believe in no religion over those who believe." *Id.*

The Supreme Court last examined a tax exemption granted on the basis of an entity's religious status in *Walz*, holding that "[t]he legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion," and thus "is neither sponsorship nor hostility." 397 U.S. at 672. The New York statute did not attempt to establish religion, but "simply spar[ed] the exercise of religion from the burden of property taxation levied on private

41

profit institutions." *Id.* at 673. The fact that the exemption in *Walz* also applied to nonreligious organizations was not dispositive for the majority, which found it "unnecessary to justify" the exemption for religious organizations "on the social welfare services or 'good works'" they might provide. *Id.* at 674. Indeed, to have rested the exemption on a "good works" rationale would have invited excessive entanglement with religion. *Id.*

In a concurring opinion joined by Justices Marshall and Stevens, Justice Brennan focused on the distinction between tax exemptions and "governmental subsidy of churches," which "would of course, constitute impermissible state involvement with religion." *Id.* at 690; *see also Lemon*, 403 U.S at 625. He explained that a "subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole," whereas an exemption "assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes." *Walz*, 397 U.S. at 690. Thus "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Id.* at 675; *see also Elmbrook Sch. Dist.*, 687 F.3d at 869 (Easterbrook, J., dissenting) ("The actual Establishment Clause bans laws respecting the *establishment* of religion[,]" which, among other things, is "taxation for the support of a church[ or] the employment of clergy on the public payroll." (emphasis in original)). While the Court in *Regan v. Taxation With Representation* pointed out that tax exemption is similar to a direct government subsidy, it quoted *Walz* to clarify that it did not mean they were identical in all respects. *Taxation With Representation*, 461 U.S. 540, 544 (1983). Consequently, "[t]here is no genuine nexus between tax exemption and establishment of religion." *Walz*, 397 U.S. at 676; *ACSTO*, 131 S. Ct. at 1447 (remarking that tax

credits do not implicate individual taxpayers in sectarian activities, thus lacking the requisite

nexus between a taxpayer and the challenged government program).

In *Texas Monthly v. Bullock*, the question before the Supreme Court was whether a state

sales tax exemption "violate[d] the Establishment Clause or the Free Press Clause of the First

Amendment *when the State denies a like exemption for other publications*." 489 U.S. at 5

(emphasis added). Notably, the *Texas Monthly* plurality expressly repudiated any inference "that

*all* benefits conferred exclusively upon religious groups or upon individuals on account of their

religious beliefs are forbidden by the Establishment Clause unless they are mandated by the Free

Exercise Clause." *Id.* at 18 n.8 (emphasis in original); *see also id.* at 38 (Scalia, J., dissenting)

(emphasizing that the Court had never adopted such a sweeping proposition). The plurality

argued that the Constitution prohibited "government direct[ing] a subsidy exclusively to

religious organizations that is not required by the Free Exercise Clause and that either burdens

non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed

deterrent to the free exercise of religion," *id.* at 15, while acknowledging that such a benefit

would be permissible if provided to a sufficiently wide array of recipients that it operated to

advance some secular purpose and primary effect,[11] *id.* at 14-15 & n.4.

But a tax exemption does not implicate the same constitutional concerns as a direct

subsidy. Any assertion that Justice Brennan regarded a tax exemption to be indistinguishable

from an actual "direct subsidy" is impossible to reconcile with the scrupulous distinction that he

---

[11] As discussed above, § 107 has a secular purpose of nondiscrimination and the Internal Revenue Code contains a number of statutes that provide classes of taxpayers other than ministers exclusions from gross income for housing benefits provided by their employers. *Supra* § III.B.2.a.ii.

and the majority drew between the two in *Walz. See Walz*, 397 U.S. at 690-691 (Brennan, J. concurring) ("A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer."). Such an assertion would also be impossible to reconcile with the Supreme Court's recent explanation in *ACSTO*, that tax benefits, including the tax credits at issue in that case, are qualitatively different from government spending for Establishment Clause purposes. 131 S. Ct. at 1447 ("The distinction between governmental expenditures and tax credits refutes respondents' assertion of standing. . . . The STO tax credit is not tantamount to a religious tax or to a tithe and does not visit the injury identified in *Flast*."). "When the government declines to impose a tax . . . there is no such connection between dissenting taxpayer and alleged establishment," and therefore no injury to a taxpayer.  *Id.* at 1447. This is so "even if one assumes that an expenditure or tax benefit depletes the government's coffers." *Id.* at 1444.

