UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION
FOUNDATION, INC.; ANNIE LAURIE
GAYLOR, and DAN BARKER

Plaintiffs,

v.                                                             Case No. 11 CV 0626

UNITED STATES OF AMERICA; TIMOTHY
GEITHNER, in his official capacity; and
DOUGLAS SHULMAN, in his official capacity,

Defendants.

**PLAINTIFFS' BRIEF OPPOSING SUMMARY
JUDGMENT IN FAVOR OF THE GOVERNMENT**

## I.      INTRODUCTION.

### A.      Standing.

Section 107(2) of the Internal Revenue Code violates the Establishment Clause by

providing preferential tax benefits exclusively to ministers of the gospel.   The conclusion does

not depend on differing constructions of § 107(2).   The parties agree on what § 107(2) means.

Church ministers can pay virtually all of their housing costs with tax-free dollars, but similarly

situated taxpayers, like the individual Plaintiffs in this case, cannot get this benefit without

religious affiliation.

The Plaintiffs do not allege a generalized grievance common to all non-clergy taxpayers.

The Plaintiffs are similarly situated to clergy who receive a designated housing allowance.   The

Freedom From Religion Foundation ("FFRF"), the employer of the individual Plaintiffs in this case, has designated a portion of the individual Plaintiffs' income as a housing allowance, just as churches may do.   The Plaintiffs' housing allowance is not exempt from federal income taxation, however, because the Plaintiffs do not perform religious services, according to the Internal Revenue Services ("IRS") criteria.

The Government now suggests, however, that the Plaintiffs might "conceivably" be ministers of the gospel who qualify for the § 107(2) exclusion for housing allowances.   The undisputed facts, however, show otherwise.   The Plaintiffs are not ordained; FFRF is not a church; and Plaintiffs do not perform religious functions.   The Plaintiffs, therefore, would face an immediate and credible threat of penalty if they excluded their housing allowances from reported income.

Nullification is an appropriate remedy in the case of a constitutionally underinclusive tax code provision such as §107(2).   Here, the Plaintiffs' discriminatory treatment can be judicially addressed by nullifying §107(2), which is the remedy that is least disruptive to the Government's tax collection responsibilities.   It is also a remedy that Plaintiffs have standing to pursue in this court.

The Plaintiffs do not base their standing on the fact that their taxes are being collected and spent in violation of the Establishment Clause.   Instead, the violation of the Establishment Clause, and of the Equal Protection Clause, occurs in this case because the Tax Code provides a benefit to religious clergy that is not available to these similarly situated Plaintiffs.   This discriminatory treatment provides a basis for standing that the Supreme Court has specifically recognized.   In Arizona Christian School Tuition Organization v. Winn, 131 S. Ct. 1436, 1440 (2011), the Supreme Court held that Plaintiffs have standing when they incur a cost or are not eligible for a

benefit on account of religious criteria.   The Supreme Court pointedly stated:   "Those costs and benefits can result from alleged discrimination in the Tax Code, such as when the availability of a tax exemption is conditioned on religious affiliation."   Id.   The present case presents just such a benefit that is only available to ministers of the gospel.   In this situation, the Plaintiffs do have standing to challenge a specific benefit that is not provided to similarly situated taxpayers.

**B.    Merits.**

Preferential tax benefits provided only to ministers violate the Establishment Clause. Neutrality is a necessary requirement of the Establishment Clause, which means that tax benefits cannot be preferentially provided to support religion.   The Supreme Court has refused to allow government to preferentially favor religion with tax breaks that are not generally available to other taxpayers, as recognized in Texas Monthly v. Bullock, 489 U.S. 1 (1989).   (See Bolton Aff., Ex. 2.)

Tax-free housing for ministers is not justifiable here as an accommodation of religion, nor is there any historical evidence that Congress enacted such tax breaks to abate government imposed burdens on the free exercise of religion.   The Government only now offers this *post hoc* argument, which is unsupported by the evidence.   In reality, the high cost of housing is neither a government burden, nor unique to ministers.

Section 107(2) also creates government entanglement with religion.   In order to ensure that this preferential tax benefit is limited to religious officials, §107(2) requires complex determinations relating to the tenets, principles and practices of those churches that provide their clergy with housing or cash housing allowances.   Because the tax benefits are only available to ministers of the gospel employed by the churches, the IRS must ensure that these ministers are really dispensing religion for an employing church -- and not something that could be done by a

layman.   The IRS, therefore, must engage in fact-intensive and intrusive inquiries to ensure that the individual is in fact a "duly ordained, licensed, or commissioned" minister of the gospel; and that the minister is really providing religious services "in the exercise of his ministry;" and that the employer qualifies as a church.   These are not trivial or incidental determinations.   Section 107(2), as a result, requires government entanglement with religion in order to restrict preferential tax benefits to the truly religious – which the Plaintiffs and FFRF are not.

Tax-free housing for ministers is controversial because it is lucrative, and because it is not available to secular taxpayers.   From the perspective of financial self-interest, ministers and churches are understandably concerned, but so are non-clergy who are denied similar benefits. From the perspective of the Establishment Clause, preferential tax breaks for ministers violate the fundamental principle of neutrality.   Tax breaks, including exemptions and deductions, must be neutral and available on the basis of non-religious criteria.   That is not the case with §107(2).

## II.   STATEMENT OF ADDITIONAL FACTS.

Dan Barker and Annie Laurie Gaylor are the co-Presidents of The Freedom from Religion Foundation ("FFRF").   (Gaylor Dec., ¶3.)

Barker and Gaylor have each received a designated housing allowance from their employer, FFRF, designated by the FFRF Executive Council, FFRF's governing body.   (Gaylor Dec., ¶4.)

The FFRF Executive Council first designated housing allowances for Barker and Gaylor in August of 2011.   The Executive Council designated the amount of $4,500 from each of their salaries yet to be paid in 2011. (Gaylor Dec., ¶5.)

In addition, FFRF designated the amount of $13,200 from each of the salaries of Barker and me to be paid in 2012 as a housing allowance.   The designated housing allowances were established for each month at $1,100.   (Gaylor Dec., ¶6.)

On October 12, 2012, the FFRF Executive Council renewed its prior housing allowance resolution, designating the amount of $15,000 to be paid in 2013 as a designated housing allowance.   (Gaylor Dec., ¶7.)

The housing allowances designated by FFRF for Barker and Gaylor were intended to approximate their actual housing expenses.   (Gaylor Dec., ¶8.)

The housing expenses for Barker and me for 2012 total approximately $26,072, including $14,522 as mortgage payments and $7,767 as property taxes.   (Gaylor Dec., ¶9.)

Housing expenses for Barker and Gaylor for 2011 totaled approximately $26,136, including $14,552 as mortgage payments and $7,444 as property taxes.   (Gaylor Dec., ¶10.)

Gaylor has not excluded her housing allowance because § 107(2) of the Internal Revenue Code is only available to ministers of the gospel.   Gaylor would exclude my housing allowance from reported income, not to exceed the reasonable expenses of her housing or the fair rental value of her home, whichever is less, if § 107(2) and implementing regulations so allowed.   (Gaylor Dec., ¶11.)

Gaylor has long considered the exemption allowed only to ministers to be discriminatory and unfair, which is made clear by FFRF's designation of a housing allowance which Barker and Gaylor cannot exclude from their reported income.   (Gaylor Dec., ¶12.)

Gaylor knows of no legitimate facts that would support her taking the exemption under § 107(2) of the IRC.   (Gaylor Dec., ¶13.)

The Government misapprehends the purpose and activities of FFRF, including the activities performed by Gaylor.   (Gaylor Dec., ¶14.)

The principal purpose of FFRF is to promote the constitutional principle of separation of state and church and to educate the public on matters related to non-theistic beliefs, which purposes do not involve ministry services.   (Exhibit 1, at 1, which is a true and correct copy of the Bylaws of FFRF.)   (Gaylor Dec., ¶15.)

FFRF also is not a church and Gaylor is not a minister, nor is FFRF a religious organization operating under the authority of a church or religious denomination.   (Gaylor Dec., ¶16.)

The Government ignores that a substantial part of the work of FFRF is to promote the constitutional principle of separation of state and church, including by advocacy, education, and litigation.   FFRF's concern with state/church entanglement is paramount.   (See Exhibit 2, FFRF 2012 Year in Review, describing representative activities of the Foundation; FFRF's website also includes answers to frequently asked questions relating to state/church violations.   See Exhibit 3, a true and correct copy of FAQ page from FFRF's website.)   (Gaylor Dec., ¶17.)

FFRF's promotion of the separation of state and church does not constitute the practice of religion and it is not based on a belief system "parallel to that of traditionally religious persons." (Gaylor Dec., ¶18.)

In fact, atheism does not have a body of dogma, tenets, or sacred writings.   (Gaylor Dec., ¶19.)

Atheism also has no hierarchical, or even congregational organization or structure. It is not like the Catholic religion, or Judaism, which have an organizational status and a substantive dogma.   (Gaylor Dec., ¶20.)

FFRF, simply put, is not a church and it is not a religious organization operating under the authority of a church or religious denomination.   FFRF is a legal entity created to conduct educational purposes, but it is not a church, nor does it operate under the authority of a church. (Gaylor Dec., ¶21.)

For her part, Gaylor does not perform services in the exercise of a ministry on behalf of FFRF.   I am not a "duly ordained, commissioned, or licensed minister of a church."   No higher atheistic body oversees FFRF, or ordains, commissions, or licenses ministers to perform ministry. Likewise, FFRF does not ordain, commission, or license ministers, including Barker and Gaylor. Gaylor is not ordained, commissioned, or licensed by any church or religious denomination. (Gaylor Dec., ¶22.)

Barker and Gaylor also do not conduct religious worship or perform sacerdotal functions based on the tenets and practices of a particular religious body constituting a church or denomination.   The Government implies that the tenets and practices of atheism recognize sacerdotal functions and forms of religious worship, but that is not true.   Atheism does not recognize any sacerdotal functions, or forms of religious worship – and FFRF does not have any such tenets or orthodoxy.   Gaylor has never performed a wedding, baptism, funeral or other such ceremony.   Gaylor has given information about secular or "god-less" funerals, but this is not the performance of a sacerdotal function.   (See Exhibit 4, from FFRF's website, providing information regarding Secular Memorials And Funerals Without God, which is informational but not derived from any tenet, creed, or orthodoxy.   Similarly, a De-Baptismal Certificate that can be obtained from FFRF is tongue-in-cheek, rather than a sacerdotal ceremony, as shown by Exhibit 5, from FFRF's website.)   (Gaylor Dec., ¶23.)

Gaylor's role as a co-President of FFRF, moreover, does not constitute any ordination, commissioning, or licensing as a minister.   The functions of the president of FFRF do not include any such ordination or authorization to perform sacerdotal functions or worship.   (Exhibit 1 at pg. 2, stating that "the President of the Foundation shall serve as executive director of the Foundation. The executive director shall be responsible for press releases, at least ten (10) periodicals annually, filing of court suits, minor policy matters, correspondence and other office routine.")   (Gaylor Dec., ¶24.)

FFRF also does not have the attributes of a church that are considered by the IRS.   (Gaylor Dec., ¶25.)

FFRF does not have a recognized creed or form of worship.   (Gaylor Dec., ¶26.)

FFRF does not have any ecclesiastical government.   (Gaylor Dec., ¶27.)

FFRF does not have a formal code of doctrine and discipline applicable to members. (Gaylor Dec., ¶28.)

FFRF does not have a distinct religious history; on the contrary, FFRF has consistently presented itself to the public as a pesky secular organization that is opposed to governmental establishment of religion.   (Gaylor Dec., ¶29.)

FFRF does not have an organization of ordained ministers and it does not have any prescribed course of study leading to ordination as a minister.   (Gaylor Dec., ¶30.)

FFRF does not engage in worship and has no established place of worship.   (Gaylor Dec., ¶31.)

FFRF does not have a congregation and does not conduct regular religious services. (Gaylor Dec., ¶32.)

FFRF does not provide religious instruction for children and has no school for the preparation of ministers.   (Gaylor Dec., ¶33.)

FFRF, in short, does not have the recognized attributes of a church, including a body of "believers or communicants" that assemble regularly in order to worship.   (Gaylor Dec., ¶34.)

Barker and Gaylor also are not recognized as spiritual leaders; in fact, FFRF consistently presents itself to the public as a secular organization, albeit one that sometimes ruffles feathers. (Gaylor Dec., ¶35.)

The Government's reference to Anne Nicol Gaylor as "Madison's Favorite Religious Leader," moreover, misconstrues irony for fact.   The Madison Magazine "award" cited by the Government was not a bona fide acknowledgement that Anne Nicol Gaylor was viewed in Madison as a spiritual leader.   Anne Nicol Gaylor has never had a reputation as a religious leader. (Gaylor Dec., ¶36.)

Gaylor is aware of no facts that would qualify Barker or her as ministers for purposes of the exclusion allowed by Section 107 of the IRC.   The Government concedes, however, that she would have to establish the elements necessary to qualify for the exclusion, which requires that a minister perform religious functions pursuant to the organized tenets and creed of a church or religious denomination.   In fact, atheism does not have such tenets, and FFRF is not a church or religious organization.   (Gaylor Dec., ¶37.)

Gaylor would claim the exclusion for the housing allowance designated by FFRF were it not for the IRS statute privileging only ministers of the gospel and excluding secular employees, including free thought leaders who reject religion.   Accordingly, Barker and Gaylor have not claimed the exclusion for fear of disallowance and penalty by the IRS.   (Gaylor Dec., ¶38.)

Based on the facts as Gaylor knows them, she cannot claim the exclusion, including because she does not perform services for a church or religious organization; she is not ordained, commissioned, or licensed by a church or a religious denomination; she does not perform sacerdotal functions or worship prescribed by the tenets of any religion; and she has no congregation or church where she provides religious services.   (Gaylor Dec., ¶40.)

Barker also is aware that the Government insinuates that he may qualify as a religious minister, but he knows of no legitimate facts that would support taking the exemption under § 107(2).   He finds it ironic and coercive, in fact, that the Government apparently expects him to identify as a religious minister, contrary to his views about religion, in order to qualify for a government benefit.   (Barker Dec., ¶13.)

