IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FREEDOM FROM RELIGION FOUNDATION, INC.,
ANNIE LAURIE GAYLOR and DAN BARKER,

                                    OPINION AND ORDER

                Plaintiffs,

                                    11-cv-626-bbc

        v.

JACOB LEW and DANIEL WERFEL,

                Defendants.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff Freedom from Religion Foundation, Inc. and its two co-presidents, plaintiffs Annie Laurie Gaylor and Dan Barker, brought this lawsuit under the Administrative Procedure Act, 5 U.S.C. § 702, contending that certain federal income tax exemptions received by "ministers of the gospel" under 26 U.S.C. § 107 violate the establishment clause of the First Amendment and the equal protection component of the Fifth Amendment. Defendants Timothy Geithner and Douglas Schulman (now succeeded by Jacob Lew and Daniel Werfel) have filed a motion for summary judgment, dkt. #40, which is ready for review.

        In their complaint, plaintiffs challenged both § 107(1) and § 107(2), but in response

_____

      [1] Initially, plaintiffs sued Timothy Geithner and Douglas Schulman in their official capacities as Secretary of the Treasury Department and Commissioner of the Internal Revenue Service. Pursuant to Fed. R. Civ. P. 25(d), I have substituted the new Secretary, Jacob Lew, and the Acting Commissioner, Daniel Werfel.

to defendants' motion for summary judgment, plaintiffs narrowed their claim to § 107(2), which excludes from gross income a minister's "rental allowance paid to him as part of his compensation."  (Section 107(1) excludes "the rental value of a home furnished to [the minister] as part of his compensation.")  Because plaintiffs have not opposed defendants' argument that plaintiffs lack standing to challenge § 107(1), I will grant defendants' motion as to that aspect of plaintiffs' claim.

With respect to plaintiffs' challenge to § 107(2), I adhere to my conclusion in the order denying defendants' motion to dismiss, dkt. #30, that plaintiffs have standing to sue because it is clear from the face of the statute that plaintiffs are excluded from an exemption granted to others.  With respect to the merits, I conclude that § 107(2) violates the establishment clause under the holding in Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989), because the exemption provides a benefit to religious persons and no one else, even though doing so is not necessary to alleviate a special burden on religious exercise.  This conclusion makes it unnecessary to consider plaintiffs' equal protection argument.

Although plaintiffs did not file their own motion for summary judgment, "[d]istrict courts have the authority to enter summary judgment sua sponte as long as the losing party was on notice that it had to come forward with all its evidence." Ellis v. DHL Exp. Inc. (USA), 633 F.3d 522, 529 (7th Cir. 2011).  In this case, the parties have fully briefed the relevant issues, which are primarily legal rather than factual.  Further, plaintiffs asked the court to enter judgment in their favor in their brief in opposition to defendants' motion for summary judgment.  Dkt. #52 at 66.  Although defendants objected to this request in their

reply brief, dkt. #53 at 3, it was on the same grounds that defendants believe that *they* are entitled to summary judgment.  Defendants do not suggest that they would have raised any other arguments or presented any additional facts if plaintiffs had filed their own motion. Under these circumstances, I conclude that it is appropriate to deny defendants' motion for summary judgment and grant summary judgment in plaintiffs' favor with respect to § 107(2).

In concluding that § 107(2) violates the Constitution,  I acknowledge the benefit that the exemption provides to many ministers (and the churches that employ them) and the loss that may be felt if the exemption is withdrawn.  Clergy Housing Allowance Clarification Act of 2002, 148 Cong. Rec. H1299-01 (Apr. 16, 2002) (statement of Congressman Jim Ramstad) (in 2002, estimating that § 107 would relieve ministers of $2.3 billion in taxes over next five years).  However, the significance of the benefit simply underscores the problem with the law, which is that it violates the well-established principle under the First Amendment that "[a]bsent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."  Board of Education of Kiryas Joel Village School Disrict v. Grumet, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in part and concurring in the judgment).  Some might view a rule against preferential treatment as exhibiting hostility toward religion, but equality should never be mistaken for hostility.

It is important to remember that the establishment clause protects the religious and nonreligious alike.  Linnemeir v. Board of Trustees of Purdue University, 260 F.3d 757, 765 (7th Cir. 2001) ("The Supreme Court has consistently described the Establishment Clause

as forbidding not only state action motivated by a desire to advance religion, but also action intended to 'disapprove,' 'inhibit,' or evince 'hostility' toward religion."). If a statute imposed a tax solely *against* ministers (or granted an exemption to everyone except ministers) without a secular reason for doing so, that law would violate the Constitution just as § 107(2) does. Stated another way, if the government were free to grant discriminatory tax exemptions in favor of religion, then it would be free to impose discriminatory taxes against religion as well. Under the First Amendment, everyone is free to worship or not worship, believe or not believe, without government interference or discrimination, regardless what the prevailing view on religion is at any particular time, thus "preserving religious liberty to the fullest extent possible in a pluralistic society." McCreary County, Kentucky v. American Civil Liberties Union of Kentucky, 545 U.S. 844, 882 (2005) (O'Connor, J., concurring).

OPINION

A. Standing

As they did in their motion to dismiss, defendants argue that plaintiffs do not have standing to challenge § 107(2). To obtain standing, plaintiffs must show that they suffered an injury in fact that is fairly traceable to defendants' conduct and capable of being redressed by a favorable decision from the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Plaintiffs Gaylor's and Barker's alleged injury is the unequal treatment they receive under § 107(2):

4

In the case of a minister of the gospel, gross income does not include—

* * *

(2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home and to the extent such allowance does not exceed the fair rental value of the home, including furnishings and appurtenances such as a garage, plus the cost of utilities.

In particular, plaintiffs argue that "ministers of the gospel" receive a tax exemption under § 107(2) that Gaylor and Barker do not, even though a portion of the salary Gaylor and Barker receive from Freedom from Religion Foundation is designated as a housing allowance. Plts.' PFOF ¶ 2, dkt. #50; Dfts.' Resp. to Plts.' PFOF ¶ 2, dkt. #55. In addition, plaintiffs argue that an order enjoining § 107(2) would redress their injury because it would eliminate the unequal treatment.  The parties agree that Gaylor and Barker are both members of the foundation and that the purpose of the foundation is related to the claims in this case, so if the individual plaintiffs have standing, then the foundation does as well.  Sierra Club v. Franklin County Power of Illinois, LLC, 546 F.3d 918, 924 (7th Cir. 2008).

Defendants do not deny that a person who is denied a tax exemption that others receive has suffered an injury in fact.  Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 7-8 (1989) (general interest magazine had standing to challenge state tax exemption received by religious publications); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 224-25 (1987) (same). See also Arizona Christian School Tuition Organization v. Winn, — U.S.—, 131 S. Ct. 1436, 1439 (2011) ("[P]laintiffs may demonstrate standing on the ground that they have incurred a cost or been denied a benefit on account of their religion. Those costs and benefits can result from alleged discrimination in the tax code, such as when the

5

availability of a tax exemption is conditioned on religious affiliation."). In addition, defendants do not deny that a discriminatory tax exemption may be redressed by eliminating the exemption for everyone. Heckler v. Mathews, 465 U.S. 728, 740, (1984) ("We have often recognized that the victims of a discriminatory government program may be remedied by an end to preferential treatment for others."). However, defendants argue that the lawsuit is premature because plaintiffs have never tried to claim the exemption. Until the Internal Revenue Service denies a claim, defendants say, plaintiffs have not suffered an injury.