            **(b)**      **Section 107 does not advance religion because it is unlikely to create new incentives to religious activity.**

Given the specialized professional qualifications and job duties on which eligibility for the exclusion under § 107 depends, *see* §§ 1.107-1(a)-(b), 1.1402(c), it is unlikely that § 107 creates new incentives to religious activity. (*See* Facts ¶¶ 40(d), 46-47, 84, 94.) As discussed above, tax exclusions for employer-provided housing are available to a variety of professions under the Internal Revenue Code, thus there is no evidence to suggest that the advancement of religion is the primary effect of excluding that form of income for "ministers."

In addition, meeting the relevant requirements to qualify for an exclusion under § 107 would render a minister responsible for paying self-employment taxes, including on his parsonage or housing allowance, rather than splitting the employment tax burden with his or her employer as other employees do, and thereby possibly increasing his or her overall tax burden, or

44

at least substantially reducing the tax savings from § 107. § 1402(a)(8). Courts have upheld

regulatory exemptions implicating far more plausible incentives for religious activities than the

housing allowance exclusion involved here. *See Cutter*, 544 U.S. at 724-725 (acknowledging the

argument that "prison gangs use religious activity to cloak their illicit and often violent conduct,"

but nonetheless upholding religious accommodations against facial challenge); *Kiryas Joel*, 512

U.S. at 725 (Kennedy, J., concurring) (discussing draft exemption upheld in *Gillette v. United

States*, 401 U.S. 437 (1971)); *Amos*, 483 U.S. at 337 (exemption from civil rights staffing

constraints); *Hobbie v. Unemployment Appeals Com.*, 480 U.S. 136, 144-145 (1987)

(unemployment benefits); *Zorach*, 343 U.S. at 312, 315 (time off from public school for religious

education).

### ii.      Section 107 does not inhibit religion.

As described thoroughly above regarding the historical context for § 107 and its

legislative history, § 107 does not inhibit religion generally or any one religion in particular.

Similarly, the administration of § 107, described above in § III.A.1.a.i-iii and below in

§ III.B.2.c, does not inhibit religion. Its intent and its effect are to eliminate discrimination

between secular and non-secular employees and among employees of different religions. The

elimination of such discrimination is a valid secular purpose and effect. *See Amos*, 483 U.S. at

348-49 (O'Connor, J., concurring in judgment)).

### iii.     The government is not endorsing or disapproving of religion through § 107.

Section 107 does not "convey[] a message of endorsement or disapproval" of religion.

*Sherman*, 623 F.3d at 517. Courts have used the "reasonable observer" test, *see supra*

§ III.B.2.a.1, to evaluate what message the government is conveying. *Freedom from Religion

Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 10 (1st Cir. 2010); *Am. Atheists, Inc. v. Duncan*, 616

F.3d 1145, 1158-59 (10th Cir. 2010); *see also Elmbrook Sch. Dist.*, 687 F.3d at 850 (To evaluate the endorsement test in a religious display case "we must assess the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion." (quotation and alteration omitted)). It follows from the history and context of the statute described above in § III.B.2.a, the government is neither endorsing nor disapproving of religion through § 107. Congress exercised its power to lay and collect taxes upon ministers in a manner consistent with the Establishment Clause.

Thus, § 107 meets the second prong of the *Lemon* test: its primary effect is neither to advance nor inhibit religion. Plaintiffs can show no facts to demonstrate otherwise.