FFRF's promotion of the separation of state and church does not constitute the practice of religion and it is not based on a belief system parallel to that of traditionally religious persons. FFRF has no doctrinal premises, except the U.S. Constitution and other secular laws.   FFRF as an organization, espouses and promotes no formal belief in doctrine beyond the wording of the First Amendment.   (Barker Dec., ¶18.)

FFRF is not based on a belief system that is "parallel to that filled by God in traditionally religious persons," and FFRF has not "taken a position on divinity."   FFRF's Bylaws expressly refer to nontheism, and is open to agnostics and deists, as well as positive atheists (i.e., there is no God), and negative atheists (do not believe there is a God).   FFRF's position is based on freethought, which is not a doctrine, and in fact, FFRF is not correctly described as an atheist organization.   (Barker Dec., ¶19.)

Nonetheless, it must be recognized that atheism does not have a body of dogma, tenets, or sacred writings.   Atheism also is not a belief system, unlike Christianity (theistic) or Buddhism

10

(nontheistic).   Atheism is not a belief at all – it is the absence of belief.   FFRF, for its part, also does not subscribe to any belief system, but rather advocates freedom from a belief system. (Barker Dec., ¶20.)

Atheism also has no denominational, or even congregational organization or structure. It is not like the Catholic religion, or Judaism, which have an organizational existence and a substantive dogma.   Atheism has no status or existence as an entity.   (Barker Dec., ¶21.)

Barker does not perform services in the exercise of a ministry on behalf of FFRF.   He is not a "duly ordained, commissioned, or licensed minister" of FFRF, and no higher atheistic body oversees FFRF, or ordains, commissions, or licenses ministers to perform ministry.   (Barker Dec., ¶23.)

Barker has officiated at secular weddings, approximately one per year, which he does personally, at no charge, and not representing FFRF.   This is not a service offered by FFRF, which takes no position on marriage.   FFRF does not perform marriages and it is not authorized to do so by FFRF's Bylaws, resolutions, or otherwise.   (Gaylor has never performed a wedding.) (Barker Dec., ¶24.)

De-baptismal certificates sold by FFRF also do not constitute sacerdotal functions.   These are not official documents, nor are they issued as an official function.   The de-baptismal certificates are offered as a tongue-in-cheek way to bring attention to opting out of religion, not as a religious exercise.   They can be purchased, not awarded, and they are available to anyone, not just FFRF members.   (Gaylor does not sign these certificates.)   FFRF also does not keep track of who buys the certificates and they are not recorded as any official record.   (Barker Dec., ¶25.)

Sacerdotal functions, by definition, are those performed by humans who purportedly stand between humans and God.   The concept of sacerdotalism implicitly requires a belief in God and

there is no such thing as an atheistic sacerdotal function.   Even if sacerdotal is given an imprecise

meaning that corresponds to a solemn official ceremony, moreover, FFRF recognizes no such

ceremonies, occasions, or official functions.   (Barker Dec., ¶26.)

Based on the facts as Barker knows them to be, he could not honestly, and consistent with

good conscience, claim the exclusion as compensation from FFRF for services as a minister.

(Barker Dec., ¶42.)

Barker cannot claim the exclusion, including because he does not perform services for a

church or religious organization; he is not ordained, commissioned, or licensed by FFRF as a

minister; he does not perform sacerdotal functions or worship prescribed by the tenets of FFRF; he

has no congregation or church where he provides religious services; and most important, he simply

does not perform religious functions for FFRF.   (Barker Dec., ¶43.)

### III.   PLAINTIFFS UNDISPUTEDLY ARE NOT ORDAINED, COMMISSIONED, OR LICENSED MINISTERS OF A CHURCH, DO NOT PERFORM RELIGIOUS FUNCTIONS, AND THEIR DESIGNATED HOUSING ALLOWANCES ARE NOT EXCLUDABLE FROM INCOME.

The Government admits that the income tax exclusion for housing allowances under §

107(2) of the IRC is only provided to taxpayers engaged in religious ministry.   The Government

argues, however, that the Plaintiffs lack standing to challenge the religious preference created by §

107(2) because they supposedly may actually be ministers themselves -- "although the United

States is not taking the position" that the Plaintiffs qualify for the exclusion under § 107(2).

(Government Brief at 10.)   The Government instead merely suggests that "it is conceivable" that

an atheist could meet the requirements for the exclusion under § 107(2).   (*Id.*)

The Government argues that the Plaintiffs should claim exempt status as ministers of the

gospel and then try to make up a plausible rationale.   The Government suggests many

hypothetical stratagems, but they ignore the actual undisputed facts.   For example, the

12

Government states that "nothing precludes an individual with non-theistic beliefs from obtaining some sort of ordination, license, [or] commission."   (Government Brief at 17.)   The Government goes on to suggest that since FFRF has given the Plaintiffs the title "Co-President," then the Plaintiffs allegedly are not "precluded from obtaining objectively verifiable recognition" of their status as ordained ministers.   (Government Brief at 18.)   The fact of the matter is, however, that FFRF does not ordain, license, or commission ministers, nor is FFRF even a church or religious denomination that could make such a designation.

In truth, the Plaintiffs are not ordained, commissioned, or licensed ministers.   That is not hypothetical or conjectural.   It is an undisputed fact that precludes the Plaintiffs from qualifying for a tax-free housing allowance.

The Government also suggests that the Plaintiffs might take the position that FFRF is a "religious organization," as to which the Government "draws no conclusions on whether the facts would ultimately support such a contention."   (Government Brief at 18.)   The Government's hedge is well advised because the Government deliberately ignores the IRS definition of a "religious organization" as an entity operating under the authority of a church or religious denomination.   FFRF does not qualify as a church or a religious denomination in its own right under applicable IRS tests, nor is it established and operated under the auspices of a church or religious denomination.

The Government ultimately relies on a single proposition, i.e., that atheism, in some circumstances, has been deemed the equivalent of a religion under the Establishment Clause of the United States Constitution.   See Kaufman v. McCaughtry, 419 F. 3d 678, 681-682 (7th Cir. 2005). From that limited premise, the Government concludes that the Plaintiffs just might qualify as ministers of the gospel under § 107(2) of the IRC.   The Government's reasoning is overly

simplistic, however, because even an avowed Catholic employed by a church is not necessarily an

ordained priest, in the eyes of the IRS.

The IRS applies exacting tests to determine whether a person qualifies as a minister of the

gospel for purposes of § 107(2).   Those tests, applied to the undisputed facts, make obvious that

the Plaintiffs do not qualify for the housing allowance exclusion.   As a result, the Plaintiffs do, in

fact, face a real and credible threat that they will be penalized by the IRS if they claim the

exclusion.   This result has nothing to do with whether the IRS does or does not inquire into the

contents of any religious belief or practice.   It has to do with the fact that the Plaintiffs are not

ministers under applicable IRS criteria, just as FFRF is not a church according to the criteria

utilized by the IRS.

### A.    The Plaintiffs Are Not Employed By A Church Or Religious Organization As Defined By The IRS.

The Government disingenuously implies that the IRS exclusion for ministers and churches

is subject to no more scrutiny than the personal honor code of the taxpayer.   That is not true.   The

IRS applies exacting tests to determine whether or not a person is a minister, or a church, or a

religious organization.   In fact, because exclusions from a tax are matters of legislative grace,

rather than matters of right, the burden of proof to establish qualification for an exclusion falls

squarely on the taxpayer.   An organization's mere declaration that it is a church is insufficient.

Foundation of Human Understanding v. United States, 88 Fed Cl. 203, 212 (2009).    Tax

exemptions, moreover, are narrowly construed.   United States v. Centennial Savings Banks FSB,

499 U.S. 573, 583-84 (1991).

Whether a person qualifies as a minister of the gospel under § 107(2) depends in part on the

employing unit.   The exclusion under § 107(2) applies to compensation received by a taxpayer for

providing religious services to a church or a religious organization.   Here, the facts undisputedly

establish that FFRF is not a church or a religious organization, and this conclusion is not affected by whether or not atheism is considered in some circumstances to be the equivalent of a religion. The Kaufman decision does not hold, imply, or otherwise answer the question whether an organization constitutes a church.   That is a different question under the tests applied by the IRS than whether atheism is protected from discrimination by the Establishment Clause.   Whether FFRF constitutes a church, moreover, is important to know as it affects whether the Plaintiffs could even conceivably be ordained, commissioned, or licensed as ministers.

To qualify for the special tax preferences available to ministers, an individual must be a "minister," and the person must perform services "in the exercise of his ministry."   Treas. Reg. § 1.107-1(a) incorporates the rules of Treas. Reg. § 1.1402(c)-5 in determining whether the individual is performing the duties of a "minister of the gospel," including the requirement that an individual be a "duly ordained, commissioned, or licensed minister of a church."   (Emphasis added.)   The IRS, accordingly, defines a minister as follows:

> "Ministers are individuals who are duly ordained, commissioned, or licensed by a religious body constituting a church or church denomination. They are given the authority to conduct religious worship, perform sacerdotal functions, and administer ordinances or sacraments according to the prescribed tenets and practices of that church or denomination.

According to the IRS, moreover, "at a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship."   Good v. Commissioner, T.C. Memo 2012 – 323, p. 21 (T.C. 2012), quoting Foundation of Human Understanding v. Commissioner, 88 T.C. 1341, 1357 (1987).   In addition, the IRS considers fourteen criteria to determine whether an organization qualifies for church status.   Id., T.C. Memo 2012 – 323 at p.21-22.   The IRS criteria include the following: (1) a distinct legal existence; (2) a recognized creed and form of worship; (3) a definite and distinct ecclesiastical government; (4) a formal code

of doctrine and discipline; (5) a distinct religious history; (6) a membership not associated with any church or denomination; (7) an organization of ordained ministers; (8) ordained ministers selected after completing prescribed studies; (9) a literature of its own; (10) established places of worship; (11) regular congregations; (12) regular religious services; (13) Sunday schools or religious instruction of the young; and (14) schools for the preparation of its ministers.   *Id.*

In Foundation of Human Understanding v. United States, 614 F. 3d 1383, 1388-1389 (Fed. Cir. 2010), the Court acknowledged that courts generally have relied mainly on the IRS's fourteen criteria, and on a related associational test, in determining what constitutes a church.   According to the Court, the tests substantially overlap but "the most important of the fourteen criteria are the requirements of regular congregations and regular religious services."   Thus, whether applying the associational test or the fourteen criteria test, courts have held that in order to be considered a church, "a religious organization must create, as part of its religious activities, the opportunity for members to develop a fellowship by worshipping together."   See Church of Eternal Life and Liberty, Inc. v. Commissioner, 86 T.C. 916, 924 (1986) ("a church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs.   In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith.").

FFRF clearly does not constitute a church under applicable IRS criteria.   In the first place, FFRF does not have congregants and it does not hold worship or church services.   In addition, as the Declarations of Annie Laurie Gaylor and Dan Barker make clear, FFRF fails to satisfy almost all of the other fourteen criteria considered by the IRS:   FFRF does not have a recognized creed and form of worship; FFRF has no definite and distinct ecclesiastical government; FFRF has no formal code of doctrine and discipline; FFRF has no distinct religious history; FFRF has no

organization of ordained ministers; FFRF has no ordained ministers selected after completing prescribed studies; FFRF has no established place of worship; FFRF has no regular congregations; FFRF conducts no regular religious services; FFRF provides no Sunday school for the religious instruction of the young; and FFRF has no schools for the preparation of its ministers.

The fact that FFRF is not a church is significant:   The Plaintiffs obviously cannot be ordained, commissioned, or licensed as ministers of the gospel by FFRF, which is not a church or religious denomination.   The Plaintiffs also are not performing the services of a minister according to the prescribed tenets and practices of a church or denomination because FFRF does not have any such creed or tenets.

The Government apparently recognizes that FFRF is not a church, and so the Government argues instead that FFRF might be a "religious organization."   For example, the Government notes that a person may qualify as a minister if the individual "performs services in the control, conduct, and maintenance of a religious organization."   (Government Brief at 13.)   The Government further muses that "an atheist organization may be considered a 'religious organization' under the applicable law and IRS procedure," and therefore, the Plaintiffs "might have taken the position that FFRF is a religious organization."   (Government Brief at 18.)   The problem with this argument is that the Government misstates the rule used by the IRS.

The IRS uses Treas. Reg. § 1.1402(c) – 5, to determine whether an individual performs the duties of a "minister of the gospel."   The relevant language of the regulation states in full that services performed by a minister in the exercise of a ministry includes the "control, conduct, and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or denomination."   (Emphasis added.)   The key language that the Government omits and ignores

17

from this definition is that a religious organization, as such, must operate "under the authority of a religious body constituting a church or denomination."   That is a big omission in the present case, because FFRF was clearly not created and authorized to act "under the authority of a religious body constituting a church or denomination."   In other words, FFRF does not have a parent church or controlling religious denomination.

In order to be a religious organization under Treas. Reg. § 1.1402(c) – 5(b)(2)(ii), FFRF would have to be operating under the authority of a church or religious denomination.   The Regulation states: "Any religious organization is deemed to be under the authority of a religious body constituting a church or church denomination if it is organized and dedicated to carrying out the tenets and principles of a faith in accordance with either the requirements or sanctions governing the creation of institutions of the faith."   In Mosley v. Commissioner, T.C. Memo 1994 – 457, p. 20 (1994), the Tax Court construed this language to require more than being "merely dedicated to carrying out the tenets and principles of a denomination."   An organization must be literally organized under the umbrella of a church or religious denomination.

FFRF undeniably is not a religious organization organized in accordance with "the requirements or sanctions governing the creation of institutions of a faith."   On the contrary, FFRF is not organized and authorized under any external umbrella, whether church, religious denomination, or any other entity.

FFRF is not a church or a religious organization, which is significant in determining whether the Plaintiffs "conceivably" could qualify as ministers of the gospel.   This undisputed fact, by itself, lays to rest the Government's insinuation that Plaintiffs may actually qualify for the housing allowance exclusion under § 107(2).   Because FFRF is not a church or religious organization, it could not ordain, commission, or license the Plaintiffs as ministers of the gospel,

which is an essential element in order to qualify for the § 107(2) exclusion.   Nor are the Plaintiffs

employed by a church or religious organization.

###### B.      The Plaintiffs Do Not Perform The Functions Of Ministers Necessary In Order To Exclude Their Housing Allowances Under Section 107(2).