As an initial matter, it is not clear whether plaintiffs would have standing to challenge § 107(2) in the context of a proceeding to claim the exemption. In several cases, courts have rejected establishment clause challenges to tax exemptions brought by parties who filed claims for the exemption that were denied. In each of those cases, the court held that the party could not receive the exemption if the court declared it to be unconstitutional, so a favorable decision could not redress their injury. Templeton v. Commissioner of Internal Revenue, 719 F.2d 1408, 1412 (7th Cir. 1983); Ward v. Commissioner of Internal Revnue, 608 F.2d 599, 601 (5th Cir. 1979); Kirk v. Commissioner of Internal Revenue, 425 F.2d 492, 495 (D.C. Cir. 1970). Thus, if accepted, defendants' view could insulate § 107 from challenge by anyone.

In any event, I considered and rejected defendants' argument in the context of denying their motion to dismiss. Dkt. #30. In particular, I concluded that plaintiffs' alleged injury is clear from the face of the statute and that there is no plausible argument that the individual plaintiffs could qualify for an exemption as "ministers of the gospel," so it would

serve no legitimate purpose to require plaintiffs to claim the exemption and wait for the inevitable denial of the claim.  Finlator v. Powers, 902 F.2d 1158, 1162 (4th Cir. 1990) (concluding that nonexempt taxpayers had standing to challenge exemption without first claiming exemption because plaintiffs' "injury is created by the very fact that the [law] imposes additional [tax] burdens on the appellants not placed on" those entitled to exemption).  See also California Medical Association v. Federal Electric Commission, 453 U.S. 182, 192 (1981) (concluding that plaintiffs had standing, noting that they "expressly challenge the statute on its face, and there is no suggestion that the statute is susceptible to an interpretation that would remove the need for resolving the constitutional questions raised"); Harp Advertising Illinois, Inc. v. Village of Chicago Ridge, Illinois, 9 F.3d 1290, 1291–92 (7th Cir. 1993) ("Challenges to statutes as written, without inquiring into their application, are appropriate when details of implementation are inconsequential.").

The Supreme Court has not addressed this question explicitly, but in Walz v. Tax Commission of City of New York, 397 U.S. 664, 666-67 (1970), the plaintiff was an owner of real estate in New York City who objected to the issuance of "property tax exemptions to religious organizations."  Although there was no indication in the opinion that the owner requested an exemption for himself before bringing his lawsuit, the Court reached the merits of his claim under the establishment clause.  In Winn, 131 S. Ct. at 1449, the Court acknowledged that it had omitted a discussion of standing from the decision in Walz but suggested that the plaintiff could have relied on the alleged discriminatory treatment among different property owners to demonstrate standing to sue.

7

In their motion for summary judgment, defendants do not ask the court to reconsider the conclusion that plaintiffs have standing to challenge § 107(2) if it is clear from the face of the statute that they are not entitled to the exemption.  Instead, defendants expand an argument that was relegated to a footnote in their motion to dismiss, dkt. #23 at 10 n.3, which is that it is *not* clear from the face of the statute and the implementing regulations that plaintiffs are ineligible for the exemption under § 107(2).  Rather, defendants say that it is "conceivable" that atheists such as Gaylor and Barker could qualify as "ministers of the gospel" under § 107, so they should be required to claim the exemption before challenging the statute.

Although defendants devote a substantial amount of their briefs to this argument, it is difficult to take it seriously.  Under no remotely plausible interpretation of § 107 could plaintiffs Gaylor and Barker qualify as "ministers of the gospel."  However, for the sake of completeness, I will address the primary arguments that defendants raise in their briefs on this issue.

Much of defendants' argument rests on Kaufman v. McCaughtry, 419 F.3d 678, 682 (7th Cir. 2005), in which the court concluded that atheism could qualify as a religion under the free exercise clause in the context of a claim brought by an atheist prisoner who wanted to start an atheist study group.  (The court went on to reject the prisoner's claim because he could not show that the absence of an atheist study group imposed a substantial burden on his religious exercise, id. at 683, without explaining how an atheist could make that showing in a different case.)  However, the issue in this case is not the scope of the free exercise clause

of the First Amendment as interpreted in the context of one case decided in 2005, but the proper interpretation of the phrase "ministers of the gospel" in a statute enacted in 1954, so cases such as <u>Kaufman</u> provide little guidance.

Alternatively, defendants says that the IRS regulations promulgated under § 107 do not discriminate against "nontheistic beliefs" and that the IRS does not evaluate the "content" of a claimant's professed religion, but these arguments are red herrings as well. As I noted in the order denying defendants' motion to dismiss, the IRS has interpreted § 107 liberally to include members of non-Christian faiths.  <u>E.g.</u>, <u>Salkov v. Commissioner of Internal Revenue</u>, 46 T.C. 190, 194 (1966) (approving tax exemption for Jewish cantor after rejecting interpretation of term "gospel" as being limited to books of New Testament and instead construing term to mean "glad tidings or a message, teaching, doctrine, or course of action having certain efficacy or validity").  However, even if I assume that IRS would continue to stretch the plain meaning of § 107, there is a difference between non-theistic faiths such as Buddhism and having no faith at all.  <u>Torcaso v. Watkins</u>, 367 U.S. 488, 495 (1961) (distinguishing "those religions based on a belief in the existence of God," "those religions founded on different beliefs" and "non-believers").  Defendants point to no regulations or decisions suggesting that a person who did not subscribe to any faith could qualify for an exemption under § 107(2).

Regardless whether the IRS might recognize atheism as a religion, this does not answer the question whether it would recognize an atheist "minister," which is the only question that matters.  Defendants cite no evidence that atheists *have* "ministers" as that

term is used in § 107, which is sufficient reason to reject an argument that an atheist could qualify for an exemption under that statute.

Even if I assume that there are atheists ministers, neither plaintiff Gaylor nor plaintiff Barker could qualify as one.  Under the federal regulations, the key question is whether the claimant is seeking an exemption for "services performed by a minister [that] are performed in the exercise of his ministry."  26 C.F.R. § 1.1402(c)-5(b)(2).  The tax court has struggled to come up with a consistent framework to answer that question, applying different tests in cases such as Good v. Commissioner of Internal Revenue, 104 T.C.M. (CCH) 595 (T.C. 2012), Mosley v. Commissioner of Internal Revenue, 68 T.C.M. (CCH) 708 (T.C. 1994), and Lawrence v. Commissioner of Internal Revenue, 50 T.C. 494 (1968), but both sides in this case cite Knight v. Commissioner of Internal Revenue, 92 T.C. 199, 205 (1989), as identifying all the relevant factors.  In Knight, the court considered whether the claimant: (1) performs sacerdotal functions under the tenets and practices of the particular religious body constituting his church or church denomination; (2) conducts worship services; (3) performs services in the control, conduct, and maintenance of a religious organization that operates under the authority of a church or church denomination; (4) is ordained, commissioned, or licensed; and (5) is considered to be a spiritual leader by his religious body.

Plaintiffs do not come close to meeting any of these factors.  Defendants cite no persuasive evidence that either Gaylor or Barker is ordained, that they perform "sacerdotal" functions or conduct "worship" services, that anyone in the foundation considers Gaylor and Barker to be "spiritual" leaders or that the foundation is under the authority of a "church."

10

Again, even assuming that atheism is a religion, the Freedom from Religion Foundation is not an "atheist" organization in the sense that the purpose of the group is to "practice" atheism like the prisoner in <u>Kaufman</u>.  Rather, the foundation is open to non-atheists, Barker Decl. ¶ 19, dkt. #48, and the purpose of the foundation, according to its bylaws, is to advocate and educate. Gaylor Decl., dkt. #47 exh. 1 at 1 (purpose of foundation is to promote "the constitutional principle of separation of church and state and to educate the public on matters related to non-theistic beliefs").  Defendants do not identify a single "religious" belief espoused by the foundation.  In fact, defendants admit that the foundation is not a church or a religious organization operating under the authority of a church, that plaintiffs Gaylor's and Barker's roles as co-presidents of the foundation do not constitute an ordination, commissioning or licensing as ministers and that the foundation does not engage in worship.  Dfts.' Resp. to Plts.' PFOF ¶¶14, 22, 29, dkt. #55.