### c.    Section 107 does not foster excessive government entanglement with religion.

"Either course, taxation of churches or exemption, occasions some degree of involvement with religion." *Walz*, 397 U.S. at 674. Congress, pursuant to its authority to "lay and collect tax," U.S. Const. art. 1 § 8, and mindful of its obligation to "make no law respecting the establishment of religion," U.S. Const. amend. I, cl. 1, determined not to exempt religion and religious activity from all contact with areas of federal taxation. Instead, Congress enacted § 107, § 1402, and numerous other tax statutes that touch on religion. These statutes do require some administrative contact of the government with religion, which contact is limited, does not constitute "excessive entanglement," and is consistent with the Constitution. *Walz*, 397 U.S. at 676. (Excessive entanglement "cannot mean absence of all contact" between government and religion.). "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon*, 403 U.S. at 614.

To determine whether the "line of separation" has been crossed and the government entanglement with religion is "excessive," the court must "examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority," *id.* at 615, and whether the relationship between government and religion "is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement" *Walz*, 397 U.S. at 675. "The test is inescapably one of degree." *Id.* at 674.

The taxing authorities of the United States necessarily have some contact with religion because "gross income means all income from whatever source derived." § 61(a). There is no exception for income derived from an occupation as a religious leader. But this contact between the United States and religion, or religious persons, does not create an unconstitutional "establishment" of religion through "excessive entanglement." At least one court has already held that the administration of § 107 does not give rise to excessive entanglement with religion when considering whether a taxpayer qualified for the exclusion of a housing allowance under § 107(2). *Flowers v. United States*, 1981 U.S. Dist. LEXIS 16758, at *18 (N.D. Tex. Nov. 25, 1981) ("The Court finds that the requirements of section 107 do not create the substantial entanglement of the kind which the Supreme Court was referring to in *Walz* . . . ."); *see also Johnson-Bey v. Lane*, 863 F.2d 1308, 1312 (7th Cir. 1988) ("Patients in public hospitals, members of the armed forces in some circumstances . . . -- and prisoners -- have restricted or even no access to religious services unless government takes an active role in supplying those services. . . . The religious establishments that result are minor and seem consistent with, and indeed required by, the overall purpose of the First Amendment's religion clauses, which is to

promote religious liberty."); *Carter v. Broadlawns Med. Ctr.*, 857 F.2d 448, 456-57 (8th Cir.

1988); *Katcoff*, 755 F.2d at 231-32.

 The hallmark of *impermissible* government entanglement is when a challenged statute or

practice requires "intrusive judgments regarding contested questions of religious belief or

practice." *See Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008). Thus,

where government is required to make determinations regarding the "sacredness," validity, or

"religiousness" of a religious belief, entanglement may become excessive.

> The anti-entanglement rule originated in the context of education,
> changing with re-interpretations of the famous doctrine of *Lemon
> v. Kurtzman*, 403 U.S. 602, (1971), although it has migrated to
> other contexts. *See, e.g.*, *Rweyemamu v. Cote*, 520 F.3d 198, 208-
> 09 (2d Cir. 2008) (Title VII of the Civil Rights Act
> unconstitutional as applied to ordained priest); *Schleicher v.
> Salvation Army*, 518 F.3d 472, 474, 477-78 (7th Cir. 2008) (Fair
> Labor Standards Act presumptively excepts "clerical personnel").
> At first the prohibition on entanglements was formulated as an
> independent requirement of the Establishment Clause, later as one
> element of determining the "effect" of the law in advancing or
> inhibiting religion. *Agostini*, 521 U.S. at 232-33; *see also Zelman
> v. Simmons-Harris*, 536 U.S. 639, 668-69 (2002) (O'Connor, J.,
> concurring) (discussing history of the "entanglement inquiry.").
> Properly understood, the doctrine protects religious institutions
> from governmental monitoring or second-guessing of their
> religious beliefs and practices, whether as a condition to receiving
> benefits (as in *Lemon*) or as a basis for regulation or exclusion
> from benefits (as here). *See* Carl H. Esbeck, *Establishment Clause
> Limits on Governmental Interference with Religious
> Organizations*, 41 WASH. & LEE L. REV. 347, 397 (1984).

*Id.* (internal parallel citations omitted).