The Government identifies a number of requirements that must be satisfied in order to

exclude designated housing allowances from income under § 107(2) of the IRC.   One

requirement, already discussed above, is that a minister must be ordained, commissioned, or

licensed by a church or religious organization -- which FFRF is not.   In addition, however, the

Plaintiffs are not in fact ordained, commissioned, or licensed at all by FFRF, even if FFRF was a

church.   As the Declarations of Annie Laurie Gaylor and Dan Barker show, FFRF has not

ordained, commissioned, or licensed the Plaintiffs to act as ministers.   That is a matter of

undisputed fact.

The Plaintiffs also do not perform the functions of religious ministry on behalf of FFRF,

which is not organized or based on any creed or orthodoxy; does not have regular congregational

services; does not conduct worship; and prescribes no religious-like functions for the Plaintiffs.

The undisputed facts, therefore, establish that the Plaintiffs would not qualify as ministers of the

gospel, and they would face an impending, immediate, and credible threat of prosecution if they

exclude their housing allowances from taxable income.

The evidence is also undisputed that the Plaintiffs do not substantively perform the duties

of a minister as construed by the IRS.   Treas. Reg § 1.1402(c)-5(b)(2) provides that service

performed by a minister in the exercise of his ministry includes the ministration of sacerdotal

functions and the conduct of religious worship.   Treas. Reg. § 1.1402(c)-5(b)(2)(i) further

provides that whether service performed by a minister constitutes the conduct of religious worship

or the ministration of sacerdotal functions depends on the tenets and practices of the particular

19

religious body constituting the minister's church or church denomination.   *See also Wingo v. Commissioner*, 89 T.C. 922, 931 (1987).   In considering the types of services that make up a minister's work, moreover, the courts also consider whether the particular church or denomination recognizes the person as a minister or religious leader.   *Id.* at 936, citing Silverman v. Commissioner, 57 T.C. 727 (1972).   In the present case, the Plaintiffs undisputedly are not recognized by FFRF as ministers or religious leaders, and they do not conduct religious worship or perform sacerdotal functions based on or derived from the tenets and practices of FFRF.

FFRF is not a church or religious denomination; it does not conduct religious services; and it does not prescribe or engage in any religious worship.   On the contrary, as discussed above, FFRF does not represent or promote a belief system based on creed, orthodoxy, or sacred writings. The Plaintiffs, accordingly, do not, as part of their work, perform religious worship for FFRF. Worship does not happen at FFRF.   The tenets and practices of FFRF do not involve religious worship and the Plaintiffs do not perform worship-like functions.

The Plaintiffs also do not perform sacerdotal functions derived from the tenets and practices of a church or religious denomination.   Again, FFRF does not define, prescribe, or conduct sacerdotal functions -- and neither do the Plaintiffs.   Annie Laurie Gaylor, for instance, does not minister any sacraments; she has never performed a wedding or funeral; she has never performed a baptism; and she has never served Communion or heard Confession.   She does not perform sacerdotal functions.   (The Government, in fact, apparently does not claim that Ms. Gaylor performs sacerdotal functions, but focuses on Mr. Barker.)

The Plaintiff, Dan Barker, also does not perform sacerdotal functions according to the tenets and practices of FFRF.   He does infrequently perform secular weddings, amounting to approximately one per year, but this is not done according to any prescription by FFRF, which

does not recognize any such sacerdotal functions or sacraments.   Similarly, FFRF also sells "De-Baptismal Certificates," signed by Mr. Barker, but these do not involve any official ceremony or official act by FFRF.   On the contrary, these Certificates represent a whimsical means of drawing attention to patently religious sacerdotal rituals, which FFRF views skeptically.

The Plaintiffs' activities as FFRF's co-presidents, in fact, reflect the executive functions of a typical educational non-profit organization, which is what FFRF is.   The duties of Ms. Gaylor and Mr. Barker are not, in fact, religious ministry precisely because FFRF views religious observances to have limited utility and to frequently involve inappropriate violations of the state and church separation required by the Establishment Clause.   The functions performed by the Plaintiffs, in other words, do not include sacerdotal functions, which would be antithetical to the views promoted by FFRF.

In the final analysis, therefore, whether the Plaintiffs qualify for the income tax exclusion provided to ministers of the gospel under § 107(2) is not hypothetical or speculative.   They do not. The Government's intimation to the contrary ignores the actual facts -- and it actually ignores a premise of the Government's own position.   While the Government suggests on the one hand that the IRS does not closely examine the substance of religious views, on the other hand, the Government argues that the Court should ignore the Plaintiffs' repudiation of religion and require them to claim themselves as religious ministers, contrary to reality.   That is not required and as the facts make clear, the Plaintiffs cannot honestly and in good conscience claim the exclusion preferentially allowed only to ministers under § 107(2).

The Plaintiffs, therefore, do face an impending, immediate, and credible threat if they exclude their designated housing allowances under § 107(2).   The Government's insinuation to the contrary is not supported by the facts, and the Plaintiffs do not have to test the Government's

21

fiction.   Their injury is immediate, traceable to § 107(2), and ripe for review. The Plaintiffs

accordingly do have standing to challenge the religious preference created by § 107(2).

## IV.   DISCRIMINATORY TREATMENT OF SIMILARLY SITUATED TAXPAYERS UNDER SECTION 107(2) OF THE TAX CODE CONSTITUTES INJURY SUFFICIENT FOR STANDING.

In the present case, the Plaintiffs have received designated housing allowances, but they do

not qualify for special tax treatment that is available only to ministers of the gospel.   Contrary to

the Government's surmise, moreover, the Plaintiffs undisputedly do not qualify for, and they have

not received the benefit of, the §107(2) exclusion for housing allowances paid to ministers.

Government programs that allocate benefits based on distinctions among religious, and

non-religious or non-believer status, are generally doomed from the start.   The Court of Appeals

explained this constitutional reality very well in American Atheists, Inc., et al. v. City of Detroit

Downtown Development Authority, 567 F.3d 278, 289 (6th Cir. 2009):

> The most essential hurdle that a government-aid program must clear
> is neutrality -- that the program allocates benefits in an evenhanded
> manner to a broad and diverse spectrum of beneficiaries.   See Good
> News Club v. Milford Central School, 533 U.S. 98, 114, 121 S. Ct.
> 2093, 150 L. Ed. 2d 151 (2001); Mitchell, 530 U.S. at 809-13
> (Plurality Opinion; Id at 838 (O'Connor, J., concurring in the
> judgment).   Phrased as an interrogatory:   Does the program
> determine a recipient's eligibility for benefits in spite of, rather than
> because of, its religious character?   See Mitchell, 530 U.S. at
> 809-10 Plurality Opinion); Rosenberger v. Rector & Visitors of
> University of Virginia, 515 U.S. 819, 839-40, 115 S. Ct. 2510, 132
> L. Ed. 2d 700 (1995).
>
> Since its earliest explorations of the Establishment Clause, the
> [Supreme] Court has underscored neutrality as a central, though not
> dispositive, consideration in sizing up state-aid programs.   See
> Mitchell, 530 U.S. at 809-10 (Plurality Opinion); Id at O'Connor, J.,
> concurring in judgment); Rosenberger, 515 U.S. at 839; Id at 846
> (O'Connor, J., concurring); Everson, 330 U.S. at 17-18.   What the
> Court has said matches what it has done.   Programs that allocate
> benefits based on distinctions among religious, non-religious and
> areligious recipients are generally doomed from the start.   See, e.g.,

Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 14-15, 109 S. Ct. 890, 103 L. Ed. 2d 1 (1989) (Plurality Opinion) (Invalidating state sales-tax exemption "for periodicals published or distributed by a religious faith and consisting wholly of writings promulgating the teaching of the faith"); Larson v. Valente, 456 U.S. 228, 246-47, and n. 23, 255, 102 S. Ct. 1673, 72 L. Ed. 33 (1982) (Striking down state law exempting only certain "well-established churches" from various registration and recording requirements), School District of Abington Township v. Schempp, 374 U.S. 203, 205, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963) (Invalidating programs mandating daily Bible reading in public school). Programs that evenhandedly allocate benefits to a broad class of groups, without regard to their religious beliefs, generally will withstand scrutiny.

Section 107(2) of the Internal Code fails the neutrality test required by the Establishment Clause.   Section 107(2) provides only ministers of the gospel with an exclusion from taxable income for cash housing allowances that are paid as part of a minister's compensation.   This exemption for cash housing allowances is not available under any circumstances to non-religious private sector taxpayers.   The exemption for cash housing allowances is provided only to ministers.

Tax benefits, including tax exclusions and exemptions, that are not neutral and available to a broad range of groups or persons without regard to religion violate the Establishment Clause. The Government argues incorrectly that exemptions from a tax inherently skate free under the Establishment Clause,   The Supreme Court recognized in Texas Monthly v. Bullock, 489 U.S. 1 (1989), that this is not true.   The Court has never waivered since in its holdings that neutrality is a necessary requirement of such government programs and the Court has never held that discriminatory tax exemptions are beyond review.   "When the government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion…it provides unjustifiable awards of

assistance to religious organizations and cannot but convey a message of endorsement to slighted members of the community."   Id at 15.

Federal and state courts have consistently adhered to the Supreme Court's Texas Monthly decision: Tax exemptions provided to taxpayers exclusively on the basis of religious criteria violate the Establishment Clause.   The Colorado Supreme Court summarized this state of the law in Catholic Health Initiatives of Colorado v. City of Pueblo, 207 P.3d 812, 818 (Colo. 2009):

> The Establishment Clause mandates equal treatment of different religious and secular actors.   A tax which makes distinctions based on religious belief would violate the Establishment Clause.   "The risk that governmental approval of some or disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude." United States v. Lee, 455 U.S. 252, 263 n. 2, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982) (Stevens, J., concurring).
>
> The United States Supreme Court addressed the impact of tax exemptions on this perception of impartiality in Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S. Ct. 890, 103 L. Ed. 2d 1 (1989) (Brennan, J., Plurality Opinion).   In Texas Monthly, the State of Texas exempted religious periodicals and books from sales tax, while imposing that tax on other nonreligious publications.   Id at 5. The Court, noting that "every tax exemption constitutes a subsidy that affects nonqualifying taxpayers" held the tax exemption violated the Establishment Clause.   Id at 14.   The Court went on to outline the proper, constitutionally valid approach to religious exemptions.   Id at 14-15.   It held that, when a subsidy "is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally" does not violate the Establishment Clause.   Id.   However, "when Government directs the subsidy exclusively to religious organizations" in a way that "either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion," the tax exemption "provides unjustifiable assistance to religious organizations and cannot but convey a message of endorsement" of religion.   Id.
>
> Thus, in order for a sales tax exemption to comply with the Establishment Clause, it must serve a broad secular purpose.   If the work of a religious organization falls within that secular purpose, it

> may properly enjoy the tax exemption.   However, a tax exemption
> may not be awarded to religious organizations simply because they
> are religious.   Id.

Court have consistently invalidated tax exemptions that preferentially benefit churches and religious organizations in challenges brought by parties similarly situated, but who did not get such an exemption.   For example, in *Budlong v. Graham*, 488 F. Supp. 2d (N.D. Ga. 2007), the court declared that a sales tax exemption applicable to only religious organizations was unconstitutional and the court enjoined continued enforcement of those provisions -- without thereby providing any such exemption to the plaintiffs.

In *New Orleans Secular Humanists Association, Inc. v. Bridges*, 2006 U.S. Dist. LEXIS 20020 (E.D. La. 2006), the court also enjoined the defendant from enforcing sales and use tax exemptions provided only to religious organizations.   Again, the plaintiff did not thereby obtain the benefit of the exemption, but it did succeed in invalidating the preferential treatment that religious organizations received.   The court explained its conclusion at 16-18:

> [Louisiana statutes] provide exemptions applicable only to religious organizations
> and can be considered together on the basis of this commonality.   In *Texas
> Monthly Inc. v. Bullock*, 489 U.S. 1 (1989), the Supreme Court held that a Texas
> state sales tax exemption for religious publications violated the Establishment
> Clause.   "Every tax exemption [for religious groups only] constitutes a subsidy
> that affects non-qualifying taxpayers, forcing them to become indirect and
> vicarious donors."   *Id*. at 14 (internal citations omitted).   For tax exemptions for
> religious groups to be constitutional, it must "be warranted by some overarching
> secular purpose that justifies like benefits for non-religious groups."   *Id*. at 15,
> fn. 4.   As in *Texas Monthly*, "there is no evidence in the record and [the State] does
> not argue in its brief to this Court, that the exemption for religious periodicals was
> grounded in some secular legislative policy that motivated similar tax breaks for
> non-religious activities.   It certainly appears from the [statutory text] that the
> exemption was intended to benefit religion alone."   *Id*.   In the absence of any
> controverting evidence, the language of the challenged statutes is clear in that the
> statutes benefit only religious organizations.   Thus, the statutes have an
> unconstitutional purpose and effect under *Lemon*.

In *Haller v. Commonwealth of Pennsylvania*, 728 A.2d 351 (Pa. 1999), the Supreme Court of Pennsylvania also concluded that enforcement of tax exemptions provided only to religious organizations violated of the Establishment Clause.   The Court relied upon the Supreme Court's decision in *Texas Monthly* in concluding that tax exemptions that include religious organizations must have an overarching secular purpose that equally benefits similarly situated non-religious organizations.   *Id*. at 296.   *See also Condemnation Proceedings by the Redevelopment Authority of the City of Philadelphia*, 891 A.2d 820, 830 (Pa. Commw. 2006) (invalidating condemnation in favor of religious organization, relying in part on *Texas Monthly*).

Section 107(2) provides just such a tax benefit that is unavailable to other similarly situated taxpayers.   Section 107(2) allows an employing church to designate part of a minister's compensation as a housing allowance -- and the designated compensation is then tax-free to the minister.   By contrast, no exclusion for cash housing allowances may be claimed by employees not employed by churches or religious organizations.   Only designated housing allowances paid to ministers are tax-free, unlike for other taxpayers.

Section 107(2) provides a benefit that is not neutrally available to other taxpayers.   By contrast, §119 of the Revenue Code, which is generally applicable to all taxpayers, does not allow for the exclusion of any housing allowance paid as compensation, even if used to pay housing costs required by the employer.   Section 119 is applicable only to in-kind housing, which must be provided for the "necessity of the employer."   The substantially broader tax benefit of §107(2), by contrast, is not available to other taxpayers under §119.   Section 107(2) provides a unique benefit that is only available to persons providing religious services.