Although some of Gaylor's and Barker's work may *relate to* religious issues, this is in the context of political and legal advocacy, similar to organizations such as the American Center for Law and Justice or the Anti-Defamation League.  <u>Tanenbaum v. Commissioner of Internal Revenue</u>, 58 T.C. 1, 8 (1972)  (denying exemption for employee of American Jewish Committee because he "was not hired to perform 'sacerdotal functions' or to conduct 'religious worship'; rather, his job is to encourage and promote understanding of the history, ideals, and problems of Jews by other religious groups").  <u>See also</u> <u>Flowers v. United States</u>, No. CA 4-79-376-E, 1981 WL 1928, *6 (N.D. Tex. Nov. 25, 1981) (upholding denial of exemption because housing allowance was for educational rather than sacerdotal functions);

11

Colbert v. Commissioner, 61 T.C. 449 (1974) (taxpayer did not qualify for exemption because his "primary emphasis . . . was in warning and awakening people to the dangers of communism and in educating them as to the principles of communism" rather than "religious instruction in the principles laid down by Christ").   In other words, even if I were to assume that the foundation is an "atheist organization," that is not enough to qualify plaintiffs as ministers because they do not engage in the activities that a minister performs.  Kirk, 425 F.2d at 495 (affirming denial of claim under § 107 by church employee in part because "all the services performed by petitioner in this case were of secular nature").

Defendants argue that plaintiff Barker engages in a number of activities that could be classified as "sacerdotal," such as performing "de-baptisms," lecturing, performing marriages, counseling, promoting free thought and writing "free thought" songs.   (The regulations do not define the term "sacerdotal" except to say that it "depends on the tenets and practices of the particular religious body constituting [a claimant's] church or church denomination."  26 C.F.R. § 1.1402(c)—5(b)(2)(i).)  Defendants' argument is a nonstarter because it does not apply to Gaylor, only to Barker; defendants admit that Gaylor is not a minister.  Dfts.' Resp. to Plts.' PFOF ¶ 14, dkt. #55.  "Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not."  Ezell vs. City of Chicago, 651 F.3d 684, 696 (7th Cir. 2011).

In any event, none of this evidence provides any support for a view that Barker could qualify as a minister of the gospel.  As an initial matter, defendants do not deny that Barker

engaged in some of the activities  (such as writing songs and books) before working for the foundation, Dfts.' Rep. to Plts.' Resp. to Dfts.' PFOF ¶ 6, dkt. #54, and that any marriages he officiates are done on his own time, not as an employee of the foundation.  Barker Decl. ¶ 24, dkt. #48.  See also Tanenbaum, 58 T.C. at 8 (refusing to consider "[a]ny other functions [the claimant] may perform . . . by virtue of his own personal desires but are not cause for remuneration by the" employer). The counseling Barker performs relates to issues such as "how to deal with religious relatives," "how to start an FFRF chapter" and "how to teach children about morality *without* religion."  Dfts.' PFOF ¶ 6(a), dkt. #41 (emphasis added).  The "debaptismal certificate" can be downloaded by anyone off the internet and will be signed by Barker for five dollars. Dkt. #42-15.  Each certificate includes the saying "With soap, baptism is a good thing." Id.  Barker describes the certificates as "a tongue-in-cheek way to bring attention to opting out of religion."  Barker Decl. ¶ 25, dkt. #48. I do not see how any of this conduct could relate "to the tenets and practices" of a particular religious body and defendants do not even attempt to develop an argument on this point.

In their reply brief, defendants argue that it "does not matter whether Ms. Gaylor or Mr. Barker would or would not be eligible for the exclusion provided in § 107 if they claimed it. What matters is that *an* atheist may lawfully make a claim for the exclusion." Dkt. #53 at 6.  This argument is puzzling because it rests on a premise that a plaintiff's own experience is irrelevant to the question of standing.  That is obviously incorrect.  A plaintiff's standing to sue is determined not by asking whether some hypothetical third party is being injured, but by whether the *plaintiff* is being injured.  Kowalski v. Tesmer, 543 U.S. 125,

13

129 (2004) ("We have adhered to the rule that a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (internal quotations omitted).  Defendants seem to concede now that plaintiffs have been injured because they cannot qualify for the exemption.  Defendants do not explain why that injury "does not matter" so long as it would be possible for some atheist to qualify under some set of circumstances, but they seem to be confusing standing with the merits.  To the extent defendants are arguing that § 107(2) is constitutional if it would allow an exemption for an "atheist minister" in the abstract, that argument has nothing to do with standing.

Defendants make a related argument in their reply brief that plaintiffs' alleged injury would not be fairly traceable to any "religious discrimination" by defendants if § 107 were interpreted as encompassing an "atheist minister."  Dfts.' Br., dkt. #53, at 12.  Again, this argument rests on a misunderstanding of standing requirements.  The question is whether the plaintiff's injury is fairly traceable to the defendant's *conduct*, Massachusetts v. EPA, 549 U.S. 497, 536 (2007), not whether the plaintiff will be able to prove that the injury was caused by a violation of a particular right, which is another question on the merits.  Arreola v. Godinez, 546 F.3d 788, 794-95 (7th Cir. 2008) ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing.").

Accordingly, I conclude that plaintiffs have standing to bring a facial challenge to § 107(2) because the statute denies them an exemption that others receive, the injury is fairly

traceable to the conduct of defendants as those responsible for implementing the tax code and plaintiff's injury is redressable by a declaration that § 107(2) is unconstitutional and an order enjoining its enforcement.

Finally, defendants raise other arguments about whether the case is ripe for adjudication and whether the Administrative Procedure Act waives the government's sovereign immunity under the facts of this case, but both of these arguments are contingent on a finding that § 107(2) does not harm plaintiffs. Because I have rejected that argument, I need not address defendants' other arguments separately.

## B. Merits

### 1. Standard of review

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion. . . ." U.S. Const., Amend. I. The first question in every case brought under the establishment clause is the proper standard of review.

The test applied most commonly by courts was articulated first in Lemon v. Kurtzman, 403 U.S. 602 (1971). Under Lemon, government action violates the establishment clause if (1) it has no secular purpose; (2) its primary effect advances or inhibits religion; or (3) it fosters an excessive entanglement with religion. Although individual justices have criticized the test, e.g., Santa Fe Independent School District v. Doe, 530 U.S. 290, 319 (2000) (Rehnquist, C.J., dissenting); Tangipahoa Parish Board of

Education v. Freiler, 530 U.S. 1251 (2000) (Scalia, J., dissenting from denial of certiorari), the Supreme Court as a whole continues to apply it.  E.g., McCreary County, Kentucky v. American Civil Liberties Union of Kentucky, 545 U.S. 844, 859-67 (2005).  Further, it is the test the Court of Appeals for the Seventh Circuit has employed in recent cases brought under the establishment clause.  E.g., Doe ex rel. Doe v. Elmbrook School District, 687 F.3d 840, 849 (7th Cir. 2012); Sherman ex rel. Sherman v. Koch, 623 F.3d 501, 507 (7th Cir. 2010); Milwaukee Deputy Sheriffs' Association v. Clarke, 588 F.3d 523, 527 (7th Cir. 2009); Vision Church v. Village of Long Grove, 468 F.3d 975, 991-92 (7th Cir. 2006).