 By contrast, when "[t]he institution, rather than the State," determines what is devotional,

*Locke*, 540 U.S. at 717, there is no constitutionally impermissible entanglement. "This avoided

the intrusiveness problem; the State made no contentious religious judgments, but simply

deferred to the self-evaluation of the affected institutions." *Colo. Christian Univ.*, 534 F.3d at

1266 (discussing *Locke*, 540 U.S. at 717). The use of "neutral, objective criteria rather than

criteria that involve the evaluation of contested religious questions and practices" does not implicate the same entanglement problems. *Id.*

"Nor is it constitutionally problematic to inquire into whether a belief is 'religious' in nature and sincerely held." *Liberty Univ., Inc. v. Geithner*, 753 F. Supp. 2d 611, 640 (W.D. Va. 2010) (citing *Benning v. Georgia*, 391 F.3d 1299, 1313 (11th Cir. 2004), *vacated on other grounds*, 671 F.3d 391 (4th Cir. 2011); *Sutton v. Rasheed*, 323 F.3d 236, 250-51 (3d Cir. 2003)) (holding that courts and the government may inquire into the existence of religious beliefs or practices); *accord Jones v. Bradley*, 590 F.2d 294, 295 (9th Cir. 1979) ("It is clearly impermissible to inquire into the 'truth' of religious doctrines or beliefs. There is no prohibition, however, against ruling whether or not a set of beliefs constitutes a religion when deciding if First Amendment protections apply.") (citing *United States v. Ballard*, 322 U.S. 78 (1944)). "However, civil authorities are not barred from settling disputes implicating the secular side of church affairs as long as they rely on neutral principles of law." *Church of Scientology v. Comm'r*, 83 T.C. 381, 462 (1984) (citing *Jones v. Wolf*, 443 U.S. 595, 602-603 (1979); *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367 (1970)).

Rather than promoting "official and continuing surveillance" of religious entities, *Walz*, 397 U.S. at 674-675, § 107, its implementing regulations, and the manner in which it is administered avoids excessive government entanglement with religion. The facts described above in § III.A.1.a.i-iii show that the IRS utilizes permissible, neutral, and objective criteria to inquire into the existence of a taxpayer's religious beliefs or practices. The IRS does not, however, evaluate the content of a taxpayer's religious beliefs, *see id.*, which minimizes entanglement and maintains a government policy of neutrality toward religion. *Zorach*, 343 U.S.

at 314. Because the IRS does not attempt to resolve any issues of religious doctrine or responsibility, but rather seeks simply to verify an individual's position according to the religion's self-evaluated tenets and practices, it is like the approach taken by the Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC* to determine whether a person was a "minister" who fell under the ministerial exception to employment discrimination suits. 132 S. Ct. at 707-08.

In particular, and as described more thoroughly above in § III.A.1.a.i-iii, the IRS evaluates whether a taxpayer may be a "minister" for purposes of § 107 by reference to the five factors articulated in § 1402(c), § 1.1402(c)-5, and controlling legal precedent, including *Knight* and *Wingo*. This test respects distinctions already made by taxpayers' respective religious denominations, not by scrutinizing the content of any religious beliefs, theistic or otherwise. For example, to show that the taxpayer has been ordained, commissioned, or licensed, the taxpayer must show "a copy of the certificate (or, if [he] did not receive one, a letter from the governing body of [his] church) that establishes [his] status as an ordained, commissioned, or licensed minister." (Facts ¶ 128.) If the taxpayer does not have such a certificate, the individual may demonstrate that, under "the tenets and practices of [his] religious denomination or church" he "performs substantially all the religious functions" of an ordained minister. (*Id.* ¶¶ 130.) Thus, the IRS seeks only to confirm that the individual engages in the requisite job tasks of the denomination.

This standard for evidence is coupled with the fact that the does not "consider the content or sources of a doctrine which is alleged to constitute a particular religion" and "make[s] no attempt to evaluate the content of whatever doctrine a particular organization claims is religious." (*Id.* ¶ 140.) Specifically with respect to the issue of the validity of religious belief, the

IRS "may not pass judgment on the merits of the applicant's asserted religious belief" or require an organization claiming tax-exempt status as a church "to prove 'the validity of the religious doctrines or beliefs of the applicant or its members.'" (*Id.* ¶ 141.)