The Supreme Court has specifically recognized that standing "can result from alleged discrimination in the Tax Code, such as when the availability of a tax exemption is conditioned on

religious affiliation."    Arizona Christian School Tuition Organization v. Winn, 131 S. Ct. 1436,

1440 (2011).    Standing is premised in such cases on the personal discrimination that occurs when

similarly situated individuals are denied a Government benefit on the basis of religious

identification.    "If a law or practice, including a tax credit, disadvantages a particular religious

group or a particular nonreligious group, the disadvantaged party does not have to rely on Flast to

obtain redress for a resulting injury."    Id at 1449.

## V.    THE PLAINTIFFS ALSO ALLEGE COGNIZABLE EQUAL PROTECTION INJURIES FOR PURPOSES OF STANDING.

The Supreme Court, in Heckler v. Mathews, 465 U.S. 728 (1984), carefully considered the

issue of standing in an equal protection context, where the extension of benefits to a disfavored

group was not sought.    The only remedy at issue in Heckler was nullification of a statute that

provided benefits exclusively to a favored group.

The Supreme Court concluded in Heckler that "we have never suggested that the injuries

caused by a constitutionally underinclusive scheme can be remedied only by extending the

program's benefits to the excluded class."    Id at 738.    The Court further stated that "we have

frequently entertained attacks on discriminatory statutes or practices, even when the Government

could deprive a successful Plaintiff of any monetary relief by withdrawing the statute's benefits

from both the favored and the excluded class."    Id at 739.    The Court concluded, therefore, that

nullification as a remedy of choice does not deprive a Plaintiff of standing to seek judicial redress

for alleged discrimination.    Id.

The Supreme Court explained in Heckler that the right to equal treatment guaranteed by the

Constitution is not coextensive with any substantive right to the benefits denied to the party being

discriminated against.    Id.    The Court emphasized, instead, that the discrimination itself gives

rise to standing.    "Accordingly, as Justice Brandeis explained, when the right invoked is that to

equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class, as well as by extension of benefits to the excluded class."   Id at 740.

Even where the remedy of extension is not sought, and only nullification is an available option for the Court, "the injury caused by the unequal treatment allegedly suffered may be redressed by a favorable decision . . . and he [Plaintiff] therefore has standing to prosecute this action."   Id.   The Supreme Court expanded upon its reasoning in Heckler as follows:

> Consistent with Justice Brandeis' explanation of the appropriate relief for a denial of equal treatment, we have often recognized that the victims of a discriminatory government program may be remedied by an end to preferential treatment for others.   E.g., Gilmore v. City of Montgomery, 417 U.S. 556, 566-567 (1974); Norwood v. Harrison, supra, at 470-471; Griffin v. School Board of Prince Edward County, 377 U.S. 218, 232-234 (1964).   See also Califano v. Westcott, supra, at 93-94 (Opinion of Powell, J.) (finding federal aid program violative of Plaintiffs' right to equal protection, but arguing that appropriate remedy under state statute was to enjoin further payment of benefits to all applicants, including Plaintiffs).

Id at n. 8.

The individual Plaintiffs in this case, therefore, allege redressable injuries under the Equal Protection Clause of the Constitution, as well as under the Establishment Clause.   Because the Plaintiffs are similarly situated to clergy who preferentially receive tax benefits, their injuries provide a basis for standing.   They are personally denied equal treatment by virtue of §107.

## VI.   CONSTITUTIONALLY UNDERINCLUSIVE STATUTES ARE REDRESSABLE BY NULLIFICATION.

A court can remedy a constitutionally underinclusive statute by declaring the statute a nullity and ordering that benefits not be extended to the favored members of the class.   The Supreme Court made this result clear in Heckler, 465 U.S. at 739, holding that nullification does

not deprive a Plaintiff of standing to seek judicial redress for allegedly discriminatory benefits. When the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, "a result that can be accomplished by withdrawal of benefits from the favored class." Id at 740.

Courts have subsequently recognized Heckler for the proposition that similarly situated taxpayers do have standing to challenge underinclusive exemptions by seeking nullification -- without being limited only to the potential remedy of an administrative petition for refund.   In Finlator v. Powers, 902 F.2d 1158 (4th Cir. 1990), for example, the Court expressly rejected the argument that an underinclusive statute is only redressable by a claim for refund.

The Finlator decision preliminarily noted that Supreme Court precedent unequivocally holds that non-exempt taxpayers have standing to challenge the constitutionality of tax code exemptions.   Id at 1160-61, citing Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989), and Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987).   In Arkansas Writers' Project, the Supreme Court, by Justice Marshall, warned that to deny standing to such parties might otherwise "effectively insulate underinclusive statutes from constitutional challenge."   481 U.S. at 227. The Supreme Court further noted that its decision in Arkansas Writers' Project was consistent "with the numerous decisions of this Court in which we have considered claims that others similarly situated were exempt from the operation of a state law adversely affecting the claimant." Id.

The defendant in Finlator, nonetheless, claimed that an implicit requirement of Arkansas Writers' Project and Texas Monthly is that non-exempt parties must take affirmative steps to ensure their standing, such as contesting the tax prior to its payment, refusing to pay the tax, paying the tax under protest or a reservation of rights, paying the tax and seeking a refund, or taking some

29

other action to permit the state to preclude or redress the injuries *ab initio*.   Finlator, 902 F.2d at

1161.   The Court of Appeals, however, refused to read such a requirement into the Supreme

Court's decisions.   The Court of Appeals explained its conclusion as follows:

> Realistically, if this Court were to deny standing in this case, the
> appellants would simply protest the payment and collection of the
> State's sales tax, and refile their suit.   We do not believe that this
> additional requirement would improve the vigorousness or quality
> of the parties' advocacy, would enhance the posture of this case,
> would clarify the legal issues presented for review, would
> strengthen the justiciability of the appellants' claims, or would
> contribute in any way to our ability to decide a question presented
> and contested by parties having a demonstrated interest and stake in
> its resolution.   Moreover, we conclude that the appellants did suffer
> actual injury in this case as a result of the discriminatory treatment
> dispensed by the Secretary -- purchasers of "Holy Bibles" need not
> protest the State's sales tax in order to claim the exemption, while
> purchasers of other texts, both sacred and non-sacred, must protest
> the sales tax in order to claim the Exemption.   Simply stated, an
> injury is created by the very fact that the Secretary imposes
> additional burdens on the appellants not placed on purchasers of
> "Holy Bibles."   Finally, we believe that it would be an untenable
> waste of judicial resources to deny the appellant standing in this
> case given the patent unconstitutionality of the Exemption.

Id at 1162.

In Planned Parenthood of South Carolina Incorporated, et al. v. Rose, 361 F.3d 786, 791

(4th Cir. 2004), the Court of Appeals reiterated that standing to challenge an underinclusive statute

does not require exhaustion of administrative efforts to obtain the discriminatory benefit.   The

decision in Rose dealt with a discriminatory personalized license plate program.   The State

claimed that the Plaintiffs lacked standing because they had not applied for a license plate under

the discriminatory scheme.   The Court concluded that the Plaintiffs' failure to apply for an

organizational plate was not fatal to their standing:

> Waiting for the Plaintiffs to apply for a specialty plate under the
> organizational statute would neither change the Plaintiffs' stake in
> the controversy nor sharpen the issues for review.   We discussed

> this sort of situation in <u>Finlator v. Powers</u>, where the Plaintiffs challenged a discriminatory tax law without first protesting the payment of the tax to the top state tax official.   In that case we said that requiring the Plaintiffs to protest the tax and then refile their suit would not improve the "parties' advocacy . . . clarify the legal issues presented for review . . . or contribute in any way to our ability to decide a question presented and contested by the parties."   <u>Finlator</u>, 902 F.2d at 1162.   As a result, we concluded that the Plaintiffs had standing to bring a facial challenge to the law.   For the same reason, the Plaintiffs in this case need not first apply for, and be denied, an organizational plate in order to gain standing.

Significantly, in both <u>Finlator</u> and <u>Rose</u>, the Court ordered nullification of the discriminatory statutory schemes at issue as a final and complete remedy.

The District Court for the District of Nevada, recently, reached the same conclusion that an underinclusive statute may be redressed by nullification, regardless of whether the Plaintiff could thereby receive the benefits of the challenged statute.   In <u>Martinez, et al. v. Clark County, Nevada</u>, 2012 U.S. Dist. LEXIS 5313 (D. Nev., January 18, 2012), the Court considered Establishment Clause challenges to a statute that required marriages to be performed only by religious clergy. The Court considered the question of redressability and concluded that "even if the Court determined at this [pleading] stage of the proceedings that it would not order extending the statute to include persons such as Plaintiffs, Plaintiffs who allege that a statute is underinclusive nonetheless shall be considered to have an injury for which they can obtain redress."   <u>Id</u> at 17.

The Court in <u>Martinez</u> expressly rejected the argument that Plaintiffs' claims were not redressable because the Plaintiffs would not be able to solemnize marriages, even if the Court nullified the offending statutory provision.   The Court held that nullification provided an available avenue of redress in the case of an underinclusive statute, so as to provide standing for the Plaintiffs:

> Defendants argue that Plaintiffs' claims are not redressable because
> even if the Court struck down the offending statutory provision,
> Plaintiffs still would not be able to solemnize marriages.   Rather,
> all Plaintiffs would succeed in doing is further narrowing who may
> solemnize a marriage.   However, Plaintiffs' injuries could be
> redressed either by extending the right to solemnize marriage to
> them, or by withdrawing the right to solemnize marriage granted to
> those with a religious affiliation.   The Court need not address at this
> stage which remedy is more appropriate in this case should
> Plaintiffs prevail, as we are only at the standing stage.   But
> Plaintiffs' injuries are redressable by the Court, even if the Court
> later decides that extending the right to solemnize marriages to those
> who are not affiliated with a religious organization is inappropriate.
> Eliminating the allegedly unconstitutional distinction redresses
> Plaintiffs' injuries, regardless of whether Plaintiffs obtain the
> remedy of being able to solemnize marriages.

Id at 17-18.   (Emphasis added.)

The District Court for the Northern District of Illinois also recently considered the issue of nullification in Anheuser-Busch, Inc. v. Schnorf, 738 F. Supp. 2d 793 (N. D. Ill. 2010).   The Court discussed the "extension" versus "nullification" dichotomy as it has been analyzed by the Supreme Court in Heckler, and concluded that the deciding Court should "measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation."   738 F. Supp. 2d at 811, quoting Heckler, 465 U.S. at 739, n. 5.

On the merits in Anheuser-Busch, the Court concluded that nullification was the most appropriate remedy because that course would least impact the regulatory scheme of which the underinclusive statute was a part.   738 F. Supp. 2d at 815.   Similarly, in the present case, nullification of § 107(2) would be less disruptive to the Government's tax collection scheme than extending the housing allowance to all similarly situated taxpayers.

The Plaintiffs' claims in the present case are clearly redressable by relief that is within the competence and jurisdiction of this Court to grant.   Nullification of a constitutionally

underinclusive tax benefit, that is conditioned on the performance of religious functions,

constitutes an appropriate and necessary remedy available to the Plaintiffs.

## VII.   SECTION 107(2) VIOLATES THE ESTABLISHMENT CLAUSE BECAUSE IT IS NOT NEUTRAL AND PROVIDES SIGNIFICANT TAX BENEFITS EXCLUSIVELY TO MINISTERS OF THE GOSPEL.

### A.   Tax Benefits That Are Not Neutrally Available To A Broad Range Of Groups Or Persons Without Regard To Religion Violate The Establishment Clause.

The absence of neutrality is evident in §107(2).   Section 107(2) allows ministers of the

gospel to exclude from their income the full amount of any housing allowance provided by their

church.   This exemption for cash payments is available only to ministers of the gospel; other

taxpayers cannot deduct similar cash allowances, even if provided for the "convenience of the

employer."   The §107(2) exemption, therefore, confers a substantial financial benefit to ministers,

by "lessening the burden of housing costs," which is not neutrally available to any other taxpayers.

(See Government Brief at 35.)

The twin notions animating the Establishment Clause are that government may not be

overtly hostile to religion -- but government also may not favor religion over non-religion.   Texas

Monthly 489 U.S. at 9-10.   "When the government directs a subsidy exclusively to religious

organizations that is not required by the Free Exercise Clause and that either burdens

non-beneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed

deterrent to the free exercise of religion . . . it provides unjustifiable awards of assistance to

religious organizations and cannot but convey a message of endorsement to slighted members of

the community."   Id at 15, quoting Bishop of Church of Jesus Christ of Latter-Day Saints v.

Amos, 483 U.S. 327, 348 (1987) (O'Connor, J., Concurring in Judgment).   Here, § 107(2) is not

required by the Free Exercise Clause and cannot be seen as removing a significant government

imposed deterrent to the free exercise of religion.

Tax exemptions provided exclusively to taxpayers on the basis of religion have never been upheld by the Supreme Court, including in <u>Walz v. Tax Commission of New York City</u>, 397 U.S. 664 (1970).   In <u>Walz</u>, the Court sustained a property tax exemption that "applied to religious properties no less than to real estate owned by a wide array of non-profit organizations."   <u>Texas Monthly</u>, 489 U.S. at 11.   The broad class of non-religious as well as religious beneficiaries was a critical factor in <u>Walz</u>, as well as in other cases decided by the Supreme Court.   This factor is consistently emphasized by requiring that benefits to religious organizations also flow to a large number of non-religious groups.   <u>Id</u>.   "Indeed, were those benefits confined to religious organizations [in <u>Walz</u>], they could not have appeared other than as state sponsorship of religion; if that were so, we [Supreme Court] would not have hesitated to strike them down for lacking a secular purpose and effect."   <u>Id</u>.   (The Government remarkably states that <u>Walz</u> is the last time the Supreme Court examined a tax exemption based on religious status, studiedly ignoring <u>Texas Monthly</u>'s discussions of <u>Walz</u> nineteen years later.   Government Brief at 41.)