In Lynch v. Donnelly, 465 U.S. 668, 691 (1984), Justice O'Connor offered what she later described as a "refinement" of the first two parts of the Lemon test, under which the court asks "whether the government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement," Wallace v. Jaffree, 472 U.S. 38, 69 (1985) (O'Connor, J., concurring), viewed from the perspective of a "reasonable observer." Elk Grove Unified School District v. Newdow, 542 U.S. 1, 34 (2004) (O'Connor, J., concurring in the judgment).  The Supreme Court has applied Justice O'Connor's test in several subsequent cases, e.g., McCreary County, 545 U.S. at 866; Zelman v. Simmons-Harris, 536 U.S. 639, 654-55 (2002); County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 620  (1989), as has the Court of Appeals for the Seventh Circuit.  Clarke, 588 F.3d at 529; Linnemeir v. Board of Trustees of Purdue University, 260 F.3d 757, 764 (7th Cir. 2001); Freedom from Religion Foundation, Inc. v. City of Marshfield, Wisconsin, 203 F.3d 487, 493 (7th Cir. 2000).  See also Salazar v. Buono, 559

16

U.S. 700, 721 (2010) (assuming that "reasonable observer" test applied).

Although the Supreme Court has articulated other tests as well over the years, e.g., Lee v. Weisman, 505 U.S. 577 (1992); Marsh v. Chambers, 463 U.S. 783, 787 (1983), the parties rely on the modified version of the Lemon test, so I will do the same.


2.  Texas Monthly, Inc. v. Bullock

Consideration of the question whether § 107(2) violates the establishment clause must begin with Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989), the only case in which the Supreme Court has addressed the constitutionality of a tax exemption granted solely to religious persons.  In Texas Monthly, the statute at issue exempted from the state sales tax "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith."

The justices in the plurality opinion (Justices Brennan, Marshall and Stevens) and those concurring in the judgment (Justices Blackmun and O'Connor) agreed that the statute violated the establishment clause.  The plurality applied the familiar test under Lemon, 403 U.S. at 612, as well as the endorsement test.  In concluding that the statute did not have a secular purpose or effect and conveyed a message of religious endorsement, the plurality emphasized that the exemption provided a benefit to religious publications only, without a corresponding showing that the exemption was necessary to alleviate a significant burden on free exercise:

> Every tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become indirect and vicarious "donors." Insofar as that subsidy is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally does not deprive the subsidy of the secular purpose and primary effect mandated by the Establishment Clause. However, when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, as Texas has done, it provides unjustifiable awards of assistance to religious organizations and cannot but convey a message of endorsement to slighted members of the community.

Id. 14-15 (internal quotations, citations and alterations omitted).  In addition, the plurality stated that the statute seemed "to produce greater state entanglement with religion than the denial of an exemption" because the statute required the government to "evaluat[e] the relative merits of differing religious claims" in order to determine whether a publication qualified for the exemption.  Id. at 20.

In the concurring opinion, Justices Blackmun and O'Connor concluded that "a tax exemption limited to the sale of religious literature by religious organizations violates the Establishment Clause" because it results in "preferential support for the communication of religious messages."  Id. at 28.  They added that "[a] statutory preference for the dissemination of religious ideas offends our most basic understanding of what the Establishment Clause is all about and hence is constitutionally intolerable."  Id.

Because no single opinion garnered at least five votes in Texas Monthly, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977)

18

(internal quotation marks omitted). Although the rule in <u>Marks</u> likely would make Justice Blackmun's opinion controlling, the differences between the plurality and concurring opinions in <u>Texas Monthly</u> are minimal for the purpose of this case.  Under either opinion, a tax exemption provided only to religious persons violates the establishment clause, at least when the exemption results in preferential treatment for religious messages. <u>Haller v. Commissioner of the Dept. of Revenue</u>, 728 A.2d 351, 354-55 (Pa. 1999) ("[A] majority of the Court in <u>Texas Monthly</u> clearly recognized that tax exemptions that include religious organizations must have an overarching secular purpose that equally benefits similarly situated nonreligious organizations.").

Because a primary function of a "minister of the gospel" is to disseminate a religious message, a tax exemption provided only to ministers results in preferential treatment for religious messages over secular ones.  Accordingly, I conclude that <u>Texas Monthly</u> controls the outcome of this case. Although this case involves an income tax exemption instead of a sales tax exemption, neither the plurality nor the concurrence placed any importance on the type of tax involved and defendants do not provide any grounds for distinguishing the two types. Even Justice Scalia in his dissent in <u>Texas Monthly</u> stated that § 107 is a "tax exemptio[n] of the type the Court invalidates today."  <u>Texas Monthly</u>, 489 U.S. at 33 (Scalia, J., dissenting).

3.  <u>Accommodation of religion</u>

Tellingly, defendants make little effort to distinguish <u>Texas Monthly</u>.  They make a

19

fleeting reference to the plurality's statement that preferential treatment for religious groups may be permissible if it "remov[es] a significant state-imposed deterrent to the free exercise of religion," Texas Monthly, 489 U.S. at 14, but they do not explain how that statement might apply to this case.  Of course, "[a]ny [government action] pertaining to religion can be viewed as an 'accommodation' of free exercise rights," Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 347 (1987) (O'Connor, J., concurring in the judgment), but the "principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." Lee, 505 U.S. at 587.

Although it is undoubtedly true that taxes impose a burden on ministers, the same is true for all taxpayers.  Defendants do not identify any reason why a requirement on ministers to pay taxes on a housing allowance is more burdensome for them than for the many millions of others who must pay taxes on income used for housing expenses.  In any event, the Supreme Court has rejected the view that the mere payment of a generally applicable tax may qualify as a substantial burden on free exercise.  Jimmy Swaggart Ministries v. Board of Equalization of California, 493 U.S. 378, 391 (1990) ("[T]o the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden is not constitutionally significant.").

Defendants cite several cases in which courts have found that 26 U.S.C. § 1402(e) and (g), which give exemptions to certain religious persons from paying taxes related to

Social Security, are permissible accommodations of religion.  E.g., Droz v. Commissioner of Internal Revenue, 48 F.3d 1120, 1121 (9th Cir. 1995); Hatcher v. Commissioner of Internal Revenue, 688 F.2d 82, 84 (10th Cir. 1979).  See also Templeton, 719 F.2d at 1413-14 (rejecting equal protection challenge to same provisions).  However, the exemptions in § 1402 are limited to those who have a religious objection to receiving public insurance *and* belong to a religion that will provide the assistance that others ordinarily would receive under Social Security.  Thus, § 1402 is distinguishable from § 107 because § 1402 limits the exemption to those whose religious exercise would be substantially burdened.  In addition, there is no preferential treatment to religious persons because the exemption is limited to those who will receive from their religious sect (rather than the government) the benefits the tax is designed to provide.   Droz, 48 F.3d at 1121 (§ 1402(g) is a permissible accommodation because it is "an exemption narrowly drawn to maintain a fiscally sound Social Security system and to ensure that all persons are provided for, either by the Social Security system or by their church"); Hatcher, 688 F.2d at 84 ("That the principal purpose of the legislation is not to advance or inhibit religion is evident in the mandate that those who receive the exemption forego the benefit of the program. To further assure that one claiming the exemption does not become a public charge Congress required that the exemption only be given to persons belonging to organizations that make provision for dependent members.").