Thus, no government "surveillance" or "monitoring" is required to evaluate whether a taxpayer is a "minister" for purposes of § 107. A minister's interaction with the IRS arising from § 107 is no greater than the extent that would be required in any audit or other examination. That level of taxpayer contact does not result in "excessive entanglement" between government and religion, and Plaintiffs cannot show otherwise. Plaintiffs have given the IRS no opportunity to evaluate a claim made by them for the exclusion from gross income of their housing allowances under § 107(2). Therefore, Plaintiffs can show no facts that, as applied to them, the administration of § 107 results in excessive entanglement between government and religion. Similarly, Plaintiffs can show no facts to support their claim in this facial challenge that the administration of § 107 results in excessive entanglement in *every* situation. *See Salerno*, 481 U.S. at 745. Accordingly, § 107 meets the third prong of the *Lemon* test: it does not foster excessive government entanglement with religion. Section 107 is constitutional under the Establishment Clause.

## 3. Section 107 is constitutional under equal protection's rational basis scrutiny.

Because § 107 is consistent with the Establishment Clause, the only remaining inquiry for Ms. Gaylor and Mr. Barker' equal protection claim is "whether Congress has chosen a rational classification to further a legitimate end." *Amos*, 483 U.S. at 339; *see also Locke*, 540 U.S. at 720 n.3; *St. John's United Church of Christ*, 502 F.3d at 638. As described thoroughly above, § 107 is rationally related to the legitimate purpose of eliminating discrimination between secular and non-secular employees required by their employers to live on-site and of eliminating

51

discrimination between religions, all while limiting government contact with religion to objectively verifiable information that does not inquire in to the content of religious tenets. *See Templeton*, 719 F.2d at 1414 (§ 1402(e) and (g) are rationally related to Congress's intent to accommodate particular religious beliefs with an exemption from the requirement of paying Social Security tax). Therefore, § 107 passes the rational scrutiny test. Plaintiffs have no facts to show that its existence or the manner in which it is administered violate Plaintiffs' equal protection rights.

## IV.     Conclusion

Plaintiffs have not met their burden, at this stage of their facial challenge to § 107, of showing no set of circumstances under which the statute would be valid. *See Salerno*, 481 U.S. at 745; *Heck*, 327 F.3d at 528. Instead, the undisputed material facts show that § 107, its regulations, and the manner in which it is administered by the Treasury Department and the IRS are all consistent with the United States Constitution. Therefore, this Court should grant the United States' motion for summary judgment and enter judgment against Plaintiffs.

Dated: June 28, 2013                    Respectfully submitted,

                                        JOHN W. VAUDREUIL
                                        United States Attorney

                                        */s/ Erin Healy Gallagher*
                                        ERIN HEALY GALLAGHER
                                        D.C. Bar Number: 985670
                                        U.S. Department of Justice, Tax Division
                                        Post Office Box 7238
                                        Washington, D.C. 20044
                                        Telephone: (202) 353-2452
                                        Fax: (202) 514-6770
                                        E-mail: erin.healygallagher@usdoj.gov


                                        */s/ Richard Adam Schwartz*
                                        RICHARD ADAM SCHWARTZ
                                        California Bar Number: 267469
                                        U.S. Department of Justice, Tax Division
                                        Post Office Box 683
                                        Washington, D.C. 20044
                                        Telephone: (202) 307-6322
                                        Fax: (202) 307-0054
                                        E-mail: richard.a.schwartz@usdoj.gov

                                        Counsel for Defendant

**CERTIFICATE OF SERVICE**

I certify that, on June 28, 2013, service of the foregoing United States' Brief in Support of its Motion for Summary Judgment was made upon Plaintiffs by filing it with the Clerk of Court using the CM/ECF system.

*/s/ Erin Healy Gallagher*
ERIN HEALY GALLAGHER