In reaching its decision in <u>Texas Monthly</u>, Justice Brennan emphasized the importance in <u>Walz</u> that the property tax exemption at issue flowed to a large number of non-religious groups. "The breadth of New York's property tax exemption was essential to our [Supreme Court's] holding that it was not aimed at establishing, sponsoring, or supporting religion."   <u>Texas Monthly</u>, 489 U.S.at 12.   The <u>Walz</u> decision "in no way intimated that the exemption would have been valid had it applied *only* to the property of religious groups or had it lacked a permissible secular objective."   <u>Id</u> at 13, n. 2.   (Emphasis in original.)   Justice Brennan's explanation in <u>Texas Monthly</u>, moreover, reflected the Court's own long-accepted understanding of the holding in <u>Walz</u>:

Nor is our reading of Walz by any means novel.   Indeed, it has been the Court's accepted understanding of the holding in Walz for almost 20 years.   In Gillette v. United States, 401 U.S. 437, 454 (1971), we said: "Neutrality in matters of religion is not inconsistent with benevolence by way of exemptions from onerous duties, Walz v. Tax Commission, 397 U.S. at 669, so long as an exemption is tailored broadly enough that it reflects valid secular purposes." We read Walz to stand for the same proposition in Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 793-794 (1973)."Without intimating whether this factor alone might have controlling significance in another context in some future case," we noted that the breadth of an exemption for religious groups is unquestionably an "important factor" in assessing its constitutionality.   Id at 794.   Our [Supreme Court] opinion today builds on established precedents; it does not repudiate them. Texas Monthly, 489 U.S.at 13, n. 3.

The Walz decision is distinguishable in other respects as well, including the fact that property taxes are generally imposed without regard to the taxpayer's ability to pay, whereas the federal income tax laws "take ability to pay" into account, including the different rates of taxation and low-income deductions.

The exemption in Walz also reduced potential "entanglement" issues between state and church, including the need to make determinations of property value.   Section 107(2), by contrast, does not avoid entanglement.   On the contrary, §107(2) requires fact-sensitive and complex inquiries into patently religious matters, such as defining "ministers of the gospel;" "sacerdotal function;" "integral agency" of a church or church denomination; and "church."   The potential for entanglement, therefore, is inherent in § 107(2), which was not the case in Walz.

Walz also was based in part on a unique historical rationale relating to property tax exemptions for property used by churches themselves.   Unlike in Walz, however, the exemption created by §107 lack this historical rationale, and involves personal income tax liability, which does not implicate the free exercise issues at play in Walz.   The exemption in §107(2) for cash housing allowances paid to ministers was only first enacted in 1954, and has been questioned ever since.   Cf. Kirk v. Commissioner, 51 T.C. 66, 72 (1968), affd. 425 F.2d 492 (D.C. Cir. 1970).

35

The Walz decision, in short, is distinguishable from the present case on many bases – and it has been authoritatively distinguished by the Supreme Court in Texas Monthly.

What remains crucial in evaluating a tax subsidy afforded to ministers is whether some "overarching secular purpose justifies like benefits for non-religious groups."   Texas Monthly at 15, n. 4.   "In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter."   Id at 17, quoting Walz, 397 U.S. at 696.

The Supreme Court rejected in Texas Monthly the counter-argument that a sales tax exemption removed a government-imposed burden on the free exercise of religion.   According to the Court, "it is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens claimant's freedom to exercise religious rights."   Id at 18.   In Texas Monthly, the payment of a sales tax to purchasers of religious books did not in any way offend their religious beliefs or inhibit religious activity.   A significant deterrence of free exercise rights, however, is necessary in order to sustain a legislative exemption as an appropriate accommodation.   Id at 18, n. 8.

The Supreme Court concluded in Texas Monthly that the tax exemption at issue there was not mandated, or even favored, by the Establishment Clause in order to avoid excessive entanglement.   "Not only does the exemption seem a blatant endorsement of religion, but it appears on its face, to produce a greater state entanglement with religion than the denial of an exemption."   Id at 19.   The risk of entanglement existed under the exemption statute, according to the Court, because of the need to determine that a publication qualified as being religious.   Id.

The Government's attempt to limit Texas Monthly to tax exemptions for publications involving religious speech, moreover, is not a distinction that favors the Government.   Here, the

§107 exclusion for ministers is available only when a minister is given use of a home or receives a housing allowance as compensation for services performed "in the exercise of" his or her ministry. Services performed by a minister in the exercise of his ministry include:   (1) the administration of sacerdotal functions; (2) the conduct of religious worship; and (3) the control, conduct and maintenance of religious organizations under the authority of a religious body constituting a church or church denomination.   In effect, the §107 tax break for ministers constitutes "preferential support for the communication of religious messages," every bit as much as in Texas Monthly.   Id at 28 (Blackmun, J. Concurring).

**B.      A Majority Of The Supreme Court Agreed On The Establishment Clause Principles In Texas Monthly.**

The controlling principles recognized in Texas Monthly were joined in by a majority of five members of the Court.   Justice Brennan, joined by Justices Marshall and Stephens, thoroughly distinguished Walz, while concluding that preferential tax exemptions for religion violate the Establishment Clause.   Justice Blackmun concurred, joined by Justice O'Connor, and they concluded that the case could be decided on the basis that "a tax exemption *limited to* the sale of religious literature by religious organizations violates the Establishment Clause," without deciding the Free Exercise issues in the case.   Id at 28.   (Blackmun, Concurring.)   In answering the decisive question, Justice Blackmun agreed with the opinion of Justice Brennan:

> In this case, by confining the tax exemption exclusively to the sale of religious publications, Texas engaged in preferential support for the communication of religious messages.   Although some forms of accommodating religion are constitutionally permissible, see Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 (1987), this one surely is not.   A statutory preference for the dissemination of religious ideas offends our most basic understanding of what the Establishment Clause is all about and hence is constitutionally intolerable . . . .   The Establishment Clause prohibits a tax exemption limited to the sale of religious literature.   Texas Monthly, 489 U.S. at 28.

Although <u>Texas Monthly</u> is sometimes described by the Government as merely a plurality decision by a splintered Court, it is really a conclusive opinion of the Court on the Establishment Clause issue.   The Government implies that <u>Texas Monthly</u> may not be binding authority because the five justices who deemed Texas' sales and use tax exemption for religious publications unconstitutional did not sign a single opinion.   <u>Marks v. United States</u>, 430 U.S. 188, 193 (1997), however, recognizes the authoritative character of Supreme Court holdings supported by separate opinions that comprise a Court majority.   When a fragmented court decides a case in which no single rationale explaining the result enjoys the assent of five justices, the holding of the court may be viewed as that position taken by those Justices who concurred in the judgment on the narrowest grounds.   <u>Id</u>.   Using this standard, <u>Texas Monthly</u> is an easy case to read because the Court does not even count as being "fragmented" on the Establishment Clause issue.

No meaningful difference exists between Justice Brennan's plurality opinion and Justice Blackmun's concurrence in <u>Texas Monthly</u> applying the Establishment Cause to tax preferences for religious activities.   Justice Blackmun, joined by Justice O'Connor, declined to join Justice Brennan's opinion only because Justice Blackmun thought that the Court should not decide what the Free Exercise Clause required regarding the taxation of religious publications.   Justice Blackmun, however, did not voice any disagreement with Justice Brennan's reading of <u>Walz</u>, nor did he leave any doubt that a tax exemption solely for religious publications contravenes the Establishment Clause.

Justice Scalia, in dissent, certainly understood the majority holding in <u>Texas Monthly</u> to prohibit preferential tax benefits provided exclusively to religion.   Religious tax exemptions "of the type the Court invalidates today," including the §107 housing exemption, "are likewise affected" by the <u>Texas Monthly</u> holding, according to Justice Scalia.   <u>Texas Monthly</u>, 489 U.S. at

24-25.   Significantly, Justice Scalia specifically identified the §107 housing allowance as being

within the scope of the Court's holding.

The division within the <u>Texas Monthly</u> majority on the Free Exercise issue is irrelevant to

the constitutionality of §107(2) because a Court majority stated unequivocally that a tax exemption

solely for religious entities cannot be constitutional, as opposed to a tax break that is available to a

broader class of entities, and that can be justified by a permissible secular purpose.   <u>See</u>,

Rakowski, <u>The Parsonage Exclusion: New Developments</u>, Tax Notes, July 15, 2002, 429; <u>See also</u>

Foster, Matthew, <u>Note: The Parsonage Allowance Exclusion:   Past, Present and Future</u>, 44 Vand.

L. Rev.   149, 175-176 (1991):

> In 1989 the Supreme Court struck down a statute that granted estate sales tax
> exemption to religious periodicals in <u>Texas Monthly, Inc v. Bullock</u>.   A plurality
> composed of Justices Brennan, Marshall and Stevens relied primarily on <u>Walz v.
> Tax Commission of New York</u> to hold that the statute was too narrow to pass
> Establishment Clause scrutiny. ...In a concurring opinion, Justices Blackmun and
> O'Connor held that a state may not give a tax benefit to proponents of religion
> without also giving it to others who actively might activate disbelief in religion.
>
> The plurality and concurring opinions in <u>Texas Monthly</u> raise serious doubts
> about the constitutionality of [Internal Revenue Code] Section 107.   Specifically,
> Section 107 grants a tax break to those who advocate religion for a living, but
> denies the savings to taxpayers who do not meet the IRS qualifications for a
> minister of the gospel.   Section 107 is drawn and interpreted narrowly and does
> not embrace a broad class of beneficiaries that might legitimize it under a <u>Walz</u>
> analysis.   As such, Section 107 arguably represents a subsidiary directed
> exclusively to religious beneficiaries, which does not remove any state-imposed
> deterrent to the free exercise of religion and may provide unjustifiable awards of
> assistance to religious interests.

Professor Erwin Chemerinsky also counts five justices in <u>Texas Monthly</u> as supporting the

conclusion that a tax exemption granted only to religion violates the Establishment Clause.   In

<u>The Parsonage Exemption Violates the Establishment Clause and Should be Declared</u>

<u>Unconstitutional</u>, 24 Whittier Law Review 707, 715-716 (2003), Professor Chemerinsky explains

that the Supreme Court's decision in <u>Texas Monthly</u> was supported by a 5-Justice majority on the

decisive preference issue:

> Although Justice Brennan wrote for a plurality of three justices (he was joined by Justices Marshall and Stevens), Justices Blackmun and O'Connor concurred in the judgment and came to the same conclusion:   A tax benefit given only to religion violates the Establishment Clause.   Justice Blackmun, joined by Justice O'Connor, declared "the Establishment Clause value suggests that a state may not give a tax break to those who spread the gospel that it does not also give to others who actively might advocate disbelief in religion.

> Justices Blackmun and O'Connor concurred in the judgment because they thought it unnecessary to discuss the Free Exercise Clause, as was done in the plurality opinion.   But Justice Blackmun's opinion left no doubt as to his agreement that the Texas statute violated the Establishment Clause. He wrote:   "A statutory preference for the dissemination of religious ideas offends the most basic understanding of what the Establishment Clause is all about and hence is constitutionally intolerable."

> Thus, five justices in Texas Monthly held that the Establishment Clause is violated by a tax exemption that gives "a tax break to those who spread the gospel that it does not also give to others."   Internal Revenue Code Section 107 (2) at issue in this case, provides a large tax break to "ministers of the gospel" that no one else can claim.   Texas Monthly v. Bullock is squarely on point, and under its controlling authority, Section 107 (2) is unconstitutional.   (See Bolton Aff., Ex. 1.)

Neither courts nor commentators have subsequently questioned that a majority of the Supreme Court in Texas Monthly held that a tax preference that is not neutral and generally available violates the Establishment Clause.   The requirement of neutrality and general applicability, particularly after Texas Monthly, has consistently prevailed in courts' analysis of tax preferences.   This conclusion is well-described by Donna Adler in The Internal Revenue Code, the Constitution and the Courts:   The Use of Tax Expenditure Analysis in Judicial Decision Making, 28 Wake Forest L.Rev. 855 902 (1993):

> Cases decided after Walz have eviscerated the Court's rationale for finding that the property-tax exemption granted by New York State did not violate the Establishment Clause.   Texas Monthly, however, cited the holding in Walz favorably and stated explicitly that exemptions like those in Walz would be upheld.   What, then, is left in the Walz decision that merits approval from the Court and Texas Monthly?   Neither the no-subsidy logic, the historical argument,

nor the entanglement argument survives.   None of those arguments, which could have been made in <u>Texas Monthly</u>, as well as in <u>Walz</u>, is sufficient to save the sales tax exemption.   Rather, the one factual distinction that seems to be the determinative issue is the breadth of the class benefited by the tax exemption.

The Court seems to be adopting an "equal access" type of analysis in the tax exemption area.   As long as the benefits offered by the government are available to a wide variety of organizations, the fact that religious institutions will share in those benefits is not objectionable.   The Court cites three cases in which statutes were upheld even though benefits flowed to religious institutions -- <u>Widmar v. Vincent</u>, which addressed free access to public space; <u>Mueller v. Allan</u>, which examined a tuition deduction for parochial schools; and <u>Walz</u> which considered a property tax exemption.   The Court noted that "in all of these cases, we emphasized that the benefits derived by religious organizations flowed to a large number of non-religious groups as well."   Alternatively, if the benefits had been confined to religious organizations, "they could not have appeared other than as state sponsorship of religion" and would have been struck down.

The controlling authority of <u>Texas Monthly</u>, in fact, suggests that even <u>Walz</u> would have been decided differently if the property tax exemption at issue had been limited only to church properties.   <u>Cf</u>.   <u>In re Springmoor</u>, 498 S.E.2d 177 (N.C. 1998) (invalidating preferential property tax exemption for religious retirement homes).   Robert Sedler makes this point in <u>Understanding the Establishment Clause:   The Perspective of Constitutional Litigation,</u> 43 Wayne L. Rev. 1317, 1391-1392 (1997):

> The property tax exemption for church property [in <u>Walz</u>] conferred a very valuable financial benefit on churches, and like any other tax exemption, effectively subsidized the churches' activity.   The effect of <u>Walz</u> is to allow the state to provide a financial benefit to religion through a tax exemption when it could not provide such a benefit through a direct grant.   Crucial to the Court's holding in <u>Walz</u> is the matter of inclusion.   The tax exemption was for non-profit institutions.   Therefore, churches qualified for the grant, not because they were churches, but because they were included within the class of non-profit institutions.   As one commentator put it, "Those institutions shared a relevant non-religious attribute with secular uses."   There is no doubt that a property tax exemption for churches alone would violate the Establishment Clause as a preference for religion, notwithstanding that such an exemption would avoid the "entanglement problems" that the Court identified in <u>Walz</u>.   This point is demonstrated by <u>Texas Monthly, Inc.v. Bullock</u>, where the Court held unconstitutional an exemption from the state sales tax law for "periodicals that are published or distributed by a religious faith and that consists wholly of writing

41

promulgating the teaching of the faith and books that consist wholly of writings sacred to our religious faith."   In other words, it is the matter of the inclusion of the religious with the secular that marks the distinction between the constitutionally permissible equal treatment of religion and the constitutionally impermissible preference for religion.