Along the same lines, the cases in which the Supreme Court has upheld religious accommodations are in contexts that otherwise would result in severe restrictions on free

exercise.  Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 705 (1994) ("The Constitution allows the State to accommodate religious needs by alleviating *special* burdens.") (emphasis added).  For example, in Amos, 483 U.S. at 335, the Court upheld a religious exemption in an antidiscrimination law that otherwise would have required religious groups to violate their own religious beliefs, such as by requiring Catholic churches to ordain women as priests.  And in Cutter v. Wilkinson, 544 U.S. 709 (2005), the Court concluded that a law requiring administrators to provide religious accommodations to persons housed in state institutions was justified by the reality of institutionalization, which is "severely disabling to private religious exercise."  Id. at 720-21. Thus, in both situations, the accommodations are best described not as singling out religious persons for more favorable treatment, but as an attempt to prevent inequality caused by government-imposed burdens.  School District of Abington Township v. Schempp, 374 U.S. 203, 299 (1963) (Brennan, J., concurring) ("[H]ostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion.").

As noted above, in this case, the burden of taxes is borne equally by everyone who pays them, regardless of religious affiliation, so concerns about free exercise do not justify a special exemption.  In 1984, the Treasury Secretary himself recognized this point in a memorandum in which he recommended the repeal of § 107 because "[t]here is no evidence that the financial circumstances of ministers justify special tax treatment. The average minister's compensation is low compared to other professionals, but not compared to

taxpayers in general." U.S. Dept. of Treasury, Tax Reform for Fairness, Simplicity, and Economic Growth: The Department Report to the President, vol. II 49 (1984). In fact, the Secretary argued that § 107 "provides a disproportionately greater benefit to relatively affluent ministers, due to the higher marginal tax rates applicable to their incomes." Id. (The Treasury Department withdrew the recommendation after many members of the clergy objected to it. Gabriel O. Aitsebaomo, Challenges to Federal Income Tax Exemption of the Clergy and Government Support of Sectarian Schools through Tax Credits Device and the Unresolved Questions after Arizona v. Winn, 28 Akron Tax J. 1, 15 (2013).) Under these circumstances, I see no basis for concluding that § 107(2) may be justified as an accommodation of religion.

4.  Walz v. Tax Commission of City of New York

Instead of Texas Monthly, defendants rely on Walz, 397 U.S. 664, in which the Supreme Court rejected a challenge under the establishment clause to a statute that gave a tax exemption to property used for "religious, educational or charitable purposes." Id. at 666-67. The obvious distinction between Walz and this case is that the statute in Walz was not a tax exemption benefiting religious persons only, but a wide variety of nonprofit endeavors. See also Schempp, 374 U.S. at 301-02 (1963) (Brennan, J., concurring) (no establishment clause violation when "certain tax deductions or exemptions . . . incidentally benefit churches and religious institutions, along with many secular charities and nonprofit organizations" because, in that situation "religious institutions simply share benefits which

government makes generally available to educational, charitable, and eleemosynary groups").

Defendants argue that the broader scope of the statute in Walz "was not dispositive for the majority," Dfts.' Br., dkt. #44, at 42, but that view is contradicted by the opinion itself as well as later decisions applying it.   In concluding that the purpose of the exemption was not to advance religion, the Court observed that the state "has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." Walz, 397 U.S. at 673.  It went on to say that the statute applies to groups that have  "beneficial and stabilizing influences in community life" as opposed to "private profit institutions."   Id.  See also id. at 687, 689 (Brennan, J., concurring) ("These organizations are exempted because they, among a range of other private, nonprofit organizations contribute to the well-being of the community in a variety of nonreligious ways, and thereby bear burdens that would otherwise either have to be met by general taxation, or be left undone, to the detriment of the community. . . . Government may properly include religious institutions among the variety of private, nonprofit groups that receive tax exemptions, for each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society."); id. at 697 n.1 (Harlan, J., concurring) (tax exemption does not violate establishment clause "because New York has created a general class so broad that it would be difficult to conclude that religious organizations cannot properly be included in it").

In <u>Texas Monthly</u>, 489 U.S. at 11, the plurality stated that "[t]he breadth of New York's property tax exemption was essential to our holding [in <u>Walz</u>] that it was not aimed at establishing, sponsoring, or supporting religion, but rather possessed the legitimate secular purpose and effect of contributing to the community's moral and intellectual diversity and encouraging private groups to undertake projects that advanced the community's well-being and that would otherwise have to be funded by tax revenues or left undone."  Further, the plurality reviewed other cases in which the Court had upheld benefits to religious organizations and concluded that they too involved a broader array of groups.  "[W]ere those benefits confined to religious organizations, they could not have appeared other than as state sponsorship of religion; if that were so, we would not have hesitated to strike them down for lacking a secular purpose and effect."  <u>Texas Monthly</u>, 489 U.S. at 10-11 (plurality opinion) (citing <u>Widmar v. Vincent</u>, 454 U.S. 263 (1981); <u>Mueller v. Allen</u>, 463 U.S. 388 (1983); and <u>Walz</u>, 397 U.S.664).  <u>See also</u> <u>Grumet</u>, 512 U.S. at 704 ("We have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges," including in <u>Walz</u>.).

To support their argument that the holding in <u>Walz</u> was not limited to exemptions that include nonreligious groups, defendants cite the statement by the Court that it was "unnecessary to justify the tax exemption on the social welfare services or 'good works' that some churches perform for parishioners and others-family counselling, aid to the elderly and the infirm, and to children."  <u>Walz</u>, 397 U.S. at 674.  However, defendants are taking the statement out of context.  The Court went on to explain that it did not want the government

25

to have to evaluate whether a religious body's good works were "good enough" to qualify because that could "produc[e] a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize." Id. Thus, the Court's observation is best read as an attempt to avoid a justification for an exemption that would lead to greater entanglement between church and state. The Court did not suggest that the government was free to provide tax exemptions to religious entities without including other groups.

Defendants also rely on Walz for the proposition that a "tax exemption does not implicate the same constitutional concerns as a direct subsidy," Dfts.' Br., dkt. #44, at 43, quoting the Court's statement that "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." Walz, 397 U.S. at 675. Taken to its logical conclusion, an argument relying on a distinction between exemptions and subsidies would permit the government to eliminate *all* taxes for religious organizations, an extreme position that defendants do not advance. However, in the absence of a categorical approach, it is not clear how exemptions could be treated differently from subsidies and defendants do not provide any suggestions.

In any event, to the extent that Walz suggested a different analysis for exemptions, that view is inconsistent with both the plurality and concurring opinions in Texas Monthly, neither of which made a distinction between the two types of support. It was rejected explicitly by the plurality, which stated that "[e]very tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become 'indirect and vicarious 'donors.'"

Texas Monthly, 489 U.S. at 14 (quoting Bob Jones University v. United States, 461 U.S. 574, 591 (1983)). The Court has resisted the distinction in other opinions as well.  Ragland, 481 U.S. at 236 ("Our opinions have long recognized—in First Amendment contexts as elsewhere—the reality that tax exemptions, credits, and deductions are a form of subsidy that is administered through the tax system.") (internal citations omitted); Regan v. Taxation With Representation of Washington, 461 U.S. 540, 544 (1983) ("Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system.").  See also Walz, 397 U.S. at 701 (Douglas, J., dissenting) ("[O]ne of the best ways to 'establish' one or more religions is to subsidize them, which a tax exemption does."); Adler, The Internal Revenue Code, The Constitution, and the Courts: The Use of Tax Expenditure Analysis in Judicial Decision Making, 28 Wake Forest L. Rev. 855, 862 n.30 (1993) ("[T]he large body of literature about tax expenditures accepts the basic concept that special exemptions from tax function as subsidies."), quoted with approval in Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819, 861 (1995) (Thomas, J., concurring).