The law is clear, therefore, that preferential tax exemptions for religious officials, which are not neutral and applicable to a broad class of beneficiaries, violate the Establishment Clause. The Government in the present case may dismiss <u>Texas Monthly</u> as merely an interesting plurality decision by a fractured Supreme Court, but the court's decision actually represents a majority opinion of the Supreme Court on the Establishment Clause issue -- that decision has never been repudiated by the Court.   Accordingly, the <u>Texas Monthly</u> decision, and the consistent authority of later Supreme Court decisions, establish that preferential tax benefits do constitute a substantive benefit that can not be preferentially conferred upon religion consistent with the Establishment Clause.

**C.      Section 107(2) Provides Greater Benefits To Ministers Than Section 119 Provides To Non-Clergy Taxpayers.**

Section 107(2) does not merely provide tax benefits to ministers that are otherwise available to all taxpayers under Internal Revenue Code §119.   The benefits provided by §107(2), in fact, are provided to ministers without regard to the requirements of §119, which is limited to in-kind housing provided for the convenience of the employer.   Section 107(2) has no such limitation.   That is precisely why Congress adopted §107 -- and it is why the religious community so vigorously defends the §107 benefits.   The requirements of §119 are different and more limiting than the requirements of §107, and for that reason, §107 undisputedly provides preferential benefits to ministers that are not neutrally and generally available to a broad range of taxpayers.   Ministers constitute a privileged class under §107(2).

Section 107 permits only ministers of the gospel performing religious services to exclude

from their taxable income that portion of their compensation that is designated as a housing allowance or housing provided in-kind.   In order to claim the housing allowance, two principal conditions must be met:

> 1.      The allowance must be provided as compensation for services that ordinarily are the duties of a minister of the gospel.   This condition is unrelated to any requirement that the minister's residence be used to perform the services of a minister.   The Internal Revenue Service, in fact, has determined that even a retired minister of the gospel is eligible to claim the housing allowance exemption because the allowance is deemed to have been paid as part of the retired minister's compensation for past services as a minister of the gospel.   Rev. Rul. 63-156, 1963-2 C.V. 79.

> 2.      The amount of the housing allowance must be designated in advance by an employing church.   The designated housing allowance must then actually be used by the minister for housing purposes.   *(Id.)*

Section 107(2) provides a tax benefit that is unavailable to other taxpayers -- beyond argument.   Section 107(2) allows an employing church to designate part of a minister's cash compensation as a housing allowance, which designated compensation is then tax-free to the minister.   By contrast, §119 allows no exemption for cash allowances, even if the allowances are used to provide housing for the convenience of the employer.   Section 107(2), moreover, has no requirement that compensation designated as a housing allowance be used for any particular housing selected by the church for its own convenience.   The designated compensation paid to the minister is tax-free, unlike for other taxpayers, and the housing allowance does not have to be used for the convenience of the employer, also unlike the requirement for other taxpayers.

Ministers derive an enormous financial benefit from Internal Revenue Code Section 107(2) by being paid in tax-exempt dollars.   Professor Chemerinsky describes this significant tax break to religion:

Section 107's blatant favoritism for religion can be seen by comparing it with other provisions of the Internal Revenue Code that provide a benefit to ministers on the same terms as others in similar situations in secular institutions.   For example, Section 119 of the Internal Revenue Code allows an income exclusion for the value of meals and lodging that are provided on the business premises of an employer as a convenience to the employer and as a condition of employment.   Thus, a minister who is required to live on the church's premises is allowed an exclusion under this provision, but so is the head of a school who lives on the premises, or any other employee who is required to live in housing provided at the workplace.   Section 107 is unique in that it provides a benefit to religion -- to "ministers of the gospel" -- that no one else receives.

Section 107(2) allows ministers to be paid without having to pay taxes on some or all of their salary by having it declared a housing allowance.   But the benefit is even greater than that:   Clergy also can deduct their mortgage payments and real estate taxes from their income tax, even though they paid for these with tax-exempt dollars.   Although this type of "double-dipping" generally is not allowed, a specific provision [Section 265(a)(6)] of the Internal Revenue Code permits "ministers of the gospel" who benefit under Section 107(2) to deduct the mortgage interest and property tax that they paid with their tax-exempt allowance. This results in a substantial windfall -- or government subsidy -- for clergy that no one else receives.   One commentator explains with a simple example:

> Suppose a taxpayer receives a $1,000 per month rental allowance from the church.   Assume also that he pays $333 in mortgage interest every month, and is in the 33% tax bracket.   If the taxpayer is allowed to deduct interest under Section 265, then he will get a $111 windfall every month.   The church spends $1,000, but the clergyman receives total benefits in the amount of $1,111.

Moreover, the effect is a significant financial benefit to religion because churches and synagogues and mosques can pay their clergy much less because of the tax-free dollars.   Without the parsonage exemption, religious institutions would have to pay clergy significantly more to make up this difference.

Chemerinsky, The Parsonage Exemption Violates the Establishment Clause and Should be

Declared Unconstitutional, 24 Whittier Law Review, 707, 712-713 (2003).

The benefit under §107(2) accrues only to ministers, who may use their designated housing

allowance to purchase an asset that has the potential to appreciate and increase in value.   This

benefit is not available to other taxpayers:

Section 107(2) directly benefits ministers and religion.   The most direct effect of

> Section 107(2) is its significant lowering of a minister's tax burden.   Section
> 107(2) concurrently bestows an economic benefit on the minister's church, in
> much the same manner as Section 107(1).   While the support that Section 107(2)
> provides to ministers and religions is qualitatively identical to Section 107(1),
> there is one difference.   The IRS has interpreted Section 107(2) to allow
> ministers to purchase homes to exclude the home's fair rental value from gross
> income.   Section 107(2) thus provides minsters with personal benefits beyond
> any religious considerations by allowing an exemption from funds expended on a
> home which will appreciate in value.

O'Neill, Thomas, <u>A Constitutional Challenge to §107 of the Internal Revenue Code</u>, 57 Notre

Dame Law. 853, 864 (1982).

The preferential tax benefits of §107(2) further differ from §119 because the exemption is

available without regard to the "convenience of the employer."   Section 119 provides an

exclusion for in-kind housing if:   (1) The lodging is furnished on the business premises of the

employer; (2) the lodging is furnished for the convenience of the employer; and (3) the employee

is required to accept such lodging as a condition of his employment.   Under this test, an employee

must pay income tax on the value of free housing, except where the lodging meets the

"convenience of the employer" requirements.

Section 119 applies only where the employer desires to have a continuous presence of the

employee at the job site and to have him within reach at all times.   As the Supreme Court held in

<u>Commissioner v. Kowalski</u>, 434 U.S. 77, 93 (1977), the convenience of the employer requires that

the employee must accept housing in order to properly perform his duties.   This requirement,

however, is not imposed as a condition of the §107(2) exemption, including as to tax-free

payments made directly to ministers.   Section 107(2) provides for tax-free compensation to

ministers in circumstances that are not available to other taxpayers, including under §119.

Section 107(2) creates an incentive for churches to designate a minister's compensation as

a housing allowance in order to increase the minister's net income, while reducing the church's

wage payments correspondingly.   "The effect is a significant financial benefit to religion because churches and synagogues and mosques can pay their clergy much less because of the tax-free dollars.   Without the parsonage exemption, religious institutions would have to pay clergy significantly more to make up this difference."   Chemerinsky, 24 Whittier Law Review at 713. Non-church employers, by contrast, cannot increase the net-compensation of their employees by designating an amount to cover their housing costs -- and therefore, they cannot correspondingly reduce their wage payments.   By the simple act of designating a housing allowance for ministers, however, churches and ministers can receive a financial advantage not available to other employers and employees.

Finally, income tax exclusions for housing allowances provided to overseas government employees and military personnel do not render §107(2) neutral and broad-based.   These exemptions are not part of a comprehensive statutory scheme for excluding housing allowances from taxable income, and as Professor Chemerinsky notes, the government can give its employees a tax break, but §107(2), in contrast, is a benefit provided only to privately-employed clergy. It is not at all about the government structuring the compensation for its employees:

> The government in the Warren case pointed to the ability of those in the United States military and those employed by the United States in foreign countries, such as in the Foreign Service, the CIA, and the Peace Corps, to be paid in tax-exempt dollars.   But these are all federal employees and if the government wants to pay its employees via a tax break it certainly can do so.   Section 107(2), in contrast, obviously is a benefit to privately-employed clergy and not at all about the government structuring the compensation for its employees.   Indeed, it is noticeable that "ministers of the gospel" in the military or in federal employ in foreign countries get the same tax break as civilians in these entities; but the parsonage exemption benefits only religion.

Chemerinsky, 24 Whittier Law Review at 728.

The Supreme Court rejected an argument similar to the Government's in Texas Monthly, where the State sought to justify its sales tax exemption for religious publications by citing other

46

sales tax exemptions provided for different purposes.   The Court was unimpressed by this argument, noting that other exemptions did not rescue the exemption for religious periodicals from invalidation.   "What is crucial is that any subsidy afforded religious organizations be warranted by some overarching secular purpose that justifies like benefits for non-religious groups."   489 U.S. at 15 n. 4.

The Supreme Court further recognized in Texas Monthly that in evaluating preferences, "the Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.   In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter."   489 U.S. at 17, quoting Walz, 397 U.S. at 696.

Here, §107(2) expressly provides an exemption intended to benefit religion alone.   The housing allowance exemption for ministers is not grounded in a secular legislative policy that motivates similar tax breaks for non-religious employees.   Section 107(2) does not provide an exemption for cash housing allowances paid to ministers for the same reason that the government exempts housing allowances paid to the military and other overseas employees of the government. "The circumference of legislation" providing allowances to overseas government employees does not "encircle a class so broad that it can be fairly concluded" that ministers of the gospel could be thought to fall within the natural perimeter.

Section 107(2) does not exempt cash housing allowances for any private employees other than ministers of the gospel.   This is a substantial tax benefit that is not available to other private employees, including under §119.   The reason that §107(2) is defended so vigorously by churches and ministers, therefore, is not because it merely duplicates the exemption otherwise available to

47

them under §119; their concern is driven by the fact that this substantial tax benefit would not

otherwise be available to them if they are held to the terms applicable to all other taxpayers.

**D.      Section 107 Does Not Simply Eliminate Disparity of Treatment Between Religious And Secular Employees.**

The Government argues unpersuasively that the original in-kind parsonage exclusion,

enacted in 1921 and currently codified in § 107(1) of the IRC, was merely intended to give

ministers an exclusion equivalent to the recognized "convenience of the employer" exemption.

The Government's historical analysis is suspect, and it does not explain the exclusion of cash

housing allowances, as provided by § 107(2), in any event.   Such cash exclusions are not

available to secular employees at all.   The Government counters, however,   by arguing that

reducing the burden of housing costs only for ministers who receive in-kind housing is "unfair" to

those ministers who have to pay cash for housing -- and so Congress supposedly enacted § 107(2)

in order to give an equivalent benefit to all religious ministers.   The Government's claimed

rationale, however, does not change the fact that the burden of housing costs for non-religious

employees is equally great, but only ministers who receive cash allowances benefit from the

§ 107(2) relief program.

The Government's historical analysis is as suspect as its logic.   Section 107(1), in fact,

also provides tax benefits to ministers that are not generally available.   Section 107(1) provides

that gross income does not include the rental value of a home furnished to a minister of the gospel

"as part of his compensation."   Although the Government contends that this is just a restatement

of §119, which allows an exemption for lodging provided for "the convenience of the employer,"§

107(1) is not equivalent to §119.

The Government claims that Congress' intent with respect to the parsonage exemption is

evident because the original parsonage exemption enacted by Congress in 1921 was supposedly

adopted in response to the Treasury Department's refusal to allow ministers to claim the same

"convenience of the employer" exclusion allowed to other employees.   Even the limited evidence

from 1921, however, indicates that Congress intended to create an exemption that is not the same

as the §119 exemption for lodging provided for the "convenience of the employer."

In the first place, the Treasury Department in 1921 did not refuse to recognize "the

convenience of the employer" doctrine as it applied to ministers.   The "convenience of the

employer" exemption was not claimed or explained in O.D. 862, which merely refused to

recognize an exemption for housing provided as part of the salary paid to a minister:

> Where in addition to the salary paid a clergyman is permitted to use the parsonage
> for living quarters free of charge the fair rental value of the parsonage is
> considered a part of his compensation for services rendered and as such should be
> reported as income.   [O.D. 862.]

The Treasury Department, in reaching its conclusion in O.D. 862, did not address the

"convenience of the employer" doctrine as applied to ministers.   There was no analysis of the

convenience of the employer, but rather the Department focused on the value of the parsonage as

part of clergy compensation, in circumstances where a minister is "permitted" to use the parsonage

-- but not required to use it.   In similar circumstances, secular employees also could not claim

"convenience of the employer" exclusion.

The Treasury Department in other cases expressly addressed the convenience doctrine

when raised by employees.   For example, with respect to fish cannery employees, the Treasury

Department concluded:

> Where, from the location or nature of the work, it is necessary that employees
> engaged in fishing and canning be furnished with lodging and sustenance by the
> employer, the value of such lodging and sustenance may be considered as being
> furnished for the convenience of the employer and deemed not, therefore, to be
> included in computing net income of the employees.   [O.D. 814.]

The Department similarly applied the "convenience of the employer" standard in respect to hospital employees:

> Where the employees of hospital are subject to immediate service on demand at any time during the 24-hours of the day and on that account are required to accept quarters and meals at the hospital, the value of such quarters and meals may be considered as being furnished for the convenience of the hospital and does not represent additional compensation to the employees.   On the other hand, where the employees are on duty a certain specified number of hours each day and could, if they so desired, obtain meals and lodging elsewhere than in the hospital and yet perform the duties required of them by such hospital, the ratable value of the board and lodging furnished is considered additional compensation.   [O.D. 915.]