Defendants cite Winn, 131 S. Ct. at 1439, as an example of a recent case in which the Court distinguished between exemptions and subsidies.  However, Winn was a case about determining a plaintiff's injury for the purpose of taxpayer standing, a doctrine the Court has taken great effort to cabin.  Id. at 1445 (emphasizing "the general rule against taxpayer standing").  The Court did not rely on Walz for the distinction it made between exemptions and subsidies in the standing context and defendants do not explain how the distinction in Winn applies to a case about the substantive scope of the establishment clause.

In sum, I conclude that defendants cannot rely on Walz or Winn to preserve § 107(2).

5.  Other cases

In addition to Texas Monthly, there are other cases in which the Supreme Court has held that it violates the establishment clause to single out religious beliefs for preferential treatment without providing a similar benefit to secular individuals or groups.  For example, in Community for Public Education v. Nyquist, 413 U.S. 756, 793 (1973), the Court concluded that tax exemptions for parents of children in sectarian schools violated the establishment clause, reasoning that "[s]pecial tax benefits . . . cannot be squared with the principle of neutrality established by the decisions of this Court."  And in Estate of Thornton v. Caldor, Inc., 472 U.S. 703 (1985), in an opinion by Chief Justice Burger (the author of Walz), the Court held that it violated the establishment clause to give employees an "unqualified" right not to work on the Sabbath because it meant "that Sabbath religious concerns automatically control over all secular interests at the workplace" and "the statute takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath."  Id. at 709.  See also  Grumet, 512 U.S. at 708-09 ("[A] statute [may] not tailor its benefits to apply only to one religious group.").

In addition to these Supreme Court cases, there are several cases in which other courts have concluded that tax exemptions violated the establishment clause when they benefited religious groups only. E.g., Finlator, 902 F.2d at 1162  (striking down sales tax exemption for Bibles); Haller, 728 A.2d at 355 (striking down sales tax exemption for

"religious publications"); <u>Appeal of Springmoor, Inc.</u>, 498 S.E.2d 177 (N.C. 1998) (striking down property tax exemption for nursing homes "owned, operated and managed by a religious or Masonic organization"); <u>Thayer v. South Carolina Tax Commission</u>, 413 S.E.2d 810, 813 (S.C. 1992) (striking down sales tax exemption for "religious publications").  <u>See also</u> <u>American Civil Liberties Union Foundation of Louisiana v. Crawford</u>, CIV.A. 00-1614, 2002 WL 461649 (E.D. La. Mar. 21, 2002) (granting preliminary injunction against tax exemption provided to places of accommodation "operated by religious organizations for religious purposes").  Defendants cite no cases to the contrary, with the exception of cases involving § 1402, which are distinguishable for the reasons explained above.

6.  <u>Purpose and effect of § 107(2)</u>

      In an attempt to show that neither the purpose nor the effect of § 107(2) is to advance or endorse religion, defendants argue that the provision actually *eliminates* discrimination among different religions and between religious and nonreligious persons. In support of this view, defendants say that the impetus for both § 107(1) and § 107(2) can be traced to the "convenience of the employer" doctrine, under which employees would not be taxed under certain circumstances on the value of housing provided by their employer. <u>Commissioner of Internal Revenue v. Kowalski</u>, 434 U.S. 77, 85-86 (1977).  The Treasury Department began applying the doctrine in 1919, shortly after the federal government began collecting income tax, using the rationale that housing should not be viewed as compensation if it is provided by the employer to enable an employee to do his job properly.  <u>Id.</u> at 84-90.

29

Examples of employees who received the exemption included seamen and hospital workers who were required to be on call 24 hours a day.  Id. at 84, 86.  In 1954, Congress codified the exemption in 26 U.S.C. § 119, which allows an employee to exclude from his gross income "the value of any . . . lodging furnished to him, . . .  but only if . . .  the employee is required to accept such lodging on the business premises of his employer as a condition of his employment."

According to defendants, in 1921 the Treasury Department refused to apply the convenience of the employer doctrine to ministers who lived in church-provided housing. (Plaintiffs dispute that view, but I need not resolve that dispute for the purpose of this opinion.)  Defendants say that, in response, Congress passed § 213(b)(11) of the Revenue Act of 1921, which allowed ministers of the gospel to exclude from their gross income the rental value of housing they received as part of their compensation.  (That exemption later became § 107(1).)  Finally, defendants say that the purpose of § 107(2) when it was enacted in 1954 was to eliminate discrimination against ministers who could not claim the already existing exemption for ministers who lived in parsonages.  In particular, defendants say that § 107(2) was needed to help "less-established and less wealthy religions [that] were not able to provide housing for their spiritual leaders."  Dfts.' Br., dkt. #44, at 33.  Defendants cite a committee report from the House of Representatives in support of their view:

> Under present law, the rental value of a home furnished a minister of the gospel as a part of his salary is not included in his gross income. This is unfair to those ministers who are not furnished a parsonage, but who receive larger salaries (which are taxable) to compensate them for expenses they incur in supplying their own home.

> Your committee has removed the discrimination in existing law by providing that the present exclusion is to apply to rental allowances paid to ministers to the extent used by them to rent or provide a home.

H.R. Rep. No. 1337, at 15, <u>available in</u> U.S. Code Congressional and Administrative News, 83rd Congress, Second Session, at 4040 (1954).

Plaintiffs challenge defendants' view that the purpose of § 107(2) was to eliminate religious discrimination by quoting a statement from Representative Peter Mack, the sponsor of the 1954 law, :

> Certainly, in these times when we are being threatened by a godless and anti-religious world movement we should correct this discrimination against certain ministers of the gospel who are carrying on such a courageous fight against this. Certainly this is not too much to do for these people who are caring for our spiritual welfare.

Hearings Before the H. Comm. on Ways & Means, 83rd Cong. 1, at 1574-75(June 9, 1953) (statement of Peter F. Mack, Jr ), dkt. #51-9.  Plaintiffs argue that Mack's statement shows that § 107(2) "was deliberately intended to send a message of support for religion during the Cold War."  Plts.' Br., dkt. #52, at 52.

The difference between plaintiffs' and defendants' view of the purpose of § 107(2) is more semantic than substantive.  Under either view, the point of the law was to assist a subset of religious groups, which, as I will explain below, is not a secular purpose under the establishment clause.

Because the validity of § 107(1) is not before the court, I must assume for the purpose of this case that Congress did not violate the establishment clause by granting a tax exemption on the rental value of a home provided to a minister as part of his compensation.

31

However, by defendants' own assertion, the purpose of § 107(1) was to eliminate discrimination between secular and religious employees by giving ministers a similar exemption to the one now codified in 26 U.S.C. § 119 for housing provided to an employee for the convenience of the employer.  Assuming this is correct, it does little to help justify the later enactment of § 107(2), which expanded the exemption to include not just the value of any housing provided but also the portion of the minister's salary designated for housing expenses.  Defendants say that § 107(2) was needed to eliminate discrimination against certain religious sects, particularly those that were "less wealthy and less established," but there are multiple problems with that argument.

To begin with, defendants are wrong to suggest that § 107(2) was needed to eliminate religious discrimination.  Section 107(1) is not discriminatory in the sense that it singles out certain religions for more favorable treatment; rather, it gives a benefit to ministers who meet certain housing criteria, just as § 119 gives a benefit to employees who meet certain housing criteria.  Although not all ministers can qualify for the exemption, the same is true for secular employees under § 119.  In other words, § 107(1) no more "discriminates" against ministers who purchase their own housing than § 119 "discriminates" against secular employees who purchase their own housing.  Because the distinction made in both statutes relates to the type of housing the employee has rather than religious affiliation, there is no religious discrimination. Under defendants' view, if one religious person received a tax exemption, then Congress would be compelled to give every religious person the same exemption, even if the exemption had nothing to do with religion.