The "convenience of the employer" rule was intended to be narrow, as evidenced by rulings such as O.D. 915 and O.D. 814.   It applied, for example, to employees living on a ship, who obviously performed work that could not be performed if they were living elsewhere. Similarly, the convenience of the employer doctrine applies to some hospital employees, but only if they are on call 24 hours a day.   As the Government acknowledges, the narrow scope of the "convenience of the employer rule," as illustrated by O.D. 915, applied where housing benefits were not supplied by the employer as "compensation for services."   (Government Brief at 32.)

The Revenue Act of 1921, by contrast, did not codify the "convenience of the employer" doctrine for ministers.   The Revenue Act of 1921, instead, provided that any free housing provided to ministers "as part of their compensation" would be exempt from income taxation. The 1921 Act also did not limit the exemption to housing provided for the "convenience of the employer," and it thereby provided greater tax benefits to ministers.   If the Revenue Act of 1921, had merely been intended to apply the "convenience of the employer" doctrine to ministers, that is what the legislation would have said -- instead, it provided an exemption that was independent of the "convenience of the employer," and hence it provided broader privileges.

When §107(1) was enacted in 1954, Congress again allowed a tax benefit to ministers for in-kind housing that was not tied to the "convenience of the employer."   Section 107(1) carried forward the unrestricted housing allowance from the Revenue Act of 1921, which provided a tax exemption for ministers that is broader than the exemption in §119, which only allows exemption for housing provided for the "convenience of the employer."   The fact that §107 and §119 were both enacted in 1954 makes clear that the parsonage allowance was not simply another way for Congress to articulate the "convenience of the employer" test.   The reality is that Congress intended §107(1) to provide a broader exemption that is independent of the restrictions of §119.

The Government's claim that §107(1) is essentially identical to §119 is simply not correct. Section 119 applies only to in-kind lodging that is not intended as compensation.   The Supreme Court noted this fact in its background discussion of the "convenience of the employer" doctrine in Commissioner of Internal Revenue v. Kowalski, 434 U.S. 77, 87 (1977).   The exclusion from income under "the convenience of the employer" doctrine rests upon the characterization of the benefit as non-compensatory, and it requires that the furnishing of such benefits be necessary to allow an employee to perform his duties properly.   By contrast, the parsonage exemption is explicitly dependent upon the parsonage being provided as part of the minister's employment compensation.   In fact, nothing in the history or language of §107(1) indicates that the in-kind parsonage exemption was based on "unique housing needs" of ministers.

The Government's historical analysis of § 107(2) also does not support the Government's conclusion that the exclusion of cash housing allowances for ministers was based on the unique housing needs of ministers.   The Government cites a House Report indicating that the cash exclusion for housing allowances was intended simply because it seemed "unfair" to distinguish between in-kind housing provided as part of compensation and cash payments provided for

housing.   According to the Government's own explanation, therefore, adoption of § 107(2) had nothing to do with the "unique housing needs" of ministers.   The "unfairness" of distinguishing between in-kind and cash benefits, however, is not unique to ministers.

The historical record, in fact, further indicates that § 107(2) was deliberately intended to send a message of support for religion during the Cold War.   Representative Peter Mack, who introduced § 107(2), urged support for an exclusion of cash housing allowances paid to ministers in House Hearings in the following manner:

> Certainly, in these times when we are being threatened by a godless and anti-religious world movement we should correct this discrimination against certain ministers of the gospel who are carrying on such a courageous fight against this.   Certainly this is not too much to do for these people who are caring for our spiritual welfare.   (Hearings on General Revenue Revisions before the House Committee on Ways and Means, 83d Cong., 1st Sess., pt. 3, at 1576 (1953)).

Representative Mack further urged support for § 107(2) as a means to subsidize low incomes of religious officials:

> Of our clergymen 55% are receiving less than $2,500 per year.   This is some $258 less than the $2,668 annual median income for our labor force.   It is well to keep in mind that many of these clergymen support families like the rest of us, and that many of these clergymen still receive low income based on the 1940 cost of living but must pay 1953 rents for a dwelling house.   (*Id.*)

Representative Mack's comments are particularly telling because he introduced the bill leading to enactment of § 107(2).   (See Bolton Aff., Ex. 9.)

The history of § 107(2) does not suggest any non-religious basis for distinguishing between cash housing allowances paid to ministers and those paid to secular employees.   The purpose may have been to "lessen the burden of housing costs," but not based on occupations that require particular housing.   The purpose was to lessen the burden of housing costs for ministers in order to support them in the fight against a "godless and anti-religious world movement."   Such preferential support for religions constitutes endorsement rather than accommodation.

52

The Government, nonetheless, argues that if all ministers and churches do not qualify for a particular tax benefit, then the law unconstitutionally discriminates among religious groups.   In other words, according to the Government, if the IRS provides benefits to any ministers, then it must also provide preferential benefits to all ministers -- and disadvantaged secular taxpayers should not complain because the Government may not discriminate between ministers.   The Government's argument is perverse in that religious preferences become constitutionally mandatory even if the resulting benefit is unavailable to similarly situated secular taxpayers.   The Government's perverse logic would mean, for example, that the sale tax exemption at issue in Texas Monthly should have been upheld as long as all religious literature was exempted.

The Government's argument is even more perverse in the present case.   The Government first argues that the in-kind parsonage allowance for ministers was enacted in order to give ministers an exclusion similar to the "convenience of the employer" exclusion provided generally to taxpayers.   The Government proceeds, however, to conclude that if ministers are provided with an exclusion for in-kind housing that creates parity with other employees, then the exclusion should be extended preferentially to all religious taxpayers without regard to the in-kind limitation and the requirements of the "convenience of the employer" doctrine.

The fallacy in the Government's reasoning lies in treating an exclusion for in-kind housing as discriminating among religions.   In fact, if the in-kind exclusion is deemed equivalent to the "convenience of the employer" exclusion, it is not a promotion of some religions over others because it does not make distinctions between different religious organizations based on any creed or orthodoxy.   The in-kind limitation, in other words, is not intended to discriminate among religions, even though it may impact religious taxpayers differently, just as secular taxpayers are impacted differently.   Cf. Droz v. Commissioner, 48 F. 3d 120, 124 (9th Cir. 1995).

The "discrimination" that § 107(2) is supposed to address is based on faulty reasoning. The Government presumes that no logic justifies distinguishing between ministers who receive in-kind lodging and those who receive cash allowances, but whether such a distinction makes sense, it is not a distinction that is unique to the housing needs of ministers.   What the Government deems to be unfair to ministers is just as "unfair" for secular employees --the only difference being that ministers were thought to be "caring for our spiritual welfare in the courageous fight against a godless and anti-religious world movement."   That is not a distinction that justifies preferential benefits for ministers.

Section 107(2) confers a tax benefit on ministers that is not neutrally and generally available to other employees, which is the key fact.   The benefit is based solely on religious affiliation.   The tax exclusion of cash housing allowances for ministers is not dependent upon the "convenience of the employer," which is critical to the exemption provided by § 119, and it was not provided to eliminate any government-imposed burden on the free exercise of religion.   It is an exclusion, moreover, that is not provided to secular employees.   In fact, the § 107(2) exclusion was intended to support and induce ministers to engage in religious activity.   It provides benefits to ministers as part of their compensation package in order to promote the religious message of ministers engaged in spreading the word of God.   That is prohibited by <u>Texas Monthly</u>.

**E.      Section 107(2) Is Not An Accommodation In Response To A Substantial Government-Imposed Burden On Free Exercise Rights.**

The Government also claims without basis that §107(2) is merely an accommodation of religion that is permissible in the case of government-imposed substantial burdens on free exercise rights.   The Government's argument lacks merit, in the first place, because the factual predicate is missing:   There is no evidence that §107(2) was enacted by Congress to relieve any government burden on the free exercise of religion.   Low pay and high housing costs apparently prompted

enactment of § 107(2), but these considerations are not unique to ministers and it is not a responsibility of government to abate such concerns just for ministers.

Providing ministers who are paid in cash with a tax benefit in order to "equalize" their circumstances with ministers provided in-kind housing, moreover, is constitutionally unacceptable, without providing a similar exclusion to secular employees.   Professor Chemerinsky explains the problem for the Government:

> The equality argument made by the Government in several of the Amici in the Warren case has no stopping point.   Under this reasoning, the Government could directly subsidize housing for clergy if that would equalize the benefits with those who live in housing provided by their churches.   The obvious impermissibility of such a subsidy shows why the equality argument is insufficient to justify the parsonage exemption.   One Amici says that the purpose of the parsonage exemption is to "equalize the impact of the federal income tax on ministers of poor and wealthy congregations."   Helping poorer religions is hardly a secular purpose; surely, the Government cannot subsidize poorer religions out of a desire to help make them more equal with wealthier religions.

Chemerinsky, 24 Whittier Law Review at 724-25.

The Government's church-equity argument with respect to §107(2) has nothing to do with government imposed burdens on free exercise rights.   The Supreme Court's decision in Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 43 U.S. 327 (1987), in particular, does not support the Government's argument.   In Amos, the Supreme Court considered the constitutionality of an exemption from anti-discrimination hiring laws as applied to religious organizations.   The Court upheld the exemption as an appropriate accommodation because of the effect that such regulatory laws might have on the internal operation of religious organizations.   The Court recognized in Amos, however, that "at some point, accommodation may evolve into an unlawful fostering of religion."   Id at 334-335.   In reaching its decision with regard to employment discrimination laws, however, the Supreme Court said that "it is a permissible legislative purpose to alleviate significant governmental interference

with the ability of religious organizations to define and carry out their religious missions."   Id at

335.   "Where, as here, the government acts for the proper purpose of lifting a [government]

regulation that burdens the exercise of religion, then an accommodation may be justified."   Id at

338.

The rationale of Amos and other cases involving accommodation of religion is

inapplicable to §107(2).   Civil rights laws, as involved in Amos, are regulatory in nature.   They

regulate what conduct is prohibited, permitted or required.   The application of anti-discrimination

hiring rules to a church, therefore, arguably "would interfere with the conduct of religious

activities."   On this basis, Amos upheld an exemption from the anti-discrimination laws.

By contrast, income tax laws are not regulatory in nature and do not govern behavior.

Rather, they only impose a monetary burden, which is not a constitutionally significant burden.

"To the extent that imposition of a generally applicable tax merely decreases the amount of money

[the taxpayer] has to spend on its religious activities, any such burden is not constitutionally

significant."   Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 391 (1990),

citing Hernandez v. Commissioner, 490 U.S. 680, 699 (1989).   "A preacher is not free from all

financial burdens of government, including taxes on income or property."   Id. at 386-387.   In

Hernandez, the Supreme Court concluded that the federal income tax was not a "constitutionally

significant" burden on religion where the taxpayer could not claim a deduction for money paid to

the Church of Scientology for religious services.

The IRS, moreover, fully understands that paying taxes is a burden to all taxpayers and

does not constitute a recognizable burden on free exercise rights.   In Thompson v. Commissioner,

2013 U.S. Tax Ct. LEXIS 3 at 24-25 (2013), the court stated:

> Paying taxes is burden, to all taxpayers, on their pocketbooks, rather than a
> recognizable burden on the free exercise of their religious beliefs.   Pixley v.

Commissioner, 123 T.C. at 274.   'Constitutional protection of fundamental
freedoms does not confer an entitlement to such funds as may be necessary to
realize all of the advantages of that freedom.   *Id.,* quoting Harris v. McRae, 448
U.S. 297, 318 (1980).   Petitioner is not entitled by the Constitution to be relieved
of paying his substantial delinquent tax liabilities and penalties in order to pay his
tithe.   Requiring petitioner to pay taxes may result in his having less money to
tithe.   However, this is not a violation of the Free Exercise Clause. . . .
Petitioner's position would allow religious organizations to control vital
government functions.   This is not the intention or purpose of the Free Exercise
Clause of the First Amendment.   Rather, it prohibits the Government from
exercising control over religious functions.   Laws of general applicability that
require persons to meet certain general requirements of citizenship, such as paying
taxes, cannot be avoided by the fact that they indirectly make it more difficult to
fulfill a purely religious duty, such as a member tithing a certain amount to his
church or making a pilgrimage to a shrine in a foreign country.

Section 107(2) similarly is not justified in this case in order to alleviate a substantial burden
on the exercise of religion.   Section 107(2) simply does not address any substantial burden on the
free exercise of religion.   As in Texas Monthly, therefore, §107 cannot be justified as a means of
removing an "imposition on religious activity."   See Texas Monthly, 489 U.S. at 15, n. 8.
Liability for income tax is not a substantial government burden on free exercise of rights.

In the absence of a government-imposed burden on the free exercise of religion, the
Government cannot preferentially bestow benefits exclusively on religion as an accommodation.
In such cases, even a purported accommodation impermissibly advances religion if it provides a
benefit to religion without providing a corresponding benefit to a large number of non-religious
groups or individuals, as described in Texas Monthly.   In fact, if Congress had truly been seeking
just to equalize the tax treatment of in-kind housing and cash housing allowances, then tax-free
allowances could have been provided to taxpayers generally.   Instead, Congress enacted a benefit
available only to clergy.

Section §107(2) cannot be construed to accommodate any government-imposed burden on
the free exercise of religion.   Section 107(2), purely and simply, is a tax benefit provided only to

religion in order to further religion by reducing housing costs.   As such, the exemption for cash housing allowances provided to ministers by §107(2) makes quite apt the Supreme Court's admonition that even "accommodation may devolve into an unlawful fostering of religion." Amos, 483 U.S. at 334-335.

### F.     Section 107(2) Creates Government Entanglement With Religion.

The Government's claim that inquiries under §107(2) are not entangling is inplausible. Section 107(2) excludes from the gross income of a minister the rental or housing allowance paid to him as part of his compensation, to the extent used to rent or provide a home.   This exemption requires the IRS to first determine whether an individual qualifies as a "minister of the gospel." Administrative regulations implementing §107 further require that ministers of the gospel perform specific duties, such as sacerdotal functions, conduct of religious worship, administration and maintenance of religious organizations and their integral agencies, and performance of teaching and administrative duties at theological seminaries.   T. Reg. 1.1402(c)-5.   What constitutes "religious worship" and "the administration of sacerdotal functions," in turn, depends on the tenets and practices of the particular religious body at issue.   T. Reg. 1.1402(c)-5(b)(2)(i).   Finally, in addition, a minister must be ordained, commissioned, or licensed by a "church," which the IRS uses at least fourteen factors to identify.