Further, to the extent that § 107(1) discriminates among religions, § 107(2) does not eliminate that discrimination but merely shifts it. In particular, § 107(2) discriminates against those religions that do not *have* ministers. Erwin Chemerinsky, The Parsonage Exemption Violates the Establishment Clause and Should Be Declared Unconstitutional, 24 Whittier L. Rev. 707, 723 (2003) ("[S]ection 107(2) itself discriminates among religions: It offers a huge financial benefit to those religions and churches that have clergy as compared to those which do not. Moreover, it discriminates among clergy based on the specific tasks they are performing."); Thomas E. O'Neill, A Constitutional Challenge to Section 107 of the Internal Revenue Code, 57 Notre Dame L. Rev. 853, 865-66 (1982) ("Section 107(2) may unconstitutionally prefer certain religions over others. For example, a congregational religion with no permanent or specifically designated ministers would not receive section 107(2)'s financial benefits as would a centralized religion with a designated ministry."). In addition, § 107(2) creates an imbalance even with respect to those ministers who benefit from § 107(1) because ministers who get an exemption under § 107(2) can use their housing allowance to purchase a home that will appreciate in value and still can deduct interest they pay on their mortgage and property taxes, resulting in a greater benefit than that received under § 107(1). Chemerinsky, 24 Whittier L. Rev. at 712; 26 U.S.C. § 265(a)(6) ("No deduction shall be denied under this section for interest on a mortgage on, or real property taxes on, the home of the taxpayer by reason of the receipt of an amount as. . . (B) a parsonage allowance excludable from gross income under section 107").

In any event, even if I assume that the exemption in § 107(2) applies equally to all

religions, that would not solve the problem because the provision applies to religious persons *only*. Congress did not incorporate an exemption for secular employees into § 107(2) or expand § 119 to accomplish a similar result. Kowalski, 434 U.S. at 84-96 (rejecting interpretation of § 119 that would extend it to cash allowances). A desire to assist disadvantaged churches and ministers is not a secular purpose and it does not produce a secular effect when similarly disadvantaged secular organizations and employees are excluded from the benefit. Nyquist, 413 U.S. at 788-89 (law motivated by desire to help "low-income parents" send children to sectarian schools "can only be regarded as one 'advancing' religion"). The establishment clause requires neutrality not just among the various religious sects but between religious and secular groups as well. McCreary County, 545 U.S. at 875-76 ("[T]he government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause."); Nyquist, 413 U.S. at 771 ("[I]t is now firmly established that a law may be one 'respecting an establishment of religion' even though its consequence is not to promote a 'state religion,' and even though it does not aid one religion more than another but merely benefits all religions alike.") (internal citation omitted); Gillette v. United States, 401 U.S. 437, 450 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes . . . to favor the adherents of any sect or religious organization."). Under defendants' view, there would be no limit to the amount of support the government could provide to religious groups over secular ones.

Alternatively, defendants cite provisions in the tax code granting housing allowance

34

exemptions for nonreligious reasons as evidence that § 107(2) does not advance religion. First, under 26 U.S.C. § 134, members of the military may exclude from their gross income any "qualified military benefit," which includes a housing allowance. 37 U.S.C. § 403. Second, under 26 U.S.C. § 911, United States citizens who live abroad may deduct a portion of their housing expenses from their gross income. Finally, under 26 U.S.C. § 912, certain federal employees who live abroad may exclude from their gross income "foreign area allowances," which may include housing expenses.

In Texas Monthly, 489 U.S. at 14, the plurality acknowledged that a tax exemption benefiting sectarian groups could survive a challenge under the establishment clause if the exemption was "conferred upon a wide array of nonsectarian groups as well." However, the Court rejected the argument that it was enough to point to a small number of secular groups that could receive a similar exemption for a different reason:

> The fact that Texas grants other sales tax exemptions (e.g., for sales of food, agricultural items, and property used in the manufacture of articles for ultimate sale) for different purposes does not rescue the exemption for religious periodicals from invalidation. What is crucial is that any subsidy afforded religious organizations be warranted by some overarching secular purpose that justifies like benefits for nonreligious groups.

Texas Monthly, 489 U.S. at 15 n.4.

In this case, defendants have not identified an "overarching secular purpose" that justifies both § 107(2) and the other exemptions they cite. Defendants suggest vaguely that all of the recipients have "unique housing needs," Dfts.' Br., dkt. #44, at 39, but they never identify how the needs of ministers who do not live in employer housing are different from those of any other taxpayer. In their reply brief, defendants say that § 107 is like the other

35

statutes in that all of them involve "[p]eople whose housing is dictated by their work," Dfts.' Br., dkt. #53, at 20, but that argument is disingenuous because it applies only to § 107(1), which is not at issue in this case. Section 107(2) does not include any limitations on the type or location of housing that a minister purchases or rents, so it cannot be described as being related to the convenience of the employer doctrine.

Each of the other statutes defendants cite involving exemptions for secular employees was motivated by a purpose specific to the particular group involved. For example, the purpose of § 911 is to protect American business people living overseas from *double* taxation, Brewster v. Commissioner of Internal Revenue, 473 F.2d 160, 163 (D.C. Cir. 1972), and the purpose of § 912 is to insure that "federal civilian employees should be adequately reimbursed for additional expenses necessarily incurred because of their overseas services." Anderson v. United States, 16 Cl. Ct. 530, 534 (1989). Thus, both of these statutes are less about giving a particular group preferential treatment and more about attempting to avoid penalizing particular taxpayers for engaging in work that provides a benefit to the United States.

Although I did not uncover a discussion of the purpose of § 134 in the case law, it seems obvious that it would be a mistake to rely on any benefit members of the military receive as providing an "overarching secular purpose" for giving a similar benefit to ministers or anyone else. Because members of the military are unique in the level of service they give to the government and the sacrifices they make, it is not surprising that they receive certain benefits not available to the general public. A housing allowance is only one of many

36

"qualified military benefits" that may be excluded from gross income.

Defendants say that § 912 (relating to federal civilian employees living overseas) is similar to § 107 in that its original scope was limited to employees who lived in housing provided by the government, but Congress expanded the exemption to cover housing allowances as well. Anderson, 16 Cl. Ct. at 534-35. This argument is a nonstarter because it does not change the fact that, unlike § 107(2), the purpose of both exemptions in § 912 is to alleviate special burdens experienced by certain taxpayers as a result of their living situation. In any event, any superficial similarity between § 107 and § 912 is irrelevant because a decision by the federal government to expand the scope of an exemption to more of its own employees as it did in § 912 does not implicate the establishment clause as does an exemption that singles out religious persons for more favorable treatment.

In sum, defendants cite no evidence that the concerns that motivated § 134, § 911 and § 912 have anything to do with § 107(2). Accordingly, I agree with plaintiffs that § 107(2) does not have a secular purpose or effect and that a reasonable observer would view § 107(2) as an endorsement of religion.

7. Applicability of § 107(2) to atheists

As discussed above, defendants argued in the context of addressing plaintiffs' standing to sue that it is "conceivable" that an atheist could qualify as a "minister of the gospel" under § 107. Dfts.' Br., dkt. #44, at 10. In the context of discussing the merits in their reply brief, defendants make a similar statement that an atheist could "make a claim" that he or she is

37

a minister of the gospel under § 107.  Dfts.' Br., dkt. #53, at 27.  In support of an argument that construing § 107(2) to include atheists would defeat plaintiffs' claim, defendants cite a passage in Justice Blackmun's concurring opinion in <u>Texas Monthly</u> that the tax exemption at issue in that case "might survive Establishment Clause scrutiny" if it included "atheistic literature distributed by an atheistic organization."  <u>Texas Monthly</u>, 489 U.S. at 49 (Blackmun, J., concurring in the judgment).  However, defendants never go so far as to argue that the phrase "minister of the gospel" § 107 could be interpreted reasonably as applying to an atheist.  In fact, they decline expressly to take a position on that issue.  Dfts.' Br., dkt. #44, at 10 ("The United States is not taking the position that any particular person would, in fact, qualify to claim the exclusion under § 107(2).").