The necessary determinations under §107(2) require that a significant amount of evidence be brought before the IRS just to prove that an individual is in fact a minister for purposes of §107. See Lloyd H. Meyer, IRS Letter Rulings: Rendering Unto Caesar, The Exempt Organization Tax Review (May, 1999 at 331-333) (discussing IRS letter ruling addressing whether "ordained deacons" constitute ministers of the gospel).   (Bolton Aff., Ex. 4.)   Although the Government claims that these requirements involve no doctrinal or intrusive inquiry, both common sense and

reality contradict the Government's argument.   The Supreme Court recognized as much in

Hernandez v. Commissioner, 490 U.S. 680, 694 (1989):

> Finally, the deduction Petitioners seek might raise problems of entanglement between church and state.   If framed as a deduction for those payments generating benefits of a religious nature for the payor, Petitioners' proposal would inexorably force the IRS and reviewing courts to differentiate 'religious' benefits from 'secular' ones.   We need pass no judgment now on the constitutionality of such hypothetical inquiries, but we do note that 'pervasive monitoring' for 'the subtle or overt presence of religious matter' is a central danger against which we have held the Establishment Clause guards.   Aguylar v. Felton, 473 U.S. 402, 413 (1985); See also Widmar v. Vincent, 454 U.S. 263, 272, n. 11 (1981) ('The University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech' then by opening its form to religious as well as non-religious speakers).

The inquiries under §107(2) historically have always required complex inquiries into the

tenets of religious orthodoxy.   In Silverman v. Commissioner, 1973 U.S. App. LEXIS 8851 (8th

Cir. 1973), aff'd 57 T.C. 727 (1972), for example, the Court of Appeals considered whether a

full-time cantor of a Jewish congregation qualified as a minister of the gospel under §107.   (See

Bolton Aff., Ex. 7.)   In reaching a decision, "the significance of ordination in the Jewish religion

as practiced in the United States was a central issue as to which the views of three major branches

of Judaism were solicited."   After examining the facts of that case against an analysis of the

historical background of the cantorate in the Jewish faith, the Court of Appeals concluded that the

taxpayer qualified for the §107 exemption.

Similarly, in Salkov v. Commissioner, 46 T. C. 190, 198-199 (1966), the Court considered

whether a full-time cantor in the Jewish faith was a minister of the gospel entitled to exclude a

rental allowance from his gross income under §107:

> Regardless of the theoretical power of a Jewish layman, what in fact does Cantor Salkov do and what are his functions?   He is a spiritual leader.   He teaches.   He performs pastoral duties.   He is the minister-messenger of the congregation,

commissioned and licensed by the congregation and by the Cantors Assembly of America to officiate professionally and regularly in sacred religious service of the Jewish people.   He performs what is regarded as a sacerdotal function of Judaism -- the sanctification of the Sabbath and festival wine in a synagogue (compare the Christian mass and Communion); he elevates and holds the sacred Torah (compare the elevation of the Host); and he waves the sacred Lulav (compare the waving of the palms).   For long periods of both prayer and service he is the only person standing at the pulpit.   At all times he and the rabbi share the pulpit. Historically and functionally he is a sui generis minister.   Hence, from the thicket of our factual and legal exploration of this issue, we emerge with the conclusion that in these particular circumstances the petitioner, a full-time cantor of the Jewish faith, qualifies as a "minister of the gospel" within the spirit, meaning and intendment of Section 107.

The Tax Court also had to consider the tenets of the Baptist religion in Colbert v. Commissioner, 61 T. C. 449 (1974).   The Court recognized in that case that there is no formal statement of precepts that are binding on Baptist churches, but nevertheless, the term "tenets and practices" as used in the IRS Regulations include "those principles which are generally accepted as beliefs and practices within the Baptist denomination."   Id at 455.   Determining what constitutes the official "precepts and principles" of a religion, however, necessarily involves drawing fine lines, as in Tenenbaum v. Commissioner, 58 T. C. 1, 8 (1972), where the Court distinguished sacerdotal functions and religious worship from a minister's job "to encourage and promote understanding of the history, ideals, and problems of Jews by other religious groups."

Questions regarding church hierarchy also must be addressed frequently when applying §107(2), as in Mosley v. Commissioner, 68 T. C. Memo 1994-457, where the Court considered whether a particular religious organization operated under the authority or control of a church or church denomination.   According to the Court, this "can only be determined after reviewing all the facts and circumstances surrounding the relationship between the church denomination and the organization."   The Court concluded that "a religious organization is deemed under the authority of a church or church denomination if it is organized and dedicated to carrying out the tenets and

principles of a faith in accordance with either the requirements or sanctions governing the creation of institutions of the faith."

The necessary and intrusive inquiries under § 107(2) remain presently operative.   In <u>Good v. Commissioner</u>, T.C. Memo 2012 -- 323 (2012), for example, the IRS recently denied a housing allowance exclusion under § 107(2) after concluding that the taxpayer "failed to introduce any credible evidence to support a finding that his purported ministry actually satisfied any of the criteria of a "church." *Id.* at 23.   In addition, the IRS determined that the taxpayer did not perform services as a minister of the gospel because "petitioner failed to introduce any credible evidence to show that he was a minister or that he performed sacerdotal functions, participated in the conduct or control of religious boards, societies, or other agencies related to a religious affiliation, or performed any teaching or administrative duties that religiously affiliated institutions." *Id.* at 24.

In <u>Foundation of Human Understanding v. United States</u>, 614 Fed. 3d 1383 (Fed. Cir. 2010), the Court of Appeals affirmed denial of a tax exemption again applying the fourteen factor and associational tests used by the IRS.   The court concluded that the taxpayer's evidence was "insufficient to demonstrate that the Foundation was a 'church' for tax purposes." *Id.* at 1390. Similarly in <u>Chambers v. Commissioner</u>, T.C. Memo 2011-- 114 (2011), the Tax Court considered the fourteen criteria used by the IRS to determine whether an entity was a church.

In short, while the Government allegedly does not question the validity of religious doctrine or other indicia of religiousness, a taxpayer cannot merely declare the status of a church or minister.   The taxpayer must demonstrate that it satisfies the IRS's criteria for such status.   Thus, the Government may not question the validity of the indicia of religiousness, but it does claim a right to know what the indicia are in deciding whether a claimed status is real.   <u>See Church of</u>

61

Visible Intelligence That Governs The Universe v. United States, 4 Cl. Ct. 55, 65 (1983).   A claimed minister must demonstrate, not just assert, that he meets relevant criteria, and the Government may and does challenge the sufficiency of such evidence and the extent to which the taxpayer actually satisfies a particular factor.

The IRS, in short, must regularly make purely religious determinations in administering §107(2).   The difficulty of resolving these religious questions, and the potential for inconsistent conclusions, give rise to far more entanglement than the purely secular inquiries that underlie "convenience of the employer" determinations under § 119.   For example, another difficult religious determination that the IRS has had to make is whether a Christian college is an "integral agency of a church."   This is the subject of many private letter rulings by the IRS, prompting one commentator to conclude that "the Service has consistently ruled that ordained ministers who teach at schools that are integrally related to churches are performing services within the exercise of their ministry, no matter what they teach."   Newman, On Section 107's Worst Feature: The Teacher-Preacher, 93 TNT 260-20 (emphasis added).   College administrators, and even basketball coaches, as well as teachers, can thus qualify for the benefits of §107 if they happen to be ordained ministers.   It is often difficult, however, to determine whether the criteria for "integral part of a church" are satisfied.   The IRS uses the criteria listed in Rev. Rul. 72-606 and Rev. Rul. 70-549, in making these determinations.   Typical rulings in this area highlight the intrusiveness of the determination.   See LTR 9608027, 96 TNT 39-49; LTR 200002040, 2000 TNT 11-24; and LTR 200925001, 2009 TNT 117-28.

Another contentious religious issue that the IRS must frequently resolve under §107 is whether "sacerdotal functions" are being performed.   Although no definition of this term is provided in the IRS regulations, performing baptisms, communion or the Lord's supper, and

Christian weddings, clearly qualify as "sacerdotal functions."   In other cases, however, the question is far more nuanced.   In one ruling, an ordained minister worked for an independent §501(c)(3) organization that was not a church.   He spent 75% of his time providing spiritual counseling to drug addicts and alcoholics, and 20% of his time in administrative work, continuing education, networking and general management.   Only 5% of his time was spent performing weddings, funerals, prayer services, adult education services and community outreach services. The IRS concluded that the minister did not qualify for favorable tax treatment under §107 because only 5% of his time was spent performing duties such as the conduct of religious worship or the performance of sacerdotal functions.   LTR 9231053, 92 TNT 157-53.   The ruling raises the basic question of what is the work of a minister -- a question to which it is virtually impossible to provide an objective answer.   Purely religious questions of this type illustrate the pervasive entanglement that §107(2) creates.

Contrary to the Government's argument, therefore, the determinations required by §107 involve regular and complex entanglement between government and taxpayer.   The inquiries under §107 involve questions that are inherently religious, subjective, intrusive and beyond the general competence of government officials.   These determinations inherently create excessive entanglement, unlike "convenience of the employer" determinations under §119.   Unlike in Walz, moreover, elimination of §107's exclusion would actually reduce entanglement between government and religion.

The Government's denial of entanglement, in short, does not stand up to even casual scrutiny.   Section 107(2) does require "official and continuing surveillance" of religious officials and entities of a nature prohibited by the Establishment Clause.   Section 107(2) involves pervasive and regular governmental monitoring and second-guessing of religious belief and

practices, as a condition to receiving benefits, all of which violates the Establishment Clause.

## VIII.   SECTION 107 VIOLATES THE ESTABLISHMENT CLAUSE UNDER THE <u>LEMON</u> TEST.

In the end, § 107(2) clearly violates the Establishment Clause, under the test announced in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971).   Under the <u>Lemon</u> test, in order to be constitutional, a challenged statute:   (1) must have a secular purpose; (2) a principal or primary effect that neither advances nor inhibits religion; and (3) must not foster an excessive government entanglement with religion.   Section 107(2) fails this test.

Section 107(2) violates the Establishment Clause under the <u>Lemon</u> test because in the first place, tax breaks for ministers that are not neutral and available generally to other taxpayers do not have a secular purpose.   Here, the exclusion for cash housing allowances paid to ministers is provided only to the clergy and it was never intended to abate any substantial government-imposed burden on religion.   On the contrary, the government acknowledges that § 107(2) was enacted to provide additional tax benefits exclusively to ministers, who did not receive in-kind housing from their churches.   Section 107(2), therefore, by all accounts was intended to benefit religion.

The second prong of the <u>Lemon</u> test is violated by Government action that has a principal or primary effect that advances or inhibits religion.   Government action has the primary effect of advancing religion if it is sufficiently likely to be perceived as an endorsement of religion.   This is an objective test, asking whether a reasonable observer who is informed and familiar with the history of the Government practice at issue would perceive the practice as having a predominantly non-secular effect.

Tax breaks provided preferentially to ministers cannot help but be perceived as an endorsement of religion.   This, in fact, was the conclusion of the Supreme Court in <u>Texas Monthly</u>.   The Government claims that giving lucrative financial benefits to ministries and

churches to reduce the burden of housing costs is inherently incapable of giving the appearance of religious endorsement, but the Government's reasoning is not convincing; nor does it reflect the views of the Supreme Court, requiring that tax benefits for religion be neutrally and generally available on the basis of secular criteria, as articulated in Texas Monthly.

An objective observer would perceive §107(2) as an endorsement of religion, including because Congress has repeatedly acted to promote the financial interests of clergy by giving them special tax privileges not enjoyed by other taxpayers.   Contrary to what the Government argues in this case, §107(2) was not enacted to further lofty principles of constitutional law, such as the avoidance of entanglement between Government and religion; it was enacted as a benefit to religion in the context of the Cold War and it obviously gives the appearance of endorsement, as intended.

Section 107 also has the effect of fostering governmental entanglement with religion.   In order to limit the tax break provided by §107 to ministers of the gospel, the IRS must make complex, intrusive and subjective inquiries into religious matters.   Unlike the situation in Walz, therefore, the exemption provided by §107 actually increases the Government's entanglement with religion.

The Supreme Court's holding in Texas Monthly ultimately represents the controlling application of the Lemon test to the present case:   Preferential tax benefits to religion, that are not neutral and generally available to other taxpayers on the basis of secular criteria, violate the Establishment Clause.   While all taxpayers would like to have exclusions and deductions to cover their housing costs, the reality is that only ministers of the clergy get this break.   Section 107(2), therefore, violates the Establishment Clause in a most obvious way by conditioning tax benefits on religious affiliation.   This case, in short, is controlled by Texas Monthly.

65

**IX.    CONCLUSION.**

The Court should deny the Government's motion for summary judgment and instead grant judgment in favor of the Plaintiffs.   Section 107(2) undisputedly excludes from taxation housing allowances that are based on religious affiliation.   Section 107(2) is not a benefit that is neutral and generally available without regard to religion, as required by <u>Texas Monthly</u>.   Section 107(2) is unconstitutional.

Dated this 26 day of July, 2013.

BOARDMAN & CLARK LLP

By:    ___*/s/ Richard L. Bolton*_____
Richard L. Bolton, SBN 1012552
*rbolton@boardmanclark.com*
One South Pinckney Street, Suite 410
Madison, Wisconsin 53703-4256
608-257-9521 || 608-283-1709 fax
Attorneys for Plaintiffs

<u>Notice of Electronic Filing and Service</u>

I hereby certify that on July 26, 2013, this document was filed electronically in accordance with the ECF procedures of the United States District Court, Western District of Wisconsin, under Rule 5(d)(1), Federal Rules of Civil Procedure. All parties who are represented and have consented to service of electronically filed documents are served upon receipt of the NEF from the electronic filing system.

To the best of my knowledge, there are no parties in this case that require service by means other than electronic service using the Court's NEF.   The original document on file with the filing party contains valid original signatures.

F:\DOCS\WD\26318\25\A1699281.DOCX