I am not aware of any decision in which a majority of the Supreme Court considered whether a claim under the establishment clause would be defeated if the particular benefit at issue were granted to atheists, but still excluded secular groups.  At least in the context of this case, there is a plausible argument that the claim would survive.  Under <u>Lemon</u>, the question is whether the government has "advanced religion."  Thus, if atheism were included under the umbrella of "religion," § 107(2) still would advance religion over secular interests, even if the provision applied to atheists, because secular taxpayers still would be excluded from the benefit.  Further, regardless whether § 107(2) could be read to include an "atheist minister," the statute still discriminates against religions that do not employ ministers, as noted above.

Regardless, to the extent defendants mean to argue that § 107(2) is constitutional

because of an abstract possibility that an atheist could qualify as a minister of the gospel, I disagree.  Defendants are correct that courts must construe statutes to "avoid constitutional difficulties," Clark v. Martinez, 543 U.S. 371, 381-382 (2005), but that canon applies only if the statute is "readily susceptible to such a construction."  Reno v. American Civil Liberties Union, 521 U.S. 844, 884 (1997).  A court may not "rewrite a . . . law to conform it to constitutional requirements."  Id. at 884-885.

In this case, no reasonable construction of § 107 would include atheists.  In the concurring opinion in Texas Monthly that defendants cite, Justice Blackmun rejected as "facially implausible" an argument that atheistic literature could be included as part of "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith."  Texas Monthly, 489 U.S. at 29 (Blackmun, J., concurring in the judgment).  Defendants do not explain why they believe interpreting § 107 to include atheists is any more plausible.  Hearings Before the H. Comm. on Ways & Means, 83rd Cong. at 1574-75 (sponsor of § 107(2) stating that purpose of law was to help ministers who are "fight[ing] against" a "godless and anti-religious world movement").

The only authority defendants cite is Kaufman, 419 F.3d at 682, in which the court concluded that atheism could qualify as a religion under the free exercise clause for the purpose of that case.  However, the question under § 107 is not whether atheism is a religion but whether an atheist can be a "minister of the gospel," a very different question.  In Kaufman, the court cited Reed v. Great Lakes Cos., 330 F.3d 931, 934 (7th Cir. 2003), for

the proposition that religion under the free exercise could be defined simply as "taking a position on divinity," <u>Kaufman</u>, 419 F.3d at 682, but, as discussed above, qualifying as a "minister of the gospel" is much more complicated. Defendants cite no evidence that an "atheist minister" exists (a term that many might view as an oxymoron), let alone an atheist that satisfies the IRS's criteria for a "minister of the gospel," by performing "sacerdotal" functions, conducting "worship" services or acting as a "spiritual" leader under the authority of a "church."

8. <u>Entanglement</u>

With respect to the question whether § 107(2) fosters excessive entanglement between church and state, I see little distinction between this case and <u>Texas Monthly</u>, in which the plurality concluded that the Texas statute "appear[ed], on its face, to produce greater state entanglement with religion than the denial of an exemption" because granting the exemption required the government to "evaluat[e] the relative merits of differing religious claims" and created "[t]he prospect of inconsistent treatment and government embroilment in controversies over religious doctrine." <u>Texas Monthly</u>, 489 U.S. at 20 (plurality opinion). Defendants argue that "it is constitutionally permissible for a government to determine whether a person's belief is 'religious' and sincerely held," Dfts.' Br., dkt. #53, at 25, but, as discussed above, § 107 and its implementing regulations go well beyond a determination whether a belief is "religious," involving a complex and inherently ambiguous multifactor test. <u>Compare Kaufman</u>, 419 F.3d at 682 (concluding in four

40

paragraphs that atheism could qualify as a religion under free exercise clause) with Foundation of Human Understanding v. United States, 88 Fed. Cl. 203 (Fed. Cl. 2009) (32-page decision devoted entirely to question whether organization qualified as "church" under tax code).  See also Justin Butterfield, Hiram Sasser and Reed Smith, The Parsonage Exemption Deserves Broad Protection, 16 Tex. Rev. L. & Pol. 251, 264 (2012) (arguing in favor of the constitutionality of § 107, but acknowledging that "there is an entanglement problem" with the implementing regulations).

More persuasive is defendants' reliance on Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, — U.S. —,  132 S. Ct. 694, 699 (2012), in which the Supreme Court concluded that a "minister" could not sue a church for employment discrimination under Title VII.  Although the Court did not consider expressly whether a "ministerial" exception to Title VII created excessive entanglement, the Court applied the exception to the facts of the case without expressing any reservations.

Hosanna-Tabor is not on all fours with this case because, like Amos, it involved countervailing concerns that a contrary rule would lead to interference with "a religious group's right to shape its own faith and mission through its appointments." Hosanna-Tabor, 132 S. Ct. at 706.  In any event, because I have concluded that § 107(2) does not have a secular purpose or effect, I need not decide whether the provision fosters excessive entanglement between church and state.  Doe, 687 F.3d at 851 n. 15 ("Since we conclude that the District acted unconstitutionally on other grounds, we need not . . . consider the District's actions under Lemon's entanglement prong.").

41

C.  <u>Conclusion</u>

Although I conclude that § 107(2) violates the establishment clause and must be enjoined, this does not mean that the government is powerless to enact tax exemptions that benefit religion.  "[P]olicies providing incidental benefits to religion do not contravene the Establishment Clause." <u>Capitol Square Review & Advisory Board v. Pinette</u>, 515 U.S. 753, 768 (1995) (plurality opinion). In particular, because "[t]he nonsectarian aims of government and the interests of religious groups often overlap," the government is not "required [to] refrain from implementing reasonable measures to advance legitimate secular goals merely because they would thereby relieve religious groups of costs they would otherwise incur." <u>Texas Monthly</u>, 489 U.S. at 10 (plurality opinion).  Thus, if Congress believes that there are important secular reasons for granting the exemption in § 107(2), it is free to rewrite the provision in accordance with the principles laid down in <u>Texas Monthly</u> and <u>Walz</u> so that it includes ministers as part of a larger group of beneficiaries.  <u>Haller</u>, 728 A.2d at 356 (noting that Texas amended statute at issue in <u>Texas Monthly</u> to grant sales tax exemption to broader range of groups).   As it stands now, however, § 107(2) is unconstitutional.


ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by defendants Timothy Geithner and Douglas Schulman (now succeeded by Jacob Lew and Daniel Werfel), dkt. #40, is

GRANTED with respect to plaintiffs' Freedom from Religion Foundation, Inc.'s, Annie Laurie Gaylor's and Dan Barker's challenge to 26 U.S.C. § 107(1).  Plaintiff's complaint is DISMISSED as to that claim for lack of standing.

2.  Defendants' motion for summary judgment is DENIED as to plaintiffs' challenge to 26 U.S.C. § 107(2).  On the court's own motion, summary judgment is GRANTED to plaintiffs as to that claim.

3.  It is DECLARED that 26 U.S.C. § 107(2) violates the establishment clause of the First Amendment to the United States Constitution.

4.  Defendants are ENJOINED from enforcing § 107(2).  The injunction shall take effect at the conclusion of any appeals filed by defendants or the expiration of defendants' deadline for filing an appeal, whichever is later.

5.  The clerk of court is directed to enter judgment in favor of plaintiffs and close this case.

Entered this 21st day of November, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